## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS - WICHITA

|  |  |  |
|---|---|---|
|  | X |  |
| Ad Astra Recovery Services, Inc. |  | Civil Action No.: |
| Plaintiff, |  |  |
| vs. |  |  |
| John Clifford Heath, Esq.; John C. Heath, Attorney at Law, PLLC d/b/a Lexington Law Firm; Progrexion Holdings, Inc. d/b/a "Progrexion;" Progrexion Teleservices, Inc. d/b/a "Progrexion;" Kevin Jones, Esq.; Adam C. Fullman, Esq.; Lexington Consumer Advocacy, Inc.; and XYZ Corps. 1-20; John Does 1-20. |  |  |
| Defendant. |  |  |

## <u>COMPLAINT</u>

1.        Plaintiff, Ad Astra Recovery Services, Inc. ("<u>Ad Astra</u>"), brings this action against John Clifford Heath, Esq. ("<u>Heath</u>"), John C. Heath, Attorney at Law, PLLC d/b/a Lexington Law Firm ("<u>Lexington Law</u>"), Progrexion Holdings, Inc. d/b/a "Progrexion," ("<u>Progrexion Holdings</u>") Progrexion, Inc. d/b/a "Progrexion," Progrexion Teleservices, Inc. d/b/a "Progrexion," ("<u>Progrexion Teleservices</u>") (collectively referred to as "<u>Progrexion Entities</u>"), Kevin Jones, Esq. ("<u>Jones</u>"), Adam C. Fullman, Esq. ("<u>Fullman</u>"), Lexington Consumer Advocacy, LLC ("<u>Lexington Advocacy</u>"), XYZ Corps. 1-20, and John Does 1-20 (collectively, the "<u>Defendants</u>") for violation of the Racketeer Influenced and Corrupt Organizations Act ("<u>RICO</u>"), 18 U.S.C. § 1961 *et seq.,* as well as Tortious Interference with Existing Contractual Relations and Fraud and alleges as follows:

**The Racketeering Scheme**

2.        Ad Astra, a debt collection agency and credit furnisher in Wichita, Kansas,[1] brings this suit to remedy injuries it suffered, and continues to suffer, because of Defendants' predatory and fraudulent "credit repair" scheme.

3.        From in or about January 2014 to the present, Defendants engaged in a fraudulent credit repair scheme designed to bombard debt collectors with false credit dispute letters with the intention of deceiving debtor collectors, like Plaintiff, and frustrating their efforts to collect legitimate debts.

**Background of the Credit Repair Scheme**

4.        Pioneered by Heath, the principal of Lexington Law, Defendants prey upon the consumers that they purport to represent and defraud the credit and collections community.

5.        Using aggressive marketing techniques, Defendants solicit unsuspecting, financially troubled consumers and persuade them to sign up for their "credit repair" services. What Defendants do not tell the consumers is that the service they are pushing—to flood the consumers' creditors with generic (likely frivolous) credit report dispute letters—is something that Defendants cannot do in the manner in which they do it (that the consumers can do themselves, for free), and which is illegal and fraudulent.

6.        To carry out this fraudulent scheme, Defendants require that the consumer sign a "power of attorney" form permitting Defendants to draft and sign letters in their name.  But, Utah law requires that letters sent by an attorney indicate that they are *from* the attorney.  Defendants intentionally disregard Utah and other laws and generate and transmit mass credit dispute letters to creditors and collection agencies, like Plaintiff, by forging the consumer's signatures, without any indication that they are actually prepared and transmitted by Defendants.

---

[1] "An entity that furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report." 12 C.F.R. § 1022.41(c) (2015).

7.     Defendants' conduct is all the more egregious because they intentionally circumvent the confines of the Fair Credit Reporting Act, 15 U.S.C. § 1681 (hereinafter "FCRA") by the manner in which they prepare and send the disputes.

8.     In other words, a credit furnisher, like Ad Astra, is required to comply with certain onerous investigative requirements (as described below) when it receives a dispute directly from a consumer.  It is not, however, required to investigate a disputed item of information it receives from a credit repair organization (like Defendants).[2]  Here, Defendants intentionally manufactured and delivered fraudulent letters to Plaintiff with the goal of circumventing the restrictions of the FCRA.

9.     Many consumers had no idea that fraudulent credit repair letters were being sent with their signatures.

10.    Defendants were acting in concert with affiliated, mass-mailing companies to inundate Ad Astra with letters that the consumers on their own would not otherwise be able to effectuate in like volume.  Ad Astra received atleast 75,000 dispute letters from the Defendants over the past four years (not including the 200,000 electronic disputes it receives from them each year).

11.    Lexington Law and its affiliates brag on its website that it secured the removal of 9,000,000 tradelines,[3] but they do not disclose that they would have been unable to achieve such results had it not been for this illegal conduct.

12.    Defendant's fraudulent credit repair letters bare striking resemblance to each other—they contain similar language, recycled signatures, and unique stamps.  In some cases, the signatures for the same consumer varied by letter, and in others, dispute correspondence was received from consumers that *passed away*.

---

[2] *See* 12 C.F.R. § 1022.43(b)(2) (2015). See also 16 C.F.R. § 660.4(b)(2) (2015); 15 U.S.C. §1681s-2(a)(8)(G) (2012) [§ 623(a)(8)(G)] and 15 U.S.C. § 1679a(3)(B)(i) (2012) [§ 403(3)(B)(i)] for the applicable definition of a credit repair organization.

[3] A tradeline is an account listed on a consumer's credit report.  Each separate account constitutes a different tradeline. The tradeline information is provided by a credit furnisher (like Ad Astra) to the pertinent credit reporting agency.

13.     The fraudulent credit repair scheme has resulted in substantial damages to Plaintiff, including: (1) losses in revenue; (2) forced staff increases to manage the overwhelming influx of fraudulent correspondence; (3) costs associated with responding to the correspondence; (4) counsel fees; and (5) client relationships.

## Parties

14.     Plaintiff Ad Astra is, and at all times herein mentioned was, a corporation duly organized and existing under the laws of the State of Nevada.  Ad Astra is a debt collection agency and maintains a principal place of business in Wichita, Kansas. Ad Astra is a credit furnisher, as defined by Regulation V, 12 CFR Part 1022.  Ad Astra is accredited by the Better Business Bureau and duly licensed by various states and municipalities throughout the United States.

15.     Defendant Lexington Law is a law firm and Utah professional limited liability company that holds itself out as a Credit Repair Organization.  Its principal place of business is located at 360 N. Cutler Drive, North Salt Lake Utah, 84054.

16.     Defendant Heath is a natural person residing in Utah.  He is the "mastermind" of the fraudulent scheme, the principal (and a Directing Attorney) of Lexington Law, and admitted to practice law in Utah, Colorado, Washington D.C., Georgia, Texas, and New York.

17.     Lexington Consumer Advocacy, LLC is a limited liability company organized and existing under the laws of the State of Nevada.  Its principal place of business is located at 427 N. Tatnall Street #83166, Wilmington, Delaware, 19801-2230.  It also holds itself out as a Credit Repair Organization and operates in concert with Lexington Law and its affiliates.

18.     Defendant Jones is a natural person residing in Utah.  Jones is the Directing Attorney of Operations and Chief Compliance Officer for Lexington Law.  He is admitted to practice law in Florida, Utah, Maine and New Jersey.

19.     Defendant Fullman is a natural person residing in California.  Fullman is a Directing Attorney at Lexington Law.  He is also the founder of the Fullman Law Firm, P.C., d/b/a Lexington Law California ("Lexington Law California") (a law firm specializing in consumer

credit law and debt settlement, and an affiliate of Lexington Law and Lexington Advocacy[4]). (However, its website does not advertise its affiliation, or Fullman's affiliation, with Lexington Law.[5])

20.     Lexington Law and Lexington Advocacy are collectively referred to herein as the "Lexington Law Association."

21.     Defendant Progrexion Holdings, Inc. d/b/a "Progrexion" is, and at all times herein mentioned was, a corporation organized and existing under the laws of the State of Delaware.  Its principal place of business is located at 330 N. Cutler Drive, North Salt Lake, Utah, 84054 (the same office complex as Lexington Law).

22.     Defendant Progrexion Teleservices, Inc. d/b/a "Progrexion" is, and at all times herein mentioned was, a corporation organized and existing under the laws of the State of Delaware.  Its principal place of business is located at 330 N. Cutler Drive, North Salt Lake, Utah, 84054 (the same office complex as Lexington Law).

23.     The Progrexion Entities are the Lexington Law Associations' letter printer, mass-mailer, and conceded affiliates.[6]  Among other things, the Progrexion entities provide "dynamic, patent-pending processes and tools that assist consumers in achieving all [their credit repair] aims"[7] and they "prepare and dispatch" a "round[s] of communications" to creditors and credit bureaus.[8]

24.     The Progrexion Entities' website admits "[t]hrough its leading consumer brands, Lexington Law and CreditRepair.com, Progrexion helps clients frame the right questions about

---

[4] https://www.fullmanfirm.com/

[5] https://www.fullmanfirm.com/

[6] https://www.lexingtonlaw.com/

[7] https://www.progrexion.com/what-we-do/our-services

[8] https://www.progrexion.com/what-we-do/how-it-works

their credit, and to direct those questions to the right people, in order to ensure that credit reports remain fair, accurate, and entirely substantiated."[9]

25.     Defendants John Does Nos. 1-20 (the "Does") are additional individuals that participated in the fraudulent scheme but whose identities and/or roles are not yet known.  At such time as the true names and/or roles of the Does become known, Ad Astra will amend this Complaint accordingly.

26.     Defendants XYZ Corp. Nos. 1-20 (the "Unknown Entities") are additional entities that participated in the fraudulent scheme but whose names and/or roles are not yet known.  As such time as the true names and/or roles of the Unknown Entities becomes known, Ad Astra will amend this Complaint accordingly.

27.     Ad Astra is informed and believes, and based thereon alleges, that at the time of the acts, conditions, and events alleged in this Complaint, each of the defendants was acting as the agent, servant, employee, officer, director, partner, joint venturer, principal, master, manager, employer, and/or alter ego of each of the other defendants and is liable, directly and/or vicariously, for the wrongful acts and omissions of each of the Defendants that are the subject of this Complaint.

**Jurisdiction and Venue**

28.     This Court has jurisdiction over the claims for relief arising under RICO, pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964 because this cases arises under the laws of the United States.

29.     Supplemental jurisdiction exists over the state law causes of action pursuant to 28 U.S.C. § 1367(a) and 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.00.

30.     Declaratory relief is available under 28 U.S.C. §§ 2201 & 2202, and 18 U.S.C. § 1964(a).

---

[9] https://www.progrexion.com/what-we-do

31.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this District.  Venue is also proper under 18 U.S.C. § 1965 because Defendants transact business within this District.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

i.      Background on Credit Repair Organizations

32.     In September 2016, the Consumer Financial Protection Bureau issued a consumer advisory to alert consumers to companies that engage in potentially misleading credit repair services.[10]  Among other things, it said:

> Some credit repair companies recognize this fact [that consumers with financial troubles struggle to repair their credit] and have developed creative marketing tactics to target you. Sometimes this marketing includes confusing and misleading messaging aimed at taking advantage when you're just trying to get your financial life back on track. Credit repair companies often promise to improve your credit report by contacting credit reporting agencies on your behalf and challenging items on the reports. The fees these types of companies may charge are often high. You also can't remove negative information if it's accurate, and you might end up paying for no results.

33.     Also, "[u]nder the Fair Credit Reporting Act, you have a legal right to dispute credit history errors yourself for free. You don't have to pay a credit repair company to do it for you." *Id.* at p. 2.

34.     Credit Repair Organizations are governed by, among other things, the Credit Repair Organization Act, 15 U.S.C. § 1679a.

ii.     Defendants' Businesses

35.     According to its website,[11] Lexington Law emphasizes "strict regulatory compliance" and claims it has "redefined" the credit repair landscape.  Lexington Law claims it developed tools and strategies that have proven effective at removing unfair, inaccurate, and unsubstantiated items on its clients' credit reports.  It claims it "understand[s] the applicable

---

[10] https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/092016_cfpb_ConsumerAdvisory.pdf

[11] https://www.lexingtonlaw.com.

consumer protection laws" and "leverage[s] those legal rights" so that a consumers' credit report is fair, accurate, and substantiated." It claims to use its 27+ years of experience to help "many clients to turn their lives around." In 2016 alone, it claims "9,000,000 negative items" were removed from its clients' credit reports.

36.     Among other things, Lexington Law says it accomplishes these goals by reviewing its clients' credit reports and "directing appropriate correspondence" to their creditors and the credit bureaus.

37.     Lexington Law is not accredited by the Better Business Bureau, and, of the 223 reviews, 171 were negative, 48 were positive, and 4 were neutral.

38.     Lexington Law offers three plans for its services,[12] all of which include credit repair services:

- For the "PremierPlus" program, a consumer pays a $129.95 one-time "First Work Fee" and $129.95 per month thereafter;
- For the "Concord Premier" program, a consumer pays a $109.95 one-time "First Work Fee" and $109.95 per month thereafter; and
- For the "Concord Standard" plan, a consumer pays an $89.95 one-time "First Work Fee" and $89.95 per month thereafter.

39.     The Progrexion Entities' website makes identical claims as Lexington Law, and says "[w]e help leverage applicable consumer protection laws to ensure that credit report data is fairly reported, 100% accurate, and thoroughly substantiated."[13]

40.     In connection with its credit repair services, Lexington Law insists that its clients execute the following Power of Attorney form:

> Lexington Law will do its best to restore your good credit. To do so, we need your permission from you to write and sign letters to the credit bureaus and creditors in your name. By granting Lexington a power of

---

[12] https://www.lexingtonlaw.com/credit-repair-services/costs.

[13] https://www.progrexion.com/what-we-do/our-services

attorney you give Lexington permission to write letters on your behalf. Your electronic signature is a Power of Attorney and authorizes us to represent you under the Fair Credit Reporting Act and other laws. You may cancel your electronic authorization by sending the law firm an email notifying us that you retract your electronic authorization. Since we will not be able to represent you without this electronic authorization, cancelling it will also close your account.

41.     Under Utah law, this Power of Attorney does not authorize Lexington Law to sign letters on behalf of the consumers without indication that the letters are coming from Lexington Law.

42.     Also, the Power of Attorney is void and unenforceable under Utah's Power of Attorney Act, which directs that the following language be used on any power of attorney form: "Agent shall disclose your identity as an agent whenever you act for the principal by writing or printing the name of the principal and signing your own name as 'agent' in the following manner: (Principal's Name) by (your Signature) as Agent." *See* Utah Code § 75-9-301.

43.     According to its website,[14] Lexington Law has a network of thirty (30) attorneys.

44.     Lexington Law purports to have offices in numerous states outside of Utah, sometimes affiliated with local, "of counsel" law firms, including Arizona, Alabama, New Mexico, California, Delaware, Illinois, Louisiana, Kansas, Missouri, Maine, Maryland, Michigan, Mississippi, Nevada, North Carolina, New York, Ohio, Pennsylvania, West Virginia, South Carolina, and Virginia. It addition to Lexington Law California, other affiliated law firms include the Law Offices of LCM, P.C. d/b/a Lexington Law Group Illinois, P.C. and Lexington Law North Carolina.

45.     Many of the affiliated law firms/attorneys practice in areas primarily unrelated to credit repair, like criminal law, trusts and estates, and personal injury.

46.     Lexington Law aggressively solicits its clients, and has been sued numerous times for violating the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq* (the "TCPA") as a

---

[14] https://www.lexingtonlaw.com/about-lexington-law/profiles

152153.00601/107065388v.6

result of its telemarketing efforts.  The TCPA complaints generally allege that Lexington Law engages in unsolicited attorney advertising and SPAM.

    iii.        The Overwhelming Influx of Similar FCRA Dispute Letters

    47.        On or about January 2014, Ad Astra began receiving an influx of dispute letters (purportedly from consumers) concerning the accuracy of their credit reports.

    48.        The FCRA requires extensive administrative action by a credit furnisher when a consumer directly disputes their consumer report.  Among others, a furnisher must:

    (1) Conduct a reasonable investigation with respect to the disputed information;

    (2) Review all relevant information provided by the consumer with the dispute notice;

    (3) Complete its investigation and report the results of the dispute investigation to the consumer within thirty (30) days.  If the consumer provides additional relevant information after the start of an investigation, the furnisher will have forty-five (45) days to complete the investigation; and

    (4) If the investigation finds that the information reported was inaccurate, promptly notify each Consumer Reporting Agency that the furnisher provided inaccurate information to of that determination, and provide the Credit Reporting Agency with any correction to the information that is necessary to make the information provided by the furnisher accurate.[15]

    49.        If it's determined that a dispute is frivolous or irrelevant, including by reason of a failure by the consumer to provide sufficient information to investigate the disputed information, or a substantially similar dispute is received that was previously reviewed and discredited, the investigation can be terminated, and the consumer must be notified within five (5) business days of that determination.[16]

    50.        This "dispute" provision of the FCRA states that "[t]his paragraph shall not apply if the notice of the dispute is submitted by, is prepared on behalf of the consumer by, or is submitted

---

[15] See 12 C.F.R. § 1022.43(e) (2015). 16 C.F.R. § 660.4(e) (2015). See also 15 U.S.C. § 1681s-2(b)(1) (2012) [§ 623(b)(1)].

[16] See 15 U.S.C. § 1681s-2(8)(F).

on a form supplied to the consumer by, a credit repair organization, as defined in section 1679a(3) of this title, or an entity that would be a credit repair organization, but for section 1679a(3)(B)(i) of this title."[17]

51.      Ad Astra meticulously follows these administrative requirements, and acts accordingly in response to disputes received.

52.      While it is not uncommon for Ad Astra to receive FCRA dispute letters, the volume, content, format, and manner of mailing of the suspect letters was similar.

53.      Many of them contained affixed postage stamps that had an image of a sun shape, leaf, or a circle shape filled with stars.  The format and spacing of each letter was similar, and the way that the envelopes were printed and addressed was identical.  The font used in each letter was identical, or purposefully varied.  Curious verbiage was used—primarily too formal or which used uncommon, British phrases (for example, "problems may be extant," "I must request," "I must ask," "I must demand," "the unverified account," the "unvalidated account," "the questionable account," "the suspicious account," "the so-called account," "the ostensible account," "the asserted account," "the alleged account," "I want more than," "this request is for more than," "this is not a request for," "vacate such bureau items," "kindly vacate that bureau material," "kindly recall such tradelines," "rescind that bureau material," "I remain appreciative," "I appreciate your attending to this circumstance," "malevolent," "deleterious," "in alignment with," "materials dispatched from your company," "any data dispatched," and "I am grateful for your examining this circumstance."  Most of the letters concluded with some variation of quickly, such as "soon," "immediately," "promptly," "as soon as possible," "now," "rapidly," and "straightaway."  Even the signatures on the letters resembled each other.  Also, many of them had a similar type-o in Ad Astra's name, spelling it as "Ad Astra Recovery Servic" or "Ad Astra Recovery Serv."

---

[17] *See* 15 U.S.C. § 1681s-2(8)(G). *The exclusionary language of section 1679a(3)(B)(i) is inapplicable to Defendants.*

54.     By and large, the dispute letters did not indicate that they came from Defendants or any affiliated individual or company.[18]

55.     Over the span of the past four (4) years, Ad Astra received approximately 75,000 such (written) dispute letters.  In one case, Ad Astra received eleven dispute letters that supposedly originated with "SJ."[19]  Later, Ad Astra learned (from a CFPB complaint SJ filed) that she had retained Lexington Law.  Upon reviewing SJ's file, Ad Astra noted that her signature on the dispute letters received did not always match.  *See* Exhibit A.

56.      In another case, "KB" requested that Ad Astra respond to him by forwarding its response to the Legal Department at Lexington Advocacy.  *See* Exhibit B.

57.     Ad Astra also received phone calls from consumers who stated that they had never seen or signed dispute letters that Ad Astra received from them (in a manner that appeared to be directly from them, signed by them).

58.      Affected consumers also informed Ad Astra that they never provided Lexington Law with permission to sign the dispute letters in their name, without indication that the letters were actually coming from Lexington Law.  When Ad Astra began comparing the signatures of the consumers on the dispute letters with their signatures on documents that the consumers executed in connection with their debts, it was evident that they did not match.

59.      Ad Astra even came across a file where a consumer named "TW" passed away (on January 10, 2018), but miraculously sent two (2) dispute letters, supposedly from him and signed by him (but in the format, content and envelope-type of Lexington Law), after his death (on February 8, 2018 and March 9, 2018).  TW's Death Certificate and "zombie" dispute letters are annexed hereto as Exhibit C.

---

[18] In some instances, like Exhibit B, below, responses to Ad Astra's responses to the consumer dispute letters requested that further responses be directed to the Lexington Law Association.

[19] The consumer's full name has been redacted to protect her privacy.

60.     Ad Astra also began to piece together that electronic "eOscar" disputes (electronic FCRA disputes which can be submitted by the consumer to dispute tradelines under the FCRA[20]) were coming from Lexington Law, even though they were in the name of the consumer and did not indicate that they were actually coming from Defendants.  These "eOscar" disputes also required manpower to address, and costs to respond to.   Ad Astra believes it has received approximately 200,000 such disputes, attributable to Defendants, each year.

61.     The Lexington Law Association and individual defendants acted in concert with the Progrexion Entities, their admitted affiliates, to print and mail (or submit) the dispute correspondence.  This connection makes sense considering the recycled, computerized signatures, way in which the envelopes are printed and addressed, the similar array of stamps, volume, and fact that the vast majority of envelopes (see exhibits attached hereto) did not indicate, as mailings typically do, where they originated.

62.     The Defendants fraudulent credit repair letters are systematic and the false statements therein are material.  Defendants well know that, under the FCRA, if a dispute letter (or correspondence) comes from a consumer, it must be processed and their credit reports must be marked to indicate that the subject debt is "disputed."  Contrarily, if such a dispute comes from a Credit Repair Organization, these administrative actions need not be taken.

63.     In short, Defendants developed a massive, fraudulent scheme to collect money to perform a service that they were not legally able to perform in the manner performed.

64.     This disregard of the confines of the FCRA is Defendants' bread and butter, and how they are able to proclaim that they secured "9,000,000 credit bureau deletions."

65.     Plaintiff suspects that similar dispute correspondence is sent by Defendants regardless of whether the dispute is actually legitimate.

66.     But for Defendants' fraudulent scheme, consumers would be unable to send FCRA dispute correspondence en masse.

---

[20] http://www.e-oscar.org/

152153.00601/107065388v.6

67.     But for Lexington Law's conduct in soliciting clients, it would not have the volume of consumer-clients to send dispute correspondence en masse.

68.     But for Lexington Law's fraudulent scheme, the dispute correspondence would have been invalid under the FCRA and would not have required Ad Astra to expend such significant resources to address.  It also would not have frustrated Ad Astra's collection efforts as it did.

v.     The Confrontation and Subsequent Cover-Up

69.     Armed with information regarding the source of the fraudulent letters, Ad Astra's then-CEO, Dave Newman ("Newman") arranged a meeting with Heath in an attempt to address the crippling influx of correspondence.

70.     In September 2017, Newman called Heath and requested a meeting.  Heath agreed to a meeting, which took place at Lexington Law's Utah office on September 6, 2017.  Newman advised him of the logistical problems Ad Astra was having with their robo-disputes, and advised Heath of the number of disputes Ad Astra believed it was receiving from the Defendants and associated individuals/entities.  Heath acted clueless about the volume (but did not deny the possibility that Newman's numbers were accurate), and agreed to provide Newman with an exact breakdown.

71.     Heath also admitted that Defendants' clients were not signing the dispute letters—that they were in fact being generated and signed by a computer.  Apparently, the "computer" had several signature options, which randomly varied as the letters were generated, which explained the similar signatures that Ad Astra had already observed.

72.     Newman explained the damage to Ad Astra in terms of wasted time, postage, and other costs associated with processing and responding to each and every dispute, and suggested that the parties consider some mechanism to offset the influx.  At one point, Heath contacted Lexington Law's CFO (name unknown) to weigh in (which seemed strange to Newman since the principal was deferring to the company's CFO on such a topic), but nothing came of it.  Newman was invited to follow-up.

73.     Newman followed-up with Heath several times thereafter, by phone and email, but he never received a response.

74.     Upon information and belief, Heath ignored Newman's follow-up inquiries because he did not want to further incriminate himself or the Defendants.

75.     Despite Ad Astra "outing" the Defendants' fraudulent scheme, Ad Astra continues to receive the fraudulent credit repair dispute correspondence from them.

vi.      Further Allegations of Defendants' Involvement in the Fraudulent scheme

76.     Heath, as a Directing Attorney and principal of Lexington Law, personally implemented, and/or with knowledge such practices were contrary to law, acted consistent with, managed, oversaw, and enforced all of the illegal policies and procedures used by the Defendants that are alleged in this Complaint.

77.     Jones, who is responsible for day-to-day management and legal compliance of Lexington Law, personally implemented, and/or with knowledge such practices were contrary to law, acted consistent with, managed, oversaw, and enforced all of the illegal policies and procedures used by Defendants that are alleged in this Complaint.

78.     Fullman, as Directing Attorney of Lexington Law and Lexington Law California, personally implemented, and/or with knowledge such practices were contrary to law, acted consistent with, managed, oversaw, and enforced all of the illegal policies and procedures used by Defendants that are alleged in this Complaint.

vii.      Further Allegations of Racketeering Activity

79.     The fraudulent credit repair letters and eOscar disputes were furnished to mislead Ad Astra into believing that the consumers were acting on their own to dispute their debts.

80.     They were also furnished to prevent Ad Astra and other debt collection agencies from learning of the existence of the fraudulent scheme, and to frustrate its collection efforts. Defendants attempted to conceal this fraudulent scheme by attempting to disguise the signatures and dispute letters through the use of rotating templates and computerized signatures.

81.     Ad Astra reasonably relied upon these fraudulent misrepresentations because it had no reason to suspect that Defendants would lie about the source of the dispute correspondence.

82.     Defendants made hundreds of thousands of fraudulent and false statements and misrepresentations through the wires and mails, over the course of a four (4) year period.

83.     These fraudulent and false statements concealed material facts regarding the existence and conduct of the fraudulent scheme.  It also deprived Ad Astra of the legal ability to disregard the disputes since they were not actually prepared by and received from the consumer.

84.     This information was concealed for the purpose of deceiving Ad Astra and others into believing that the dispute correspondence was legitimate.

85.     Ad Astra acted in reasonable reliance of these fraudulent misrepresentations.

86.     As a proximate result of Defendants' misrepresentations and the concealment of the fraudulent scheme, Ad Astra was deprived of information necessary to appropriately act in response to the dispute correspondence or to make an informed decision.

87.     As a result of this reliance, Ad Astra suffered damages, in excess of $75,000.00, arising from:

- Payment of additional employee salaries to handle the dispute (approximately 6,000 of per month);

- Lost collection fee revenue for debts that are disputed by Defendants, likely without basis, instead of paid by the consumers;

- Lost revenue in collection fees for files that are recalled by clients as a result of Defendants' disputes;

- As a result of Ad Astra's diminished collections, its reputation and relationship with its clients has been tarnished;

- Postage paid to mail dispute responses;

- Costs incurred with Plaintiff's letter vendor;

- Costs of responding to eOscar disputes (200,000 per year at approximately $.35 each); and

- Counsel fees.

88.     These damages are continuing and subject to change once the full extent of the fraud is uncovered in discovery.

## FIRST CAUSE OF ACTION
*Claim against Defendants Heath, Jones, Fullman, Lexington Law, Progrexion Holdings, Progrexion Teleservices and Lexington Advocacy Under Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)*

89.     Ad Astra repeats and incorporates by reference the foregoing paragraphs of the Complaint as though fully set forth herein.

90.     Ad Astra is a "person" as defined by 18 U.S.C. §§ 1964(c) and 1961(3).

91.     Defendants Heath, Jones, Fullman, Lexington Law, Progrexion Holdings, Progrexion Teleservices, and Lexington Advocacy are natural persons and corporate entities, and are "persons" as defined by 18 U.S.C. §§ 1961(3) and 1962(c).

### *A.     The Enterprise*

92.     Defendants Heath, Fullman, Jones, the Progrexion Entities, Lexington Law, and Lexington Advocacy, as well non-defendants Lexington Law California, the Law Offices of LCM, P.C. d/b/a Lexington Law Group Illinois, P.C., and Lexington Law North Carolina (all led and managed by Heath), form an enterprise (the "Enterprise").

93.     Each Defendant is employed by or associated with the Enterprise.   These individuals and entities thus operate as an association in fact "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

94.     The purpose of the Enterprise is to defraud debt collection agencies by profiting off of "credit repair" services in a manner that is illegal and fraudulent.  This is accomplished by (1) the Lexington Law Association and Defendants associated therewith soliciting consumers for their "services," (2) the Lexington Law Association coordinating and drafting fraudulent credit repair dispute letters (3) the Progrexion Entities disguising the place of mailing and person mailing (or electronic forwarding, where applicable), and forwarding the fraudulent dispute letters to the Plaintiff and others in furtherance of the fraudulent scheme.   The Enterprise participants are

related, and the Enterprise is longstanding and ongoing in pursuit of such common purpose. Such participants act together for a common purpose and function as a continuing unit.

95.      From on or about January 2014 to the present, the Enterprise has been engaged in, and continues to be engaged in, activities that affect interstate commerce. This is apparent by their representation of consumers nationwide, Lexington Law Associations' offices throughout the country, and the facilitation of fraudulent dispute letters in all fifty states.

### B.      Pattern of Racketeering Activity – Mail and Wire Fraud

96.      Defendants conducted and participated in, directly and indirectly, the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5).

97.      Defendants devised a scheme and artifice to defraud, and obtain money or property by means of false or fraudulent pretenses, representations and promises in the ways described more fully above and including:

- Using aggressive marketing techniques to obtain consumer-clients;
- Concealing the fraudulent nature of their credit repair services, and charging a fee(s) for such services;
- Marketing and providing credit repair services that were illegal to provide in the manner in which they were provided;
- Utilizing unenforceable powers of attorney;
- Forging consumers' signatures on dispute correspondence;
- Misrepresenting the source and author of the dispute correspondence, and concealing that such correspondence had been drafted by, and from, the Defendants.
- Causing the U.S. Postal Service mails and interstate wires to be used (or other private and commercial interstate carriers), or reasonably knowing that the U.S. Postal Service mails and interstate wires would be used (or other private and commercial interstate carriers) to transmit forged, disguised, illegal communications in interstate commerce.

152153.00601/107065388v.6

98.     Defendants have used the mails and interstate wires in connection with every fraudulent dispute correspondence they have sent, and each use of the mails and wires was in furtherance of the fraudulent scheme and enabled Defendants to obtain money and property from Plaintiffs as partially described above and below as follows:

### Racketeering Acts

| | |
|---|---|
| Racketeering Act No. 1 | Dispute Letter sent to Plaintiff in Kansas through the U.S. Post Office from "JH," in the language and format (including mailing format) of other disputes from Defendants, dated July 28, 2017 (purportedly from a Texas address, but the envelope did not contain a Texas postmark) |
| Racketeering Act No. 2 | Dispute Letter sent to Plaintiff in Kansas through the U.S. Post Office from "JP," in the language and format (including mailing format) of other disputes from Defendants, dated July 28, 2017 (purportedly from a Texas address, but the envelope did not contain a Texas postmark) |
| Racketeering Act No. 3 | Dispute Letter sent to Plaintiff in Kansas through the U.S. Post Office from "JH," in the language and format (including mailing format) of other disputes from Defendants, dated July 28, 2017 (purportedly from a Texas address, but the envelope did not contain a Texas postmark) |
| Racketeering Act No. 4 | Dispute Letter sent to Plaintiff in Kansas through the U.S. Post Office from "AP," in the language and format (including mailing format) of other disputes from Defendants, dated August 9, 2017 (purportedly from a Virginia address—this time it had a Virginia postmark) |
| Racketeering Act No. 5 | Dispute Letter sent to Plaintiff in Kansas through the U.S. Post Office from "AB," in the language and format (including mailing format) of other disputes from Defendants, dated August 11, 2017 (purportedly from a Texas address, but the envelope did not contain a Texas postmark) |
| Racketeering Act No. 6 | Dispute Letter sent to Plaintiff in Kansas through the U.S. Post Office from "SF," in the language and format (including mailing format) of other disputes from Defendants, dated August 14, 2017 (purportedly from an Arkansas address, but the envelope did not contain an Arkansas postmark) |
| Racketeering Act No. 7 | Dispute Letter sent to Plaintiff in Kansas through the U.S. Post Office from "TB," in the language and format (including mailing format) of other disputes from Defendants, dated August 17, 2017 (purportedly from a Nevada address, but the envelope did not contain a Nevada postmark) |
| Racketeering Act No. 8 | Dispute Letter sent to Plaintiff in Kansas through the U.S. Post Office from "JH," in the language and format (including mailing format) of other disputes from Defendants, dated August 17, |

152153.00601/107065388v.6

| | |
|---|---|
| | 2017 (purportedly from a Texas address, but the envelope did not contain a Texas postmark) |
| Racketeering Act No. 9 | Dispute Letter sent to Plaintiff in Kansas through the U.S. Post Office from "RS," in the language and format (including mailing format) of other disputes from Defendants, dated August 18, 2017 (purportedly from a Texas address, but the envelope did not contain a Texas postmark) |
| Racketeering Act No. 10 | Dispute Letter sent to Plaintiff in Kansas through the U.S. Post Office from "NS," in the language and format (including mailing format) of other disputes from Defendants, dated August 18, 2017 (purportedly from an Illinois address, but the envelope did not contain an Illinois postmark); |
| Racketeering Act No. 11 | Dispute Letter sent to Plaintiff in Kansas through the U.S. Post Office from "KH," in the language and format (including mailing format) of other disputes from Defendants, dated October 20, 2017 (purportedly from a Missouri address, but the envelope did not contain a Missouri postmark). |
| Racketeering Act No. 12 | Approximately 800,000 eOscar disputes received by Plaintiff electronically in Kansas, via the browser-based eOscar portal, over the past four (4) years (see http://www.e-oscar.org/) |

All in violation of 18 U.S.C. §§ 1341 and 1343.

99.     Each of the thousands of uses of the mails and interstate wires made in connection with Defendants' fraudulent scheme, spanning a period of no fewer than four (4) years, constitutes a separate instance of mail and/or wire fraud within the meaning of 18 U.S.C. §§ 1341 and 1343, and taken together, constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

100.     Defendants knew that the interstate mails and interstate wires were/are utilized in furtherance of the fraudulent scheme, and/or it was reasonably foreseeable that the mails and interstate wires would be used.

101.     In connection with Defendants' fraudulent scheme, the acts of racketeering activity are related and occurred over a substantial period of time within ten (10) years of each other.  The racketeering acts are an ongoing part of Defendants' regular way of doing business.  The predicate acts are ongoing and have been and will be repeated.

152153.00601/107065388v.6

### C.   *Relationship of Pattern of Racketeering Activity to Enterprise*

102.     The pattern of racketeering activity described above is integral to Defendants' fraudulent scheme.  Without engaging in mail and wire fraud, Defendants' would be unable to offer their fraudulent credit repair scheme to consumers, and would be unable to transmit the fraudulent dispute correspondence in the manner that they do.

103.     Defendants' conduct involves and continues to pose a threat of long term criminality and has continued to the present.

104.     Each Defendant operates and manages the Enterprise's affairs as described above.

105.     Each Defendant intended to engage in the predicate acts with intent to defraud, with knowledge that such acts were wrongful and illegal.

106.     As a direct and proximate result of these RICO violations, Ad Astra was injured within the meaning of 18 U.S.C. § 1964(c).

107.     By reason of Defendants violations described above, Ad Astra is entitled to recover compensatory and treble damages in an amount in an amount to be determined at trial, in accordance with 18 U.S.C. § 1964, with interest from the date of loss and reasonable attorneys' fees.

### SECOND CAUSE OF ACTION
*Claim against Defendants Heath, Jones, Fullman, Lexington Law, Progrexion Holdings, Progrexion Teleservices and Lexington Advocacy Under Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d)*

108.     Ad Astra repeats and incorporates by reference the foregoing paragraphs of the Complaint as though fully set forth herein.

109.     Ad Astra is a "person" as defined by 18 U.S.C. §§ 1964(c) and 1961(3).

110.     Defendants Heath, Jones, Fullman, Lexington Law, Progrexion Holdings, Progrexion Teleservices and Lexington Advocacy are "persons" as defined by 18 U.S.C. §§ 1961(3) and 1962(d).

111.     As described in Paragraphs 92 – 95 above, the Enterprise is an association in fact within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which Enterprise has, at all relevant times, been engaged in activities that are in and affect interstate commerce in carrying out the fraudulent credit repair scheme.

112.     Each Defendant has unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate the provisions of 18 U.S.C. § 1964(c), including numerous predicate acts of mail and wire fraud described above, and has thus violated 18 U.S.C. § 1962(d).  Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in the furtherance of the fraudulent scheme, including the acts of racketeering set forth above.

113.     The Defendants took overt acts in furtherance of the scheme and to conceal the existence of the scheme from Ad Astra and others, including its own clients, as set forth above.

114.     By reason of the violation of 18 U.S.C. § 1964(d) committed by Defendants, Ad Astra was injured within the meaning of 18 U.S.C. § 1964(c), the full extent of which will be determined t trial.

115.     By reason of Defendants' violations described above, Ad Astra is entitled to three times its actual damages in accordance with 18 U.S.C. § 1964, with interest from the date of loss and reasonable attorneys' fees.

### THIRD CAUSE OF ACTION
*Claim against Heath, Jones, and Fullman Under Racketeer Influenced and*
*Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) [Alternative RICO Enterprise]*

116.     Ad Astra repeats and incorporates by reference the foregoing paragraphs of the Complaint as though fully set forth herein.

117.     Ad Astra is a "person" as defined by 18 U.S.C. §§ 1964(c) and 1961(3).

118.     Defendants Heath, Jones, and Fullman are "persons" as defined by 18 U.S.C. §§ 1961(3) and 1962(c).

### A.      The Alternative Enterprise

119.    Lexington Law is an "enterprise" (the "Alternative Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).   The Defendants operate and manage the Alternative Enterprise's affairs, and each Defendant is employed by or associated with the Alternative Enterprise.

120.    The purpose of the Alternative Enterprise is to defraud debt collection agencies by profiting off of "credit repair" services in a manner that is illegal and fraudulent.   This is accomplished by (1) Heath, Jones, Fullman, through Lexington Law, soliciting consumers for their "services," (2) Heath, Jones, Fullman, through Lexington Law, coordinating and drafting the fraudulent credit repair dispute letters, and (3) Heath, Jones, Fullman, through Lexington Law, disguising the place of mailing and person mailing (or electronic forwarding, where applicable), and forwarding the fraudulent dispute letters to Plaintiff and others in furtherance of the fraudulent scheme.

121.    From on or about January 2014 to the present, the Alternative Enterprise has been engaged in, and continues to be engaged in, activities that affect interstate commerce.   This is apparent by its representation and solicitation of consumers nationwide, Lexington Law's offices throughout the country, and Defendants' facilitation of fraudulent dispute letters in all fifty states.

### B.      Pattern of Racketeering Activity – Mail and Wire Fraud

122.    Defendants conducted and participated in, directly and indirectly, the Alternative Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5).   This pattern of mail and wire fraud is set forth above at Paragraphs 96 - 101.

123.    Defendants knew that the interstate mails and interstate wires were/are utilized in furtherance of the fraudulent scheme, and/or it was reasonably foreseeable that the interstate mails and interstate wires would be used.

124.    Each of the thousands of uses of the mails and interstate wires made in connection with Defendants' fraudulent scheme, spanning a period of no fewer than four (4) years, constitutes a separate instance of mail and/or wire fraud within the meaning of 18 U.S.C. §§ 1341 and 1343,

and taken together, constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

125.    In connection with Defendants' fraudulent scheme, the acts of racketeering activity are related and occurred over a substantial period of time within ten (10) years of each other.  The racketeering acts are an ongoing part of Defendants' regular way of doing business.  The predicate acts are ongoing and have been and will be repeated.

### C.    *Relationship of Pattern of Racketeering Activity to Enterprise*

126.    The pattern of racketeering activity described above is integral to Defendants' fraudulent scheme.  Without engaging in mail and wire fraud, Defendants would be unable to offer their fraudulent credit repair scheme to consumers, and would be unable to transmit the fraudulent dispute correspondence in the manner that they do.

127.    Defendants' conduct involves and continues to pose a threat of long term criminality and has continued to the present.

128.    Each Defendant operates and manages the Alternative Enterprise's affairs as set forth above.

129.    Each Defendant intended to engage in the predicate acts with intent to defraud, with knowledge that such acts were wrongful and illegal.

130.    As a direct and proximate result of these RICO violations, Ad Astra was injured within the meaning of 18 U.S.C. § 1964(c).

131.    By reason of Defendants violations described above, Ad Astra is entitled to recover compensatory and treble damages in an amount to be determined at trial, in accordance with 18 U.S.C. § 1964, with interest from the date of loss and reasonable attorneys' fees.

### FOURTH CAUSE OF ACTION
*Claim against Heath, Jones, and Fullman Under Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d) [Alternative RICO Conspiracy]*

132.    Ad Astra repeats and incorporates by reference the foregoing paragraphs of the Complaint as though fully set forth herein.

133.    Ad Astra is a "person" as defined by 18 U.S.C. §§ 1964(c) and 1961(3).

134.    Defendants Heath, Jones, and Fullman are "persons" as defined by 18 U.S.C. §§ 1961(3) and 1962(d).

135.    As set forth at Paragraphs 119 – 121 above, Lexington Law is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which Alternative Enterprise has, at all relevant times, been engaged in activities that are in and affect interstate commerce in carrying out the fraudulent credit repair scheme.

136.    Moreover, each Defendant has unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate the provisions of 18 U.S.C. § 1964(c), including committing numerous predicate acts of mail and wire fraud described above, and has thus violated 18 U.S.C. § 1962(d).  Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Alternative Enterprise's affairs through a pattern of racketeering activity in the furtherance of the fraudulent scheme, including the acts of racketeering set forth above.

137.    The Defendants took overt acts in furtherance of the scheme and to conceal the existence of the scheme from Ad Astra and others, including its own clients, as set forth above.

138.    By reason of the violation of 18 U.S.C. § 1964(d) committed by Defendants, Ad Astra was injured within the meaning of 18 U.S.C. § 1964(c), the full extent of which will be determined at trial.

139.    By reason of Defendants violations described above, Ad Astra is entitled to three times its actual damages in accordance with 18 U.S.C. § 1964, with interest from the date of loss and reasonable attorneys' fees.

## **FIFTH CAUSE OF ACTION**
*Claim against Defendants for Tortious Interference with Existing Contractual Relations*

140.    Ad Astra repeats and incorporates by reference the foregoing paragraphs of the Complaint as though fully set forth herein.

141.    Ad Astra has servicing agreements with each creditor-client.

152153.00601/107065388v.6

142.     Under those servicing agreements, Ad Astra is required to use its best efforts to satisfy certain collections benchmarks.  Also, Ad Astra is only paid for its services if it successfully collects debts.

143.     As industry experts, Defendants were aware of the existence and general terms of these servicing agreements and their interference was intentional and unjustified.

144.     Not only did the overwhelming influx of fraudulent dispute correspondence interfere with Ad Astra's ability to collect debts from the affected consumers, it frustrated Ad Astra's ability to achieve certain client benchmarks.  In addition, the resources Ad Astra had to divert to handle the dispute correspondence undermined its ability to successfully collect debts for its clients, or to hit certain client benchmarks.

145.     Defendants acted maliciously and improperly, for an improper purpose—they had no legal or actual right to charge consumers to send misrepresentative, unauthorized, dispute correspondence, and they were aware of the damage that Plaintiff would suffer, and continues to suffer.

146.     As a direct and proximate result of this interference, not only was Ad Astra's reputation with its clients jeopardized, Ad Astra suffered losses by way of lost revenue because of Defendants' fraudulent conduct.

**SIXTH CAUSE OF ACTION**
*Claim against Defendants for Fraud*

147.     Ad Astra repeats and incorporates by reference the foregoing paragraphs of the Complaint as though fully set forth herein.

148.     For the reasons described herein, Defendants knowingly misrepresented the source and author of the dispute correspondence.

149.     The misrepresentations were material.

150.     Defendants intentionally concealed the source and author of the dispute correspondence because they knew it would not have the same legal effect under the FCRA.  They

took these actions with intentional disregard for the truth and intent to deceive Plaintiffs into acting differently than they otherwise would.

151.     Ad Astra justifiably relied on the statements made in the dispute correspondence because there was no indication on the face of the correspondence that they came from a source other than the consumers.  As a result, Ad Astra undertook the extensive administrative processing that is required when dispute correspondence is received "directly from the consumer."

152.     Plaintiff was damaged by Defendants' conduct as set forth herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Ad Astra prays that judgment be entered in its favor against each and every Defendant, jointly and severally, as follows:

1. Compensatory damages, in excess of $75,000.00, for, among other things, the payment of additional salaries to process the fraudulent disputes, postage, letter vendor costs, eOscar response costs, counsel fees, damage to Plaintiff's reputation with its clients, and lost revenue, the full extent of which to be determined at trial;

2. Trebling of compensatory damages under 18 U.S.C. § 1964(c);

3. Punitive damages in an amount to be determined at trial;

4. A judgment declaring that Defendants have committed the violations of law alleged in this action;

5. An order enjoining and prohibiting Defendants from further engaging in conduct associated with the fraudulent scheme, as set forth in 18 U.S.C. § 1964(a);

6. Costs and reasonable attorneys' fees as provided by 18 U.S.C. § 1964(c) and other applicable law;

7. Pre and post judgment interest; and

152153.00601/107065388v.6

8.    Such other damages and other or further relief as this Court may deem just
and proper.

## **JURY DEMAND**

Plaintiff demands trial by jury in this Court with respect to all issues so triable.

Dated: Wichita, Kansas
        May 21, 2018

THOMPSON LAW FIRM, LLC

By:  s/ Lee Thompson
        Lee Thompson, No. 8361
        106 East 2nd Street
        Wichita, Kansas 67202
        Telephone: (316) 267-3933
        Fax: (316) 267-3901
        Email: lthompson@tslawfirm.com

        - and -

BLANK ROME LLP

        Hilary Korman (Pro Hac Vice pending)
        Scott Wortman (Pro Hac Vice pending)
        405 Lexington Avenue
        New York, New York 10174
        swortman@blankrome.com
        hkorman@blankrome.com
        (212) 885-5000 (Phone)
        (212) 885-3078 (Fax)

        Nicholas Harbist (Pro Hac Vice pending)
        300 Carnegie Center
        Suite 220
        Princeton, New Jersey 08540
        Harbist@blankrome.com
        (609) 750-7700 (Phone)
        (609) 750-7701 (Fax)

        *Attorneys for Plaintiff Ad Astra Recovery*
        *Services, Inc.*

152153.00601/107065388v.6

**<u>Exhibit A</u>**

October 14, 2016

S█████ J█████ 
███████████████

Ad Astra Recovery Servic
7330 W 33rd St N Ste 118
Wichita, KS 67205

Dear Sirs,

I hereby ask that Ad Astra Recovery Servic formally document consumer materials Ad Astra Recovery
Servic conferred to the credit bureaus for me, S████ J██████ with regard to the suspicious account
█████████. Since personally harmful reporting problems may exist within that dissemination, I am
compelled to demand that your company send all relevant data promptly. In addition please show that
collection behavior has been facilitated in accordance with applicable federal and state consumer
protections. I want more than only an account review. Instead, I am requesting a detailed verification. If
you cannot forward these materials within a reasonable time frame, any data disseminated by you to the
three credit CRAs should not be considered veracious and may indicate an intention to willfully violate
my rights as described by FDCPA or applicable laws. Given that occasion, remove that bureau material
rapidly.

I remain appreciative regarding your attending to this circumstance.

Sincerely,



S████ J██████



NORTH HOUSTON TX. 773

25 OCT 2016 PM 3 L

FOREVER USA



Ad Astra Recovery Servic
7330 W 33rd St N Ste 118
Wichita, KS  67205

67205-937043





July 29, 2016


Ad Astra Recovery Servic
3611 N Ridge Rd # 104
Wichita, KS  67205

Sir:

Ad Astra Recovery Servic must validate background information with respect to any consumer data reported to the major credit reporting agencies for me, S████ J█████, with regard to the unverified account number ████████. Given the possibility that problems may be extant in those files, I demand that your company mail these materials within one month.

Additionally, please include documentation which shows that you adhered to all provisions of the FDCPA or applicable laws and that you have not disregarded my right to privacy under HIPAA or other applicable consumer protection regulations during a time of physical illness during the period in question. You should send more than only an account statement. In lieu of that I am demanding a formal validation. If you cannot meet such lawful requirements during this reasonable period, account history dispatched by you to credit reporting agencies must be deemed erroneous and may bespeak your desire to abridge my federal rights. If this is the case, you must cancel those bureau reports straightaway.

I offer my sincere gratitude for your examining this circumstance.


Sincerely,



S████ J█████

RECEIVED

AUG 1 1 2016

Ad Astra Recovery





Ad Astra Recovery Servic
3611 N Ridge Rd # 104
Wichita, KS  67205

**<u>Exhibit B</u>**



Date: 09/22/2017

Account #:

AD ASTRA Recovery Services Inc.ZZ                    316-771-8880
Attn: Collections/Legal Department

To Whom it May Concern:

I appreciate your response, however, it does not address representations that were made to me which may
have been inappropriate.

How do you suggest we handle the situation because the documents do not reflect everything that was said?

Once again, Please again send your response to:

K___ Bu_____
Lexington Consumer Advocacy, LLC.
Attn. Legal Department
427 N Tatnall Street #83166
Wilmington, DE 19801-2230


FAX (888) 979-9187

Thank you,

Keith Burrell



Date: 09/18/2017

Account #:

AD ASTRA Recovery Services Inc.ZZ                      316-771-8880
Attn: Collections/Legal Department

To Whom it May Concern:

I am in receipt of your letter responding to my requests. Please be advised, you failed to answer all of
my requested information.

Therefore, I am demanding that you immediately send all of my requested information including, but
not limited to, the following:

1.      The HTML Email Creative used to solicit me.
2.      The URL Tracking link.
3.      The Affiliate Network used to promote your Online Ad to solicit me
4.      The Publisher (aka Spammer) who was paid to Email me.
5.      The time, date, and IP address from which you emailed me and from which you received
        correspondence from me.
6.      A copy of your Headersused in the solicitation (i.e. FromTo, Reply-To) – including the
        originating domain and email address.
7.      A list of your Subject Lines used in my Email Solicitation.
8.      Your Opt Out link provided in the Email Solicitation.

Again, please note that I am demanding that you provide the forgoing information/documentation
immediately. Specifically, please be sure to answer each and every one of my requests in a numbered
paragraph that corresponds to my request; if you do not have any of the requested
information/documentation, please outline clearly the reasons for not having, or maintaining, the
specific requests.

In the event that you fail to answer, or provide the information/documents supporting each request, it
shall be understood that your failure shall be considered proof that you do not have the
information/documentation which I have requested.  I want to simply confirm that you have the lawful
right to conduct business with me and that you complied with all of the laws related to our relationship.

Please again send your response to:

Ki▇▇▇B▇▇▇▇
Lexington Consumer Advocacy, LLC.
Attn. Legal Department
427 N Tatnall Street #83166
Wilmington, DE 19801-2230

FAX (888) 979-9187

Thank you,

To:   Page 2 of 2                    2017-09-18 17:04:46 (GMT)                    18889799187  From: L DP

K███B████

**<u>Exhibit C</u>**

STATE OF TEXAS
CERTIFICATION OF VITAL RECORD

# DEPARTMENT OF STATE HEALTH SERVICES
## VITAL STATISTICS UNIT

TEXAS DEPARTMENT OF STATE HEALTH SERVICES - VITAL STATISTICS

**STATE OF TEXAS**    **CERTIFICATE OF DEATH**    **STATE FILE NUMBER** 142-18-013436

| 1. LEGAL NAME OF DECEASED (Include AKA's, if any) (First, Middle, Last) | 2. DATE OF DEATH -ACTUAL OR PRESUMED (mm-dd-yyyy) |
|---|---|
| ████ H. ████ | JANUARY 10, 2018 |

| 3. SEX | 4. DATE OF BIRTH (mm-dd-yyyy) | 5. AGE-Last birthday (Years) | Under 1 Year Months Days | Under 1 Day Hours Min | 6. BIRTHPLACE (City & State or Foreign Country) |
|---|---|---|---|---|---|
| MALE | | 83 | | | MOORHEAD, MN |

| 7. SOCIAL SECURITY NUMBER | 8. MARITAL STATUS AT TIME OF DEATH | 9. SURVIVING SPOUSE'S NAME (If wife, give name prior to first marriage) |
|---|---|---|
| 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 | ☐ Married ☐ Widowed ☒ Divorced ☐ Never Married ☐ Unknown | |

| 10a. RESIDENCE STREET ADDRESS | 10b. APT. NO. | 10c. CITY OR TOWN |
|---|---|---|
| ████████ | | HOUSTON |

| 10d. COUNTY | 10e. STATE | 10f. ZIP CODE | 10g. INSIDE CITY LIMITS? |
|---|---|---|---|
| HARRIS | TEXAS | 77005 | ☐ Yes ☒ No |

| 11. FATHER'S NAME PRIOR TO FIRST MARRIAGE | 12. MOTHER'S NAME PRIOR TO FIRST MARRIAGE |
|---|---|
| H████ ████ W████ | ████ H. ████ |

| | 13. PLACE OF DEATH (CHECK ONLY ONE) |
|---|---|
| IF DEATH OCCURRED IN A HOSPITAL: ☒ Inpatient ☐ ER/Outpatient ☐ DOA | IF DEATH OCCURRED SOMEWHERE OTHER THAN A HOSPITAL: ☐ Hospice Facility ☐ Nursing Home ☐ Decedent's Home ☐ Other (Specify) |

| 14. COUNTY OF DEATH | 15. CITY/TOWN, ZIP (IF OUTSIDE CITY LIMITS, GIVE PRECINCT NO.) | 16. FACILITY NAME (If not institution, give street address) |
|---|---|---|
| HARRIS | HOUSTON, 77030 | MICHAEL E. DEBAKEY VA MEDICAL CENTER |

| 17. INFORMANT'S NAME & RELATIONSHIP TO DECEASED | 18. MAILING ADDRESS OF INFORMANT (Street and Number, City, State, Zip Code) |
|---|---|
| | |

| 19. METHOD OF DISPOSITION | 20. SIGNATURE AND LICENSE NUMBER OF FUNERAL DIRECTOR OR PERSON ACTING AS SUCH | 21. |
|---|---|---|
| ☐ Burial ☒ Cremation ☐ Donation ☐ Entombment ☐ Removed from state ☐ Other (Specify) | CARLY GONZALES ,BY ELECTRONIC SIGNATURE - 12319 | ☒ Unknown Section Block Lot Space |

| 22. PLACE OF DISPOSITION (Name of cemetery, crematory, other place) | 23. LOCATION (City/Town, and State) |
|---|---|
| CREMATE TEXAS | SOUTH HOUSTON, TX |

| 24. NAME OF FUNERAL FACILITY | 25. COMPLETE ADDRESS OF FUNERAL FACILITY (Street and Number, City, State, Zip Code) |
|---|---|
| VETERANS FUNERAL SERVICES | 10567 VETERANS MEMORIAL DR, HOUSTON, TX 77038 |

26. CERTIFIER (Check only one)
☐ Certifying physician-To the best of my knowledge, death occurred due to the cause(s) and manner stated.
☒ Medical Examiner/Justice of the Peace - On the basis of examination, and or investigation, in my opinion, death occurred at the time, date and place, and due to the cause(s) and manner stated.

| 27. SIGNATURE OF CERTIFIER | 28. DATE CERTIFIED (mm-dd-yyyy) | 29. LICENSE NUMBER | 30. TIME OF DEATH (Actual or presumed) |
|---|---|---|---|
| JENNIFER L ROSS, M.D., BY ELECTRONIC SIGNATURE | JANUARY 29, 2018 | N4746 | 05:37 PM |

| 31. PRINTED NAME, ADDRESS OF CERTIFIER (Street and Number, City,State,Zip Code) | 32. TITLE OF CERTIFIER |
|---|---|
| JENNIFER L. ROSS, M.D., 1861 OLD SPANISH TRAIL, HOUSTON, TX 77054 | ASSISTANT M.E. |

33. PART 1. ENTER THE CHAIN OF EVENTS - DISEASES, INJURIES, OR COMPLICATIONS - THAT DIRECTLY CAUSED THE DEATH. DO NOT ENTER TERMINAL EVENTS SUCH AS CARDIAC ARREST, RESPIRATORY ARREST, OR VENTRICULAR FIBRILLATION WITHOUT SHOWING THE ETIOLOGY. DO NOT ABBREVIATE. ENTER ONLY ONE CAUSE ON EACH.

|  | | Approximate interval Onset to death |
|---|---|---|
| IMMEDIATE CAUSE (First disease or condition resulting in death) → a. PENDING | Due to (or as a consequence of): | |
| Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST. b. | Due to (or as a consequence of): | |
| c. | Due to (or as a consequence of): | |
| d. | | |

| PART 2. ENTER OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH, BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN PART 1. | 34. WAS AN AUTOPSY PERFORMED? ☒ Yes ☐ No |
|---|---|
| | 35. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH ☐ Yes ☐ No |

| 36. MANNER OF DEATH | 37. DID TOBACCO USE CONTRIBUTE TO DEATH? | 38. IF FEMALE: | 39. IF TRANSPORTATION INJURY, SPECIFY: |
|---|---|---|---|
| ☐ Natural ☐ Accident ☐ Suicide ☐ Homicide ☐ Pending Investigation ☐ Could not be determined | ☐ Yes ☐ No ☐ Probably ☒ Unknown | ☐ Not pregnant within past year ☐ Pregnant at time of death ☐ Not pregnant, but pregnant within 42 days of death ☐ Not pregnant, but pregnant 43 days to one year before death ☐ Unknown if pregnant within the past year | ☐ Driver/Operator ☐ Passenger ☐ Pedestrian ☐ Other (Specify) |

| 40a. DATE OF INJURY (mm-dd-yyyy) | 40b. TIME OF INJURY | 40c. INJURY AT WORK? ☐ Yes ☐ No | 40d. PLACE OF INJURY (e.g. Decedent's home, construction site, restaurant, wooded area) |
|---|---|---|---|
| | | | |

| 40e. LOCATION (Street and Number, City,State,Zip Code) | 40f. COUNTY OF INJURY |
|---|---|
| | |

41. DESCRIBE HOW INJURY OCCURRED

| 42a. REGISTRAR FILE NO. | 42b. DATE RECEIVED BY LOCAL REGISTRAR | 42c. REGISTRAR |
|---|---|---|
| 0201451 | JANUARY 30, 2018 | REGISTRAR - CITY OF HOUSTON, ELECTRONICALLY FILED |

EDR NUMBER 000002237084

This is a true and correct reproduction of the original record as recorded in this office. Issued under authority of Section 191.051, Health and Safety Code.

ISSUED   FEB 02 2018

TARA DAS
STATE REGISTRAR

WARNING: THIS DOCUMENT HAS A DARK BLUE BORDER AND A COLORED BACKGROUND

RECEIVED

2-9-18

Ad Astra Recovery Servic
7330 W 33rd St N Ste 118
Wichita, KS  67205

Dear Sirs:

I am asking Ad Astra Recovery Servic to provide validation for all consumer data Ad Astra Recovery
Servic transmitted to the major consumer reporting agencies for me, T███ W████ regarding the
suspicious account ██████ Since deleterious serious problems may be present within that
information, I must ask that Ad Astra Recovery Servic send the formal validation within one month. Also,
please supplement with materials which verify that any third-party collection agency, if engaged, is
bonded to collect in my state of residence. This request is for more than just an account review. Rather,
I have requested a formal validation. If you cannot meet such lawful requirements within the reasonable
delineated period, details forwarded on behalf of Ad Astra Recovery Servic to the three credit bureaus
must not be regarded as factual and may indicate a statutory violation. Should this be the circumstance,
you must vacate that reported data as soon as possible.

I appreciate your examining this circumstance.

With regards,



T███ W█
████████, TX ████

RECEIVED

FEB 1 2 2018

Ad Astra Recovery Services





Ad Astra Recovery Servic

7330 W 33rd St N Ste 118

Wichita, KS 67205

AALOSS2 67205

03-09-2018

T███ W███
████████
████ TX ███



Ad Astra Recovery Servic
7330 W 33rd St N Ste 118
Wichita, KS  67205

Dear Ad Astra Recovery Servic Credit Reporting,

I request that you substantiate your claims concerning account data conferred to credit bureaus for my name, T███ W███, for the unverified account number ████. Since it is possible that errors may be in that file, I hereby request that Ad Astra Recovery Servic collect and forward this notarized validation within a month of receipt of this request. Moreover, please confirm that the account was established legally. Forward more than a simple statement without detail. Instead, this is a requisition for a full verification.

Should you be unable to comply with my request during this reasonable period, account compilations communicated from your company to the three credit bureaus must be regarded as inaccurate and may bespeak a statutory violation. Should this be the case, cancel those credit report items promptly.

Thank you for Ad Astra Recovery Servic's assistance in this regard.

Very truly yours,



T███ W███

RECEIVED
MAR 1 2 2018
Ad Astra Recovery Services



Ad Astra Recovery Servic
7330 W 33rd St N Ste 118
Wichita, KS 67205

BPALOPS2  67205