## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

AD ASTRA RECOVERY SERVICES, INC.,

      Plaintiff,

      v.

JOHN CLIFFORD HEATH, *ET AL.*,

      Defendants,

Case No. 18-1145-JWB-ADM

## MEMORANDUM AND ORDER

This matter comes before the court on Plaintiff's Motion to Disqualify Defendants' Counsel (ECF No. 164). Plaintiff Ad Astra Recovery Services, Inc. ("Ad Astra") seeks disqualification of the *pro hac vice* attorneys representing Defendant Kevin Jones and a declaration that the general release entered into by Mr. Jones and his former employer, a codefendant, is null and void because it violates a federal anti-gratuity statute and amounts to payment for testimony. Ad Astra also contends that that the firm's "enforcement" of the release and other nonconsentable conflicts among Mr. Jones and his codefendants, previously represented by the same firm, require disqualification of Mr. Jones' counsel.[1]

---

[1] Ad Astra's motion seeks "the entry of an order disqualifying Brent W. Martinelli, Esq., Steven Wood, Esq., and the law firm of Quintairos, Prieto, Wood & Boyer, P.A. from continued representation [of all defendants]." (ECF No. 164, at 1.) Inexplicably, the motion does not reference Frank Alvarez, an attorney of record at the same firm also representing Mr. Jones and formerly representing his codefendants. It is also unclear why Ad Astra moved to disqualify the firm as to all defendants. At a conference on March 24, 2020—before Ad Astra filed the present motion—defense counsel clarified that these attorneys now only represent Mr. Jones. Mr. Jones maintains that position in this briefing. (ECF No. 181, at 2.) Ad Astra does not contend this is incorrect, and so it is not apparent why Ad Astra moved to disqualify attorneys from representing clients that they do not currently represent.

The court disagrees. Ad Astra's arguments are largely unsupported, both legally and factually. The agreement between Mr. Jones and his former employer is a standard release by which Mr. Jones agreed to release any claims he may have had in exchange for a better severance package than he would have received under his employment agreement. It is not a contract for or because of his testimony. Ad Astra attempts to transform a standard release and Mr. Jones' fairly mundane criticisms of the firm and his former boss into a basis for disqualifying his counsel of choice and having the court declare the release null and void because it violates a federal criminal statute. Such relief is unwarranted given the record before the court and the absence of any legal authority to support the relief Ad Astra seeks. Accordingly, for the reasons explained in greater detail below, Ad Astra's motion is denied.

## I.    BACKGROUND

Ad Astra is a debt collector and credit agency that alleges defendants "engaged in a fraudulent credit-repair scheme designed to bombard debt collectors with false credit dispute letters with the intention of deceiving debt collectors . . . and frustrating their efforts to collect legitimate debts." (Am. Compl. ¶ 3 (ECF No. 120).) At the center of the allegations is that John C. Heath, Attorney at Law, PPLC, d/b/a Lexington Law Firm ("Lexington Law"), related corporate entities, attorneys with Lexington Law, and the CEO of some of the related corporate entities used deceptive marketing techniques to solicit financially troubled consumers by offering services from a law firm in hopes that the consumers would sign up for their credit-repair services. (*Id.* ¶ 5.) According to Ad Astra, once consumers signed up, Lexington Law would transmit mass credit-dispute letters to creditors in the consumer-clients' names without disclosing that the firm prepared

_____

To that extent, the motion is denied as moot. Because the firm currently represents only Mr. Jones, the court addresses the motion as to Mr. Jones' representation.

and transmitted them.  Ad Astra alleges this practice was designed to circumvent the Fair Credit Reporting Act and cause Ad Astra to perform certain onerous statutory investigative requirements. (*Id.* ¶¶ 6-9.)  Ad Astra asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).  Ad Astra also asserts Kansas common law claims for fraud and tortious interference with existing contractual relationships.

Ad Astra filed this lawsuit on May 21, 2018, naming, among others, Mr. Jones, who served as the firm's managing attorney of firm operations.  (ECF No. 1.)  At that time, counsel Brent W. Martinelli, Frank Alvarez, and Steven A. Wood of the Dallas law firm Quintairos, Prieto, Wood & Boyer, PA ("Quintairos") represented all defendants, including Mr. Jones.  According to Mr. Jones, Quintairos represented all defendants based on the common allegations against them, including that defendants acted in concert.  (ECF No. 120, at ¶11, ¶73; and ECF No. 181, at 3.) Defendants generally deny the allegations and maintain that their conduct was not fraudulent.

Years before this lawsuit was filed, Mr. Jones had an employment agreement with Lexington Law that was effective September 16, 2014.  It provided him with various levels of severance packages for a "qualifying termination," including payment of Mr. Jones' base salary, prorated target bonus, and health benefits.  (ECF No. 167-3, at 14.)  If a qualifying termination occurred before September 15, 2014, the payments/benefits would last 24 months; if a qualifying termination occurred between September 15, 2014, and September 15, 2015, the payments/benefits would last twelve months; and, if a qualifying termination occurred after September 15, 2015, the payments/benefits would last six months.  (*Id.*)

Mr. Jones' 14-year employment relationship with Lexington Law ended on March 26, 2019, about ten months into this case.  At that time, Lexington Law and Mr. Jones entered into a release agreement.  Quintairos had no part in drafting or negotiating the release.  (ECF No. 175-2,

at 3.)  The release provides that Mr. Jones agreed to release all claims he may have had against Lexington Law and its vendors (many of which are codefendants) arising out of, based on, or related to "the termination of employment of the undersigned by the Releasees" in exchange for a severance package.  (ECF No. 167-2, at 1.)  The release also addresses Mr. Jones' representation in this lawsuit.  It states that so long as Mr. Jones "remains in a non-adversarial position vis-à-vis the Company in this litigation, the Company will continue to pay the defense costs to cover the undersigned's activities as an employee of the Company."  (*Id.* at 3.)  It specifies that Mr. Jones' communications with defense counsel must be coordinated through Progrexion ASG's litigation manager.  (*Id.*)  The release also states that if Mr. Jones' interests became adversarial, he agrees to immediately engage separate defense counsel and bear the costs of his personal representation. (*Id.*)  The release also provides that if this lawsuit results in a damages award against Mr. Jones personally resulting from his activities as an employee, "the Company shall pay the damages awards."  (*Id.*)  The release contains confidentiality and non-disparagement clauses but also specifies that "nothing herein shall be construed to prevent the undersigned from providing truthful testimony to any court or tribunal pursuant to legal process."  (*Id.*)  The severance portion provides for twelve monthly installment payments that total Mr. Jones' annual salary, standard benefits for that period, reimbursement for COBRA costs, his 2018 bonus, CLE costs, bar registration dues, and costs for legal or accounting advice.  (*Id.* at 6.)

Ad Astra deposed Mr. Jones on September 24, 2019.  This was about six months after he stopped working for Lexington Law.  Ad Astra highlights certain aspects of Mr. Jones' deposition testimony, including the fact that he voiced criticism of some of the language used in the letters Lexington Law sent to credit furnishers—that they "look like they're written by someone who speaks English as a second language."  (ECF No. 165-2 at 40:20-24; 41: 5-8.)  He also testified

that he raised concerns about Progrexion's encroachment in Lexington Law's decision-making process, and he raised questions about why letters were not sent on firm letterhead. (*Id.* at 41:16-17; 42:20-25.)

Mr. Martinelli represented Mr. Jones at the deposition, and he improperly instructed Mr. Jones not to answer questions relating to the release in order to prevent Mr. Jones from violating the release's confidentiality provision. (ECF No. 165-2, at 101:6-102:22.)  Mr. Jones testified that he was concerned about discussing the release in the event it could be a breach that could create liability. (*Id.* at 14:20-23; 21:4-12.)  But he also testified that, as a licensed attorney, he had ethical obligations and assured Ad Astra's counsel that "if someone sued me in an attempt to color my testimony, I would turn them in immediately to the judge."  (ECF No. 175-4, at 236:15-237:2.).  The following day, Ad Astra deposed Mr. Heath.  Counsel for Mr. Heath raised the same objections to questions about the release.  At the parties' request, the court convened a telephone conference and instructed the parties that Mr. Health must answer the questions because counsel could not instruct a witness not to answer based on a confidentiality objection.  (ECF No. 73.)

Ad Astra reconvened Mr. Jones' deposition on October 3.  He testified that he believed Mr. Heath "spins facts" but that he would hesitate to call anyone dishonest. (*Id.* at 272:13-15.)  In response to a question about Mr. Heath's recollection that the two were just "work friends," Mr. Jones stated that he had spent time with Mr. Heath outside of work multiple times. (*Id.* at 271:11-13.)  He also disagreed with Mr. Heath's statements about the reason for Mr. Jones' separation from Lexington Law—that Mr. Jones would not show up to work for some time and would not finish tasks as assigned. (*Id.* 277:8.)  He further stated that he was not screening his testimony based on a fear that Lexington Law would stop indemnifying him.  He pointed out that the "agreement says that, you know, they can't interfere with my ability to testify in any type of

judicial proceeding or talk to governmental entities or agencies if I have a compliant to file against Lexington or Progrexion. So, I don't feel that threat." (ECF No. 175-5, at 280:10-19.) By the time of Mr. Jones' deposition, he had already been receiving his installment payments under the release, and Lexington Law continued making those payments after his deposition. (ECF No. 181, at 2.)

By late November, Mr. Jones' codefendants hired Williams & Connolly, LLP to represent them. Quintairos' representation of those defendants ceased, but the firm continued to represent Mr. Jones. On December 26, one of the Williams & Connolly attorneys of record emailed Mr. Martinelli to relay Lexington Law's understanding of the release in light of Ad Astra's "concerns reflecting a misunderstanding of certain provisions." (ECF No. 175-7, at 1.) The email states that Lexington Law expects that Mr. Jones has and will continue to testify truthfully and that Lexington Law will continue to pay his defense costs "even if his testimony is adverse in some respect to the Company's position in the litigation." (*Id.*) The email further states that Lexington Law has provided independent counsel for Mr. Jones and that he has the right to confer privately with his counsel regarding this litigation. (*Id.*) Progrexion ASG's litigation manager is available to participate, "but Mr. Jones is not required to include the representative in every such communication." (*Id.*)

Ad Astra now contends that the release is tantamount to witness payments in violation of a federal anti-gratuity statute, which Ad Astra contends warrants disqualification of the Quintairos attorneys and a declaration that the release is null and void. Ad Astra also argues that Mr. Martinelli's attempt to control Mr. Jones by enforcing the release exacerbates the conflict. Mr. Jones denies that the release violates the statute, denies that his attorneys have a conflict that precludes representation, and argues that Ad Astra unduly delayed in bringing the motion because

Ad Astra knew about the release for months and yet waited until now to bring this motion.  Ad Astra seeks two distinct forms of relief, albeit largely based on the same set of facts, and these two distinct forms of relief trigger different legal frameworks.  So the court will separately address Ad Astra's request for declaratory relief and request that the court disqualify counsel.  But because the core of Ad Astra's arguments is based on its contention that the release violates a federal statute, the court addresses this issue first.

## II.  THE RELEASE DOES NOT VIOLATE 18 U.S.C. § 201(c)(2)

The federal bribery statutes prohibit bribery and illegal gratuities to witnesses and officials. Ad Astra relies on 18 U.S.C § 201(c)(2) in support of its position that the court should disqualify the firm and declare the release invalid.  That section provides that whoever:

> directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom . . . shall be fined under this title or imprisoned for not more than two years, or both.

Disputes concerning § 201(c)(2) most often arise in criminal cases involving plea agreements in which the government trades sentencing recommendations in exchange for cooperation regarding a codefendant's case.  *See, e.g., United States v. Singleton,* 165 F.3d 1297 (10th Cir. 1999).  In the civil context, disputes may arise when a party has compensated a witness for time or expenses, oftentimes when a party retains that individual as a consultant.  *See, e.g., Centennial Mgmt. Servs., Inc. v. Axa Re Vie*, 193 F.R.D. 671, 679 (D. Kan. 2000).  Generally, contracts to pay fact witnesses for favorable testimony violate public policy and are void—a concept embodied both in the law of contracts and in many states' ethical rules governing attorneys.  *See United States v. Singleton ("Singleton I"),* 144 F.3d 1343,1347 (10th Cir. 1998)

(stating contracts to pay fact witnesses are void as violative of public policy), *vacated on other grounds,* 165 F.3d 1297 (10th Cir.), *cert. denied,* 527 U.S. 1024, (1999); *see also Hamilton v. Gen. Motors Corp.*, 490 F.2d 223, 228 (7th Cir. 1973) (contracts for testimony are invalid both on grounds of public policy and for lack of consideration); *In re Complaint of PMD Enterprises Inc.*, 215 F. Supp. 2d 519, 530 (D.N.J. 2002) (summarizing the general rule that courts "have rejected such agreements as lean[ing] toward the procurement of perjury; toward the raising of a class of witnesses who, for a sufficient consideration, will give testimony that shall win or lose the lawsuit; toward the perversion of justice; and toward the perversion of our courts").   However, it is permissible to pay reasonable compensation for time spent in connection with the litigation process.   *See* 18 U.S.C. § 201(d) (providing that the statute's prohibitions do not apply to compensating a witness for his or her reasonable travel costs, subsistence incurred, or reasonable value of time lost in attendance at any such trial, hearing, or proceeding); *see also Centennial*, 193 F.R.D. 679-80 (reaching the same conclusion); *Rajaratnam v. Motley Rice, LLC*, --- F. Supp. 3d ---, 2020 WL 1476171, at *21 (E.D.N.Y. 2020) (describing the majority rule as allowing witness compensation for the time spent preparing to testify or otherwise consulting on a litigation matter in addition to the time spent testifying).   But if compensation is unreasonably high or disproportionate, then "an inference could be drawn that the payments, in reality were made for the substance or efficacy of . . . testimony." *Centennial*, 193 F.R.D. 679-80*; see also ART+COM Innovationpool GmbH v. Google Inc.*, No. CV 1:14-217-TBD, 2016 WL 10033421, at *3 (D. Del. Sept. 9, 2016) (stating there must be evidence that the agreement was designed as a financial inducement and that the payments affected the testimony).

No party disputes that Lexington Law's release with Mr. Jones provided Mr. Jones with something "of value" in terms of a severance package beyond that contemplated in his employment

agreement. *See United States v. Williams*, 705 F.2d 603, 623 (2d Cir. 1983) (noting that a broad construction of "anything of value" is in line with congressional intent). But, to violate § 201(c)(2), the payments must be "for" or "because of" testimony. *Centennial*, 193 F.R.D. 681 (citing § 201(c)(2)).

Ad Astra points to several provisions of the release it contends show that the agreement was made for or because of Mr. Jones' testimony even though the release states it shall not be construed to prevent Mr. Jones from providing truthful testimony. Specifically, Ad Astra notes that the agreement contains a confidentiality clause, a non-disparagement clause, and an indemnification provision that provides that Lexington Law would pay the costs to defend Mr. Jones in this suit and indemnify him as to any damages awarded against him provided that Mr. Jones "remains in a non-adversarial position vis-à-vis the Company in this litigation[.]" (ECF No. 167-2, at 3.) Ad Astra contends that the release conditions Mr. Jones' conduct in this litigation as the framework for either satisfying or breaching the terms of the agreement, effectively incentivizing him to comply with Lexington Law or risk losing the benefits he has and continues to receive.

The plain language of the release provides for a severance package to Mr. Jones in exchange for him releasing any claims he may have had against Lexington Law and its vendors arising from his employment. There is nothing impermissible about this. The benefit to Lexington Law is not favorable testimony; rather, it is that Mr. Jones promises not to sue the firm or its associated entities. Other provisions of the release provide additional context. For example, the confidentiality clause provides that Mr. Jones agrees to keep the terms of the release itself confidential. (*Id.* at 3.) The non-disparagement clause does not reference this litigation, but,

9

rather, applies generally to any statements Mr. Jones may make, specifically including "statements on social media." (*Id.*) In other words, most of the release is not focused on this litigation.

Confidentiality and non-disparagements clauses are quite common and not *per se* contrary to public policy. *See Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 457 (5th Cir. 2005) (finding a non-disparagement clause in an employee's separation agreement was not invalid because of the "mere possibility that an employer *could* use a non-disparagement clause to hide illegal activity"). Even years before this litigation, Mr. Jones' employment agreement contained confidentiality and non-disparagement clauses. The fact that they were carried over into the release supports that these are standard clauses and that release was not entered into with the purpose of compensating Mr. Jones for testimony, but rather to maintain the status quo in effect under his employment agreement. (*See* ECF No. 167-3, at 6, 8-9 (also containing confidentiality and non-disparagement clauses)).

Even the provision pertaining to Lexington Law's indemnification is not as questionable as Ad Astra suggests. Mr. Jones has been subjected to this lawsuit because of his actions as an attorney with the firm—*i.e.*, based on his duties in the course and scope of his employment. It is therefore unremarkable that Lexington Law agreed to continue to provide a defense for him in this litigation. Again, this is effectively a carryover from his employment agreement, which contemplates that Lexington Law would provide him with this protection. (ECF No. 167-3, at 9 ("Company shall defend and indemnify Employee for al acts and failures to act while Employee was acting reasonably in the ordinary course of Employee's performance of Duties . . . .").)

Moreover, the release does not define what it means for Mr. Jones' interests to become adversarial. However, it is clear that providing truthful but potentially unfavorable testimony would not rise to that level because the release contains an express provision stating that "nothing

contained herein shall be construed to prevent the undersigned from providing truthful testimony." (*Id.* at 3.)  As Ad Astra itself notes, Mr. Jones did in fact testify about his criticisms of the dispute letters and Progrexion's influence over the firm, matters that Ad Astra characterizes as providing "adverse testimony to Lexington Law and [Mr.] Heath on topics that are central to Plaintiff's claims."  (ECF No. 167-1, at 6.)

Ad Astra also attacks the reasonableness of Mr. Jones' severance package as constituting evidence of extraordinary compensation to Mr. Jones that does not fall within any of the permissible exceptions in § 201.  The court presumes Ad Astra is referring to the exceptions listed in § 201(d), which provides that § 201(c)(2) and other provisions of the statute do not bar payment of witness fees, reasonable costs of travel and subsistence incurred, and the reasonable value of time lost to attend court proceedings.  The release does not fall within any of the exceptions because the release contemplates payment for the release of Mr. Jones' claims, not payment to him related to litigation expenses, which is what § 201(d) addresses.  The fact that Mr. Jones' severance package does not fall within the § 201(d) categories does not mean the release violates § 201(c)(2).

Ad Astra also has not shown that Mr. Jones' severance package is so excessive that he was being paid for his testimony.  The court may consider the reasonableness of the compensation to determine whether it may infer that the compensation was really for the purpose of Mr. Jones' testimony.  *See Centennial*, 193 F.R.D. at 679-80 (considering the issue on the grounds that an agreement violated public policy).  Ad Astra points to text messages between Eric Kamerath, a Progrexion representative, and Mr. Jones confirming that Mr. Jones received greater benefits under the release than he did under the employment agreement.  But of course Lexington Law paid Mr. Jones more than what he would have received under the employment agreement because Mr. Jones agreed to additional terms not contained in the employment agreement—namely, that he released

any claims he may have had against the firm and its vendors.  The fact that Lexington Law paid Mr. Jones more than what he would have been entitled to receive under the under his employment agreement does not show that the severance package was unreasonably high.

Contrary to Ad Astra's argument, using the employment agreement as a baseline only supports the reasonableness of the benefits that the release provided to Mr. Jones.  The release provided Mr. Jones with twelve installment payments that totaled the equivalent of his annual salary, his projected annual bonus, and other more financial benefits.  Under the employment agreement, he would have been entitled to six months of his annual salary, a prorated target bonus based on his date of termination, and other more minor financial benefits.  But, at earlier times during Mr. Jones' tenure at the firm, he would have been entitled under his employment agreement to twelve months or twenty-four months of his base salary, depending at what point a qualifying termination occurred.  (ECF No. 167-3, at 14.)  Although Mr. Jones presumably made a lower salary earlier on in his career, these terms show that Lexington Law already provided a generous severance package under the employment agreement.  Against that backdrop, the severance package provided in the release is not unreasonable.  Because Ad Astra's request for declaratory relief and disqualification are premised on a violation of § 201(c)(2) that did not occur, the court denies the motion for this reason, in addition to the other reasons explained below.

## III.    DECLARATORY RELIEF IS NOT AVAILABLE

Ad Astra requests that the court issue a declaration that the release is null and void because it violates § 201(c)(2).  The court has already found that the release does not violate the statute.  But, even if it did, Ad Astra's request is without merit as a procedural matter.

Ad Astra presents no legal authority showing that declaratory relief is available in the absence of an actual claim seeking declaratory relief.  To the contrary, under the Declaratory

Judgment Act, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United

States, upon the filing of an appropriate *pleading*, may declare the rights and other legal relations

of any interested party seeking such declaration, whether or not further relief is or could be sought."

28 U.S.C. § 2201(a) (emphasis added).  A motion for declaratory relief is not a pleading.  *See* FED.

R. CIV. P. 7(a) (listing recognized pleadings).

Even on a properly pleaded claim for declaratory relief, the district court retains discretion

whether to hear the claim considering,

> [1] whether a declaratory action would settle the controversy; [2]
> whether it would serve a useful purpose in clarifying the legal
> relations at issue; [3] whether the declaratory remedy is being used
> merely for the purpose of procedural fencing" or to provide an arena
> for a race to *res judicata*; [4] whether use of a declaratory action
> would increase friction between our federal and state courts and
> improperly encroach upon state jurisdiction; and [5] whether there
> is an alternative remedy which is better or more effective.

*State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994) (internal quotations

omitted).  Ad Astra has not addressed any of the *Mhoon* factors.

By bringing a motion for declaratory relief rather than pleading a claim for declaratory

relief, Ad Astra essentially seeks to bypass the requirements of obtaining declaratory relief on a

declaratory judgment claim.  Ad Astra cites several cases in support of its position that the release

violates § 201(c)(2).  But none of those cases involve a motion for declaratory relief or would

support declaring a contract null and void based on a violation of the statute in the absence of a

claim for declaratory relief.  Because Ad Astra has not shown declaratory relief is available here,

the court denies its request on this basis, as well.

## IV.    DISQUALIFICATION OF COUNSEL IS NOT WARRANTED

 "It is well-established that ordinarily 'the control of attorneys' conduct in trial litigation is

within the supervisory powers of the trial judge,' and is thus a matter of judicial discretion."  *Cole*

*v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1383 (10th Cir. 1994).   When faced with a motion to disqualify counsel, the court must consider both the local rules of the court in which the attorney appears and the "standards developed under federal law."   *United States v. Stiger*, 413 F.3d 1185, 1195 (10th Cir. 2005) (overruled on other grounds) (citing *Cole,* 43 F.3d at 1383).   In other words, "motions to disqualify are governed by the ethical rules announced by the national profession and considered in light of the public interest and the litigants' rights."   *Cole*, 43 F.3d at 1383 (10th Cir. 1994) (internal quotations omitted).

This district has adopted the Kansas Rules of Professional Conduct ("KRPC").   *See* D. KAN. RULE 83.6.1(a) (stating the Kansas rules apply "except as otherwise provided by specific rule of this court").   But an ethical violation does not necessarily trigger disqualification.   *See Koch v. Koch Indus.*, 798 F. Supp. 1525, 1531 (D. Kan. 1992).   Rather, the court must consider whether disqualification serves the purpose behind the rule in question.   *See id.*   The moving party bears the burden to demonstrate circumstances warranting disqualification, and the court must balance the interests of protecting the integrity of the judicial process against the right of a party to its counsel of choice.   *See id.* at 1530.   The court retains discretion to determine whether disqualification is warranted, but it must be mindful that a motion to disqualify can be used as a litigation strategy.   *Smith v. Whatcott,* 757 F.2d 1098, 1100 (10th Cir. 1985).

Ad Astra argues that: (1) Mr. Jones and Lexington Law entered into a release that is tantamount to payment for testimony and that Quintairos' enforcement of the release compels disqualification; and (2) Quintairos has nonconsentable conflicts among defendants and has violated KRPC 1.7 and 1.9.   The court has already explained why the release does not amount to an improper witness payment.   But, even if it did, Ad Astra has not set forth any circumstances establishing any nexus between the release and Quintairos or any violation of the KRPC.

### A.   "Enforcement" of the Release as a Basis for Disqualification

Ad Astra does not present any legal authority supporting that disqualification is a remedy available under the facts here, where the release was entered into by a defendant and his codefendant employer with no involvement from the firm that Ad Astra seeks to disqualify.  Ad Astra points to no rule of professional conduct that Quintairos violated in "enforcing" the release and, critically, Ad Astra does not clarify how exactly the firm and its attorneys purportedly enforced the release.  Instead, Ad Astra simply notes that Mr. Martinelli made improper deposition objections based on the release.  However, to support disqualification, Ad Astra must, at a minimum, point to violations of applicable rules, the KRPC (adopted by local rule), or another national standard developed under federal law.  *See Stiger*, 413 F.3d at 1195.  Ad Astra makes no such showing.

Instead, Ad Astra cites a handful of cases in which courts have analyzed § 201(c)(2).  None of these cases involve motions to disqualify, let alone motions to disqualify when the attorneys and their firm had virtually no involvement in the conduct that allegedly constitutes a violation of the statute.  *See Mataya v. Kingston*, 371 F.3d 353, 359–60 (7th Cir. 2004) (appeal of a habeas corpus case claiming a *Brady* violation where a state's witness received $1,000 in exchange for his cooperation and testimony against the convicted); *United States v. Blaszak*, 349 F.3d 881, 884–85 (6th Cir. 2003) (affirming conviction for selling testimony in a pending civil case in violation of § 201(c)(2)); *Centennial*, 193 F.R.D. at 679 (considering a motion for sanctions based on an argument that a consulting agreement between a witness and a party's law firm was unreasonable and violated public policy, § 201(c)(2), and a model rule of professional conduct prohibiting a lawyer from offering an inducement to a witness.)

For example, Ad Astra attempts to draw parallels between this case and *State of New York v. Solvent Chemical Company*, which involved a witness who was also the former vice-president of one of the corporate defendants.  166 F.R.D. 284, 288 (W.D.N.Y. 1996).  But *Solvent Chemical* did not focus on the attorneys' conduct.  It involved a discovery dispute concerning the discoverability of the former vice president's consulting agreement, related documents, and documents he reviewed in preparation for his deposition.  At most, *Solvent Chemical* supports the relevance or discoverability of Mr. Jones' release, which defendants have already produced.  It does not address the disqualification standard or support that disqualification is an appropriate remedy here.

Although Ad Astra does not cite KRPC 3.4(b), the court mentions it here because it provides that counsel shall not "offer an inducement to a witness that is prohibited by law."  This provides additional context to Ad Astra's position, and is the more appropriate rule for the court to consider in light of Ad Astra's arguments concerning an alleged pay-to-testify arrangement.  But Ad Astra's position is that *Lexington Law* offered an inducement to Mr. Jones, not to the Quintairos attorneys.  Indeed, Quintairos did not draft the release agreement.  It did not represent any parties in conjunction with reviewing or negotiating the agreement.  At most, one Quintairos attorney made improper confidentiality objections during two depositions based on the confidentiality clause in the agreement.  But the court took up the objections raised at Mr. Heath's deposition in which he was instructed not to answer questions about the release agreement, and the court instructed Mr. Heath to answer those questions.  Based on this ruling, the parties agreed to reconvene Mr. Jones' deposition.  At that time, Ad Astra was able to ask Mr. Jones questions about the release, and the record shows that Mr. Jones answered these questions.  If Ad Astra had lingering concerns about Mr. Jones' testimony, it could have filed a motion to compel.  It never

did.  Instead, it now attempts to cast those objections as "enforcement" of an illegal release in seeking disqualification.

Counsel's improper deposition objections are not a basis for the extraordinary relief of disqualification of a party's counsel of choice.  That is not to say that a violation of § 201(c)(2), if one occurred, cannot form the basis of a motion to disqualify, but at a minimum, the *attorney's* conduct must rise to the level to support disqualification, and improper deposition objections that the court ultimately overruled do not come close to meeting the standard.  *Cf. Biocore Med. Techs., Inc. v. Khosrowshahi*, 181 F.R.D. 660, 670 (D. Kan. 1998) (denying a motion to disqualify counsel brought on multiple grounds, including that *counsel* employed a witness and provided free legal services to induce her to testify favorably), *on reconsideration*, No. CIV.A. 98-2031-KHV, 1998 WL 919126 (D. Kan. Nov. 6, 1998), and *aff'd sub nom. Butler v. Biocore Med. Techs., Inc.*, 348 F.3d 1163 (10th Cir. 2003).

### B.  Disqualification Based on KRPC 1.7 and 1.9

Ad Astra also argues that a nonconsentable conflict of interest exists between Mr. Jones and his codefendants because "Mr. Jones' deposition testimony establishes that representation of Jones is directly adverse to Lexington Law and Heath, and the representation of Jones has already been materially limited by the concurrent representation of Lexington Law."  (ECF No. 167-1, at 11.)  Ad Astra invokes both KRPC 1.7 and 1.9, which govern conflicts of interest among current clients and duties to former clients, respectively.

#### 1.  Ad Astra has not Shown it has Standing to Move to Disqualify Based on a Potential Conflict Concerning Codefendants.

Ad Astra addresses standing only generally and not specifically regarding standing to move to disqualify based on a potential conflict among opposing party defendants.  In the context of conflicts with former clients, a party moving to disqualify counsel must establish (among other

things) that "an actual attorney-client relationship existed between the moving party and opposing counsel." *Cole*, 43 F.3d at 1384 (considering case law applying ABA Model Rule 1.9). Indeed, "[a]s a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification." *In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83 (5th Cir.1976); *see also Kasza v. Browner*, 133 F.3d 1159, 1171 (9th Cir. 1998) (finding it difficult to see how a party "has standing to complain about a possible conflict of interest arising out of common representation of defendants in different civil actions, having nothing to do with her own representation" but addressing the merits of the argument because no party raised the issue of standing); *United States v. Rogers*, 9 F.3d 1025, 1031 (2d Cir. 1993) ("No case has been called to our attention, and we are aware of none, in which an attorney has been disqualified on grounds of conflicting prior representation solely at the behest of a person other than the former client or its privy."); *O'Connor v. Jones*, 946 F.2d 1395, 1399 (8th Cir. 1991) (finding a prison inmate lacked constitutional standing to move to disqualify the state's retained counsel on the ground that Missouri's system of employing private law firms violated the Sherman Act and reduced the number of available attorneys to represent indigent prisoners because the plaintiff had no stake in the legal or ethical status of the state's retained attorneys and had competent counsel of his own); *but see Kevlik v. Goldstein*, 724 F.2d 844 (1st Cir. 1984) (representing the minority view that a non-client may have standing because the Model Code of Professional Responsibility requires attorneys to report ethical violations to a tribunal). This is because "[t]o allow an unauthorized surrogate to champion the rights of the former client would allow that surrogate to use the conflict rules for his own purposes where a genuine conflict might not really exist." *Yarn Processing*, 530 F.2d at 90.

This district has applied the same principle in the context of motions to disqualify based on a potential conflict among current clients under KRPC 1.7. *See, e.g., Smith v. TFI Family Servs., Inc.*, No. 17-02235-JTM-GEB, 2018 WL 2926474, at *3 (D. Kan. June 8, 2018) (recognizing the general rule is that an opposing party has no standing to move for disqualification based on a conflict among the attorney's clients); *Hjersted Family Ltd. P'ship v. Hallauer*, No. 06-2229-CM-GLR, 2007 WL 2789829, at *4 (D. Kan. Sept. 21, 2007) (considering KRPC 1.7 and collecting cases reaching the same conclusion about standing). Other judges in this district have recognized "an exception to the rule that only clients have standing where the interests of the public are so greatly implicated that a third party should be entitled to raise any apparent conflicts of interest which may tend to undermine the validity of the proceedings." *Smith*, 2018 WL 2926474, at *3; *see also Yarn Processing*, 530 F.2d at 89 (suggesting a possible exception where the ethical violation was "manifest and glaring" or "open and obvious and confronted the court with a plain duty to act"). For example, the court has recognized an exception when the parties performed services for children in need of care placed in the state's custody. *See Smith*, 2018 WL 2926474, at *3.

Ad Astra generally cites to two cases from this district for the proposition that a party has standing to move to disqualify where the public interest is greatly implicated or when an attorney's actions cast the appearance of impropriety on the profession. But both cases are factually distinguishable and illustrate why Ad Astra has not shown that it has standing. In *United States v. Wittig*, the court considered whether the government had standing in a criminal prosecution to move to disqualify a defense attorney where the attorney's former client would likely testify against his current client. *See United States v. Wittig*, No. 03-40142-01-JAR, 2005 WL 7139151, at *5 (D. Kan. May 6, 2005). The court found that the government had standing to seek

disqualification because of the possibility that the attorney may be faced with the choice to elicit confidential information from his former client in violation of ethical rules or refrain from vigorously cross-examining those witnesses. *Id.* Because the case was a criminal prosecution where the attorney's former client was not a party that was able to seek disqualification itself, the government could raise the issue. *Id.* In contrast, Ad Astra's motion concerns parties to this case capable of seeking disqualification themselves, and there is no indication that Mr. Jones plans to testify against his codefendants.

In *Beck v. Board of Regents*, the court granted the defendants' motion to disqualify plaintiffs' counsel. In doing so, the court found the vice chancellor for clinical affairs at the University of Kansas Medical Center and the director of medical center police had standing because of plaintiffs' counsel's prior representation of the medical center's vice chancellor in an unrelated civil rights action. 568 F. Supp. 1107, 1111 (D. Kan. 1983). Among other things, the defendants argued that plaintiffs' counsel had access to confidential information through the first suit that could ultimately jeopardize defendants' right to a fair and honest proceeding in the case at hand—that the moving party would somehow be affected by the conflict. *Id.* But, here, Ad Astra does not allege that Ad Astra would be negatively impacted by Quintairos' ongoing representation of Mr. Jones. Ad Astra has not articulated any basis from which the court could find it has standing to move to disqualify Quintairos based on a potential conflict among codefendants. Instead, Ad Astra seems to suggest that the fact of a potential conflict among Quintairos' clients would be enough to confer standing, but under this approach, a non-client would have standing in every case, which is contrary to the majority rule and the case law in this district. Moreover, the violations Ad Astra alleges are not so open and obvious that the court would be confronted with the plain duty to act. In fact, the violations are non-existent.

### 2.  Ad Astra has not Shown a Violation of KRPC 1.7.

KRPC 1.7(a) provides that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest."  A concurrent conflict of interest occurs when: (1) the representation of one client will be directly adverse to another client; or (2) there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."  KRPC 1.7(a).  Even if a conflict exists, the lawyer may still represent the client if: "(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) each affected client gives informed consent, confirmed in writing."  KRPC 1.7(b).

KRPC 1.7 does not apply here because its plain language states that it governs conflicts of interest among *current* clients.  At this procedural juncture, Quintairos represents only Mr. Jones and not the other codefendants.  Ad Astra does not challenge this assertion or argue that KRPC 1.7 would somehow apply to conflicts among current and former clients (particularly when KRPC 1.9 clearly governs those situations), yet it inexplicably advances the argument that the alleged conflict among Mr. Jones and his codefendants violates the rule and supports disqualification.  This is simply incorrect, and the rule provides no basis for disqualification under the facts here.

### 3.  Ad Astra has not Shown a Violation of KRPC 1.9.

KRPC 1.9(a) governs duties to former clients.  It provides that, "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests

of the former client unless the former client gives informed consent, confirmed in writing."  Here, both Mr. Jones and his codefendants gave informed written consent to Quintairos attorneys' continued representation of Mr. Jones.  This should be the end of the matter.  (ECF Nos. 175-9 and 175-10.)

But, Ad Astra's reply argues the conflict is nonconsentable—not under KRPC 1.9 (the more applicable rule) but under KRPC 1.7.  Ad Astra notes that Comment 14 states that as set out in KRPC 1.7(b), "some conflicts are nonconsentable, meaning that the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent."  Examples of nonconsentable conflicts include claims by one client against another client represented by the lawyer in the same litigation and where the representation is prohibited by law, such as where a state prohibits representation of more than one defendant in a capital case.  KRPC 1.7, cmt. 14.  In contrast, KRPC 1.9 contains no similar comment.  Instead, Comment 9 makes clear that the KRPC 1.9 is "for the protection of former clients and can be waived if the client gives informed consent, which must be confirmed in writing[.]"

Ad Astra relies on *Yost v K Truck Lines* in support of its argument that a conflict exists in this case, but *Yost* does not support Ad Astra's position.  No. CIV.A. 03-2086-DJW, 2006 WL 314348, at *3 (D. Kan. Jan. 27, 2006).  There, the court found that a nonconsentable conflict existed under KRPC 1.7 such that the court was required to find that defense counsel could not continue to represent both defendants in the case.  *Id.* at *4.  But the court found that defense counsel could continue to represent one defendant provided the other defendant gave consent as contemplated by KRPC 1.9.  *Id.*  That is exactly what happened here.  Quintairos' former clients consented to Quintairos' continued representation of Mr. Jones.  So Quintairos has not violated KRPC 1.9.

But even in the absence of the former clients' consent, there is no conflict under KRPC 1.9. The court applies a three-part test for determining whether disqualification on the grounds of former representation is warranted: (1) the attorney represented a former client in a matter; (2) the matter is substantially related to the matter in which the attorney now seeks to represent a client; and (3) the current client's interests and the former client's interests are materially adverse. *Cole* 43 F.3d at 1384. Here, no party disputes that the Quintairos attorneys have an attorney-client relationship with Mr. Jones and previously had an attorney-client relationship with his codefendants. Likewise, the firm represented the parties in the same matter—this case. But Mr. Jones' and the codefendants' interests are not materially adverse.

Ad Astra argues that Quintairos's continued representation of Mr. Jones is directly adverse to Lexington Law and Mr. Heath. Ad Astra contends that the doctrine of *respondeat superior* applies to Mr. Jones' relationship with Lexington Law, and Mr. Jones' statements regarding Mr. Heath could bind Lexington Law and create liability for the firm. Ad Astra also argues the information Quintairos obtained in representing the codefendants could create a conflict between the firm's obligations to Mr. Jones and its former clients. In addition, Ad Astra raises the possibility that Quintairos attorneys may have to cross-examine their former clients and contends that disqualification is therefore necessary to preserve the integrity of the judicial process.

These arguments are speculative and do not establish that Mr. Jones' and his codefendants' interests are materially adverse. Ad Astra sued these defendants jointly and based on allegations that they have acted in concert, and defendants answered collectively, essentially staking out the same defenses and denials. (ECF Nos. 120 and 145.) The possibility that Quintairos may examine its former clients at trial or that Mr. Jones may testify in a manner that could harm his codefendants does not establish that these parties' interests are materially adverse or that they would likely

23

become materially adverse.  And Ad Astra has not made the same arguments about Williams & Connolly's representation of Mr. Jones' codefendants, some of whom include individual lawyers with Lexington Law.  Nothing about Mr. Jones' deposition testimony establishes that his interests are materially adverse to those of his codefendants.  He merely testified that he thought the dispute letters portrayed Lexington Law in a negative light; he had concerns that the Progrexion entities had too much influence over firm operations; and he thought he had a closer relationship with Mr. Heath than what Mr. Heath had recalled during his own deposition.

In sum, Ad Astra's request to disqualify Quintairos and its attorneys lacks both legal and factual support.  Ad Astra argues that Quintairos' "enforcement" of what is a fairly standard and legal release supports disqualification, but Ad Astra cannot show any "enforcement" except deposition objections designed to make sure that Mr. Jones did not stand accused of voluntarily breaching the release's confidentiality provision.  Granted, instructing the witness not to answer questions on that basis violated the Federal Rules of Civil Procedure.  But, once the court ordered the witnesses to answer the questions, thus obviating the risk of a claim that they voluntarily breached the agreement, the witnesses answered the questions.

Ad Astra does not cite any legal authority supporting the drastic remedy of disqualification where the firm has no other connection to the release that allegedly violates federal law.  The more appropriate rule, KRPC 3.4(b), requires that counsel shall not "offer an inducement to a witness that is prohibited by law."  But Quintairos did not draft the release or have any other involvement with the release agreement.  So even if the release constituted payment for testimony (which it did not), the facts here still would not support disqualification.  Additionally, Ad Astra does not establish its standing to move for disqualification based on an alleged conflict among codefendants.  And Although Ad Astra relies heavily on KRPC 1.7 as a basis for disqualification,

24

that rule does not apply here because it applies to conflicts arising from representation of current clients. Mr. Jones' codefendants are former clients. Finally, Quintairos did not violate KRPC 1.9. But, even if a conflict existed, it was remedied by obtaining the firm's former clients' informed consent to Quintairos' continued representation of Mr. Jones. Although Ad Astra argues that some conflicts are nonconsentable, it relies only on the comments to KRPC 1.7, which does not apply to the circumstances here. Ad Astra does not present any authority suggesting that any conflict here could not be cured by obtaining the consent of the former clients. For all of these reasons, Ad Astra's request for disqualification is denied.

*****

In sum, Ad Astra has not shown that what is a fairly standard release agreement between Mr. Jones and his former employer violates § 201(c)(2). Moreover, Ad Astra has not shown that declaratory relief is available by motion based on a violation of the statute. Finally, Ad Astra does not establish any circumstances from which the court could find counsel should be disqualified. For all of these reasons, the court denies Ad Astra's motion.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Defendants' Counsel (ECF No. 164) is denied.

**IT IS FURTHER ORDERED** that the clerk's office shall modify the docket to reflect that attorneys with the firm Quintairos, Prieto, Wood & Boyer, PA represent only Defendant Kevin Jones, not any other codefendant.

**IT IS SO ORDERED.**

Dated May 22, 2020, at Topeka, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge