## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

AD ASTRA RECOVERY SERVICES, INC.,

     Plaintiff,

     v.

JOHN CLIFFORD HEATH, ESQ., *ET AL.*,

     Defendants,

Case No. 18-1145-JWB-ADM

## MEMORANDUM AND ORDER

This matter comes before the court on Defendants' Motion to Compel a Complete Response to Interrogatory No. 1.  (ECF No. 191.)  Defendants move for an order compelling Plaintiff Ad Astra Recovery Services, Inc. ("Ad Astra") to provide a complete response to an interrogatory that seeks information about how Ad Astra compiled a list of consumers for whom defendants produced certain communications in response to production requests that were narrowed by the parties' agreement.  The parties initially disputed whether Ad Astra selected a representative sample or "cherry-picked" consumers that were favorable to its case.  To that end, Lexington Law propounded an interrogatory asking Ad Astra to explain the process it used to select those consumers.  As set forth below, Ad Astra's response is insufficient in two respects. First, most of the three-page response is not responsive, as it details matters that are unrelated to how Ad Astra compiled the list.  Second, the single paragraph that focuses on how Ad Astra compiled the list provides only a high-level overview of the selection process.  It does not truly meet the substance of the question posed because it omits most of the key criteria that Ad Astra used to winnow and adjust the list of consumers.  Defendants' motion is therefore granted.

I.     BACKGROUND

Ad Astra is a debt collector and credit agency that alleges defendants "engaged in a fraudulent credit-repair scheme designed to bombard debt collectors with false credit dispute letters with the intention of deceiving debt collectors . . . and frustrating their efforts to collect legitimate debts." (Am. Compl. ¶ 3 (ECF No. 120).)  Specifically, Ad Astra alleges that defendants used deceptive marketing techniques to solicit financially troubled consumers by offering services from a law firm in hopes that the consumers would sign up for their credit-repair services.  (*Id.* ¶ 5.)  According to Ad Astra, once consumers signed up, the law firm transmitted mass credit-dispute letters to creditors in the consumer-clients' names without disclosing that the firm prepared and transmitted them.   Ad Astra alleges this practice was designed to circumvent the Fair Credit Reporting Act and trigger Ad Astra to perform certain onerous statutory investigative requirements.  (*Id.* ¶¶ 6-9.)  Ad Astra asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1962(c) and (d), and a Kansas common law fraud claim.[1]  Ad Astra has named as defendants: (1) the law firm, John C. Heath, Attorney at Law, PLLC d/b/a Lexington Law ("Lexington Law"); (2) certain attorneys with the firm: John Clifford Heath, Kevin Jones, Adam C. Fullman; (3) other related corporate entities that Ad Astra alleges directed and/or participated in the scheme: Progrexion Holdings, Inc.; Progrexion Teleservices, Inc.; PGX Holdings, Inc.; Progrexion ASG, Inc.; Progrexion Marketing, Inc.; Progrexion IP, Inc.; and (4) Jeffrey R. Johnson, CEO of the Progrexion entities.

On April 19, 2019, the court ordered Lexington Law to produce all communications from clients that resulted in the firm generating dispute letters sent to Ad Astra under the clients'

---

[1] Ad Astra also pleaded a claim for tortious interference with contractual relationships, but Ad Astra informed the court during the pretrial conference that it intends to abandon that claim.

signatures, including but not limited to communications directing the firm to dispute a debt collected by Ad Astra. *See Ad Astra Recovery Services, Inc. v. Heath*, No. 18-1145, 2019 WL 1753958, at *4 (D. Kan. Apr. 19, 2019).  Then, during a discovery conference on May 31, Lexington Law told the court that full compliance would require production of communications with more than 14,000 clients.  Based on this representation, the parties agreed that Lexington Law could produce responsive documents from a sampling of clients, capped at one hundred, with Ad Astra selecting the clients in two increments of fifty.  (ECF No. 54.)  Ad Astra served a list of fifty names of Lexington Law clients and subsequently produced its own files corresponding to those names.  But defendants became concerned that the list was not a representative sample of Lexington Law's client base when they began reviewing Ad Astra's own files of the sampled consumers.  (ECF No. 192-2, at 4-5.)  At that point, defense counsel emailed Ad Astra's counsel to ask about the manner of selection.  (*Id.*)  But Ad Astra's counsel dismissed these inquiries by responding, "We are done responding to this fiction."  (*Id.* at 2.)

On January 28, 2020, defendants served Interrogatory No. 1.  It requires Ad Astra to: "Explain in detail the process used by Ad Astra to select the list of fifty consumers included on the list produced by Ad Astra titled 'Random Sampling of Lexington Law Consumers in accordance with May 31, 2019 Order.'"  (ECF No. 192-3, at 7.)  Ad Astra's initial response incorporated its general objections, asserted a relevance objection, and provided a non-responsive answer.  (ECF No. 192, at 3-4.)  The response stated that Ad Astra agreed that Lexington Law could select an additional fifty consumers whose files would be produced and whose names would be run as ESI search terms by Ad Astra.  (*Id.* at 4.)

During a discovery conference with the court on March 24, defendants raised the issue of Ad Astra's deficient interrogatory response.  Defendants explained that they were concerned that

Ad Astra would attempt to present the documents as being from a random or representative sampling of Lexington Law's client base, but defendants had no way to test that assertion because they did not know how Ad Astra selected the names.  The court asked Ad Astra what objection Ad Astra lodged to the interrogatory that it continued to maintain.  (ECF No. 192-5, at 31.)  Ad Astra responded that it asserted a relevance objection.  (*Id.* at 32.)  The court did not issue any substantive ruling but told the parties that, based on their arguments at the discovery conference, the interrogatory appeared to seek relevant information.  (*Id.* at 34.)  At that point, Ad Astra agreed to supplement its response to avoid motion practice.  (*Id.* at 36.)

Ad Astra served an amended response on April 3.  The amended response did not assert any further objections.  It stated as follows:

> Ad Astra attempted to select 50 consumers from the document produced by Defendants entitled "Summary of Clients Who Sent Ad Astra Letters" (the "Client List"). (LL003548-007110). In doing so, Ad Astra determined that the Client List was inaccurate and could not be relied upon for this purpose. In particular, Ad Astra determined that the Client List contained names that were not in Ad Astra's system, and omitted the names of other consumers who Ad Astra had reason to believe had used Lexington Law's services. Given the inaccuracies in the Client List, and consistent with the Court's instructions, Ad Astra compiled a list of 50 consumers who Ad Astra had reason to believe had used Lexington Law's services at some point in time.

(ECF No. 192-6, at 3-4.)

During another discovery conference with the court on April 24, defendants again raised issues relating to deficiencies in Ad Astra's amended response.  The court agreed that the response did not provide the substantive information sought by the interrogatory.  (ECF No. 192-7, at 11 ("I don't think that the plaintiff's supplemental response in any way provides the substantive information sought by the interrogatory.  It's completely deficient in that respect.").)  The court provided a deadline for defendants to move to compel.  Counsel for Ad Astra stated that they

would consult with their client to see whether they could fashion another supplemental response that might obviate the need for motion practice.  (*Id.* at 18.)

On April 28, Ad Astra served another supplemental response, again without asserting any further objections.  The second amended response spans over three pages.  It details the events in discovery that brought Ad Astra to the point of selecting fifty names; Ad Astra's inability to use Lexington Law's "Summary of Clients Who Sent Ad Astra Letters" because Ad Astra contends it is inaccurate; and information about the fifty consumers selected and why those consumers reflect a representative sample of the client base.  (ECF No. 192-8, at 3-6.)  The second amended response also reiterates Ad Astra's offer for defendants to select fifty other consumers whose files would be produced if defendants remained concerned about the representativeness of the sample.  (*Id.* at 6.)  In the entire three-page response, the only explanation as to how Ad Astra selected the clients appears in the following single paragraph:

> . . . Ad Astra searched its collection notes for "Lexington" and compiled a list of approximately 100 consumers that had collection notes dated between September 11, 2013 and May 2, 2019 which provided, in sum and substance, "I told them not to dispute this," "I don't know why they disputed this," "they told me this would get deleted," and "I am no longer disputing this."  Counsel for Ad Astra selected 50 names from this list.  Ad Astra later determined that 13 of the names selected by counsel were not associated with Lexington Law, but instead, another credit repair company with "Lexington" in the name (e.g., Lexington Consumer Advocacy and Lexington, Feldman, & Stern).  Ad Astra personnel selected the remaining 13 names by identifying consumers from whom Ad Astra had received a significant number of dispute letters that were similar in appearance and substance to the dispute letters Defendants have admitted to sending Ad Astra in this litigation.

(*Id.* at 5-6.)

Based on this response, defense counsel emailed follow-up questions asking Ad Astra's counsel things like how many records were searched, the parameters of the search criteria, which individuals conducted the searches, how the remaining thirteen names were collected, and who

specifically conducted the searches to identify those thirteen consumers.  (ECF No. 192-9, at 2-3.)
In response, Ad Astra's counsel provided answers to most of the questions but refused to respond
to questions asking what specific guidance was provided to the individuals who conducted the
searches and what guidance was provided to the individuals who selected the remaining thirteen
names.  (ECF No. 192-10, at 3.)  Ad Astra refused to respond to these questions because they
called for the disclosure of attorney-client privileged information.  (*Id.*)  On May 1, defense counsel
sent another email posing "a few clarifying follow-up questions."  (ECF No. 196-4, at 1.)  Among
other things, defense counsel asked if the guidance was in writing and whether it appeared on Ad
Astra's privilege log.  (ECF No. 196-4, at 2-3.)  Ad Astra took the position that it had fully
responded to the interrogatory and declined to respond to the additional questions.  (ECF No. 192-
11, at 2.)

    Defendants then filed this motion to compel, asserting the second amended response falls
short of providing a complete answer and that the selection of the fifty consumers is not attorney-
client privileged.  The court addresses each of these positions after discussing the relevance of the
information defendants seek.

## II.    DEFENDANTS HAVE ESTABLISHED RELEVANCE

    The permissible scope of an interrogatory is the same as the scope of discovery generally.
*See* FED. R. CIV. P. 33(a)(2).  Under the Federal Rules, "[p]arties may obtain discovery regarding
any nonprivileged matter that is relevant to any party's claim or defense and proportional to the
needs of the case."  FED. R. CIV. P. 26(b)(1).  In other words, considerations of both relevance and
proportionality now expressly govern the scope of discovery.  FED. R. CIV. P. 26(b)(1) advisory
committee's note to the 2015 amendments.  To that end, the party moving to compel bears the
initial burden to establish relevance, but it does not bear the burden to address all proportionality

considerations.  *See Landry v. Swire Oilfield Servs.*, L.L.C., 323 F.R.D. 360 (D.N.M. 2018) (discussing the effect of the 2015 amendment on the party seeking discovery).  Relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *see Rowan v. Sunflower Elec. Power Corp.*, No. 15-9227, 2016 WL 3745680, at *2 (D. Kan. July 13, 2016) (applying *Oppenheimer* after the 2015 amendment); *see also Kennicott v. Sandia Corp.*, 327 F.R.D. 454, 469 (D.N.M. 2018) (analyzing the 2015 amendment and concluding that it did not change discovery's scope but clarified it, and therefore *Oppenheimer* still applies).  Once relevance is established, the court considers the discovery objections and the sufficiency of the response.

Defendants contend that the criteria Ad Astra used to select the fifty consumers is relevant because, without fully understanding the criteria, neither defendants nor the court will be able to gauge what records are admissible or for what purpose.  Defendants also argue the jury would not be able to assess what weight, if any, it should accord to the records.  Ad Astra generally disagrees that the selection criteria will impact admissibility, contending instead that the records are either admissible as business records or as opposing party statements.  But Ad Astra does not directly contend that the information is not relevant, and its second amended interrogatory response removes the relevance objection.  (ECF No. 192-8, at 3-6.)  Indeed, Ad Astra states that defendants are free to argue that the fifty consumers were cherry-picked by Ad Astra, which shows the information is relevant for at least that purpose.

The court agrees that the interrogatory seeks relevant information.  Specifically, how Ad Astra compiled the list of names is relevant to a jury's determination of what weight to accord the documents produced in response to the parties' agreed narrowed scope of the production requests

seeking Lexington Law client communications.  To that end, the court will not allow either party to unfairly benefit from their nearly year-old agreement to make these production requests proportional to the needs of the case by pursuing arguments that would essentially undermine the value and reasons behind Rule 26's proportionality requirement in the first place.  Specifically, defendants' suggestion that they may seek to exclude evidence based on the interrogatory response is without merit because Lexington Law agreed to limit the production requests, and the very point of that agreement was to make burdensome discovery proportional for Lexington Law.  On the other hand, Ad Astra should not benefit from the narrowed scope of the production requests by selecting consumers favorable to Ad Astra but refusing to disclose how it did so, all the while planning to argue that the communications demonstrate a pattern of misconduct or are "'representative' in the colloquial sense" without providing the information necessary to explain how Ad Astra targeted those particular consumer communications.  (ECF No. 196, at 3.)

To that end, although Ad Astra's interrogatory response is the present issue before the court, it is only part of the bigger issue as to how this information may be presented to a jury.  The court therefore intends to include in the pretrial order a proposed jury instruction based on Ad Astra's forthcoming supplemental response that will avoid the parties relitigating this discovery dispute before the jury.  The instruction will inform the jury how Ad Astra selected the consumers and will prohibit the parties from characterizing the selection process otherwise, whether in pejorative or laudatory terms.  Either party may request that the district judge give the instruction. The jury can then determine what weight to accord the files.

### III. AD ASTRA IS ORDERED TO SERVE AN AMENDED RESPONSE THAT REMOVES NONRESPONSIVE AND ARGUMENTATIVE LANGUAGE AND PROVIDES ADDITIONAL INFORMATION TO FAIRLY MEET THE SUBSTANCE OF THE QUESTION POSED

An evasive or incomplete answer to an interrogatory is treated as a failure to answer. *See* FED. R. CIV. P. 37(a)(4). When the court is asked to evaluate the sufficiency of a response to an interrogatory, the court considers whether the response, as a whole, discloses a conscientious endeavor to understand the question and to fully answer the question. 8B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 2177 (3d ed.); *see also Parrott v. Wilson*, 707 F.2d 1262, 1273 (11th Cir. 1983) (evaluating the sufficiency of answers by determining whether they "disclose a conscientious endeavor to understand the questions and to answer fully those questions"); *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 616–17 (5th Cir. 1977) (stating that an interrogatory response requires candor); *Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.*, No. 12-2350-SAC, 2014 WL 806071, at *14 (D. Kan. Feb. 28, 2014) (considering whether the answer fairly met the substance of the question posed)*; Williams v. Sprint/United Mgmt. Co.*, 235 F.R.D. 494, 501 (D. Kan. 2006) (same); *Cont'l Illinois Nat. Bank & Tr. Co. of Chicago v. Caton*, 136 F.R.D. 682, 684 (D. Kan. 1991) ("The answers to interrogatories must be responsive, full, complete and unevasive."). Defendants raise two arguments regarding the sufficiency of Ad Astra's second amended response: (1) it is evasive to the extent that it is largely non-responsive; and (2) the single paragraph that is responsive requires further elaboration.

#### A. Nonresponsive Paragraphs

Defendants note that the Ad Astra's amended response consists largely of arguments and accusations about Lexington Law's discovery efforts and other extraneous matters. (ECF No. 192, at 4.) The court agrees. The interrogatory asks Ad Astra to explain how it selected the list of fifty consumers. Instead of providing this information, the first paragraph recounts the discovery efforts

that led to the court order memorializing the parties' agreement to select one hundred consumers. This is not responsive to the question posed. The second paragraph essentially consists of complaints that Lexington Law's list of clients who sent correspondence to Ad Astra was inaccurate and, because of that, Ad Astra was unable to use the list. Again, this is not responsive. It is also argumentative. The interrogatory does not ask what steps Ad Astra decided *not* to take to come up with its own list and why. For the most part, the third paragraph (quoted and discussed below) provides the actual explanation as to how Ad Astra selected the list of fifty consumers. But then the fourth paragraph consists of argument about why the fifty consumers are a representative sample—again, information that the interrogatory does not seek. The fifth and sixth paragraphs are also non-responsive. They reiterate that defendants can select their own sample of fifty consumers, and they selectively quote the court's discussions with the parties about the interrogatory. These paragraphs are non-responsive attorney argument.

In short, Ad Astra must amend its response to omit all non-responsive verbiage. This includes everything except for most of paragraph 3. The only exception is that Ad Astra must also omit the following first two clauses of the opening sentence in paragraph 3: "Given the inaccuracies in the Client List, and consistent with the Court's instructions . . . ." (ECF No. 192-8, at 5.) This language is also argumentative and non-responsive.

**B. Sufficiency of Responsive Information Provided**

In addition, Ad Astra must expand the explanation provided in paragraph 3 to provide more detailed information in its supplemental response. The interrogatory requires Ad Astra to "explain in detail" the process it used to select the list of fifty consumers. The third paragraph of Ad Astra's interrogatory response states as follows:

> . . . Ad Astra searched its collection notes for "Lexington" and
> compiled a list of approximately 100 consumers that had collection

notes dated between September 11, 2013 and May 2, 2019 which provided, in sum and substance, "I told them not to dispute this," "I don't know why they disputed this," "they told me this would get deleted," and "I am no longer disputing this." Counsel for Ad Astra selected 50 names from this list. Ad Astra later determined that 13 of the names selected by counsel were not associated with Lexington Law, but instead, another credit repair company with "Lexington" in the name (e.g., Lexington Consumer Advocacy and Lexington, Feldman, & Stern). Ad Astra personnel selected the remaining 13 names by identifying consumers from whom Ad Astra had received a significant number of dispute letters that were similar in appearance and substance to the dispute letters Defendants have admitted to sending Ad Astra in this litigation.

This response provides some of the steps Ad Astra took to identify the consumers. But it does not provide a complete answer that explains the key steps as to how it came up with the list. It essentially just states that a search was completed that returned an undisclosed number of names that was winnowed to one hundred through undisclosed methods, further winnowed to fifty through undisclosed methods, and when Ad Astra determined that thirteen of the names were not associated with Lexington Law, Ad Astra staff selected thirteen replacement names from an undisclosed number of individuals from whom Ad Astra had received a significant amount of correspondence. This response provides no meaningful insight into how one name was selected over another. At best, the response is partially responsive but wholly evasive in substance, and therefore Ad Astra must supplement in accordance with the guidance directed below.

Specifically, the first sentence states that Ad Astra "searched its collection notes." This is insufficient because the sentence provides no substantive details about what "collection notes" were searched or how they were "searched." In Ad Astra's opposition to defendants' motion to compel, Ad Astra revealed (apparently for the first time) that Ad Astra searched "the collection notes for all 2,379,565 accounts Plaintiff had as of June 12, 2019." (ECF No. 196, at 5.) And, in response to follow-up questions by email, Ad Astra explained that it ran key word searches on these collection notes for "Lexington" and received 5,650 hits, although some of these were false

hits—*e.g.*, "Lexington, Kentucky."  (ECF No. 192-10, at 2.)  Although defendants now have this information, Ad Astra did not include these details in the response.  Even with this information, the response does not explain how Ad Astra narrowed the list from the 5,650 hits to the "approximately 100 consumers that had collection notes dated between September 11, 2013 and May 2, 2019 which provided, in sum and substance, 'I told them not to dispute this,' 'I don't know why they disputed this,' 'they told me this would get deleted,' and 'I am no longer disputing this.'"  Although this detail is responsive, Ad Astra does not explain whether this is the *only* criteria it applied to winnow the list from the initial 5,650 hits so that applying only this criteria resulted in the list of one hundred, or if Ad Astra applied this criteria in combination with some other criteria to narrow the list to one hundred.

The next sentence explains that, from that list of one hundred, Ad Astra then selected fifty names.  But Ad Astra provides no detail how it did so, simply stating that counsel selected the fifty names.  For the reasons explained below, Ad Astra may not refuse to provide the responsive information by belatedly asserting any attorney-client privilege and/or work-product objection.  Ad Astra has waived any such objections—both by failing to timely assert them and by placing the responsive information at issue.  Accordingly, Ad Astra must specify in its supplemental response how it selected fifty consumers from the list of one hundred.

In the next sentence, Ad Astra states that it determined thirteen individuals from the list of fifty were not associated with Lexington Law.  Again, Ad Astra does not specify how it reached this conclusion.  Ad Astra's response must explain how it made this determination.  Ad Astra also needs to provide additional information about how it selected the thirteen replacement names.  Reading the response, it appears that Ad Astra did not select these individuals from the list of one hundred.  But, in follow-up emails between counsel, Ad Astra states that seven of these individuals

appeared on the list of one hundred but six did not.  (ECF No. 192-10, at 3.)  Ad Astra provides

no explanation as to why one consumer was selected over another.  Ad Astra must supplement to

explain how it selected the remaining thirteen names, including whether they were selected from

the list of one hundred and, if not, why not.

## IV.   AD ASTRA WAIVED ANY ATTORNEY-CLIENT PRIVILEGE OR WORK PRODUCT OBJECTION

Defendants also argue that whatever criteria Ad Astra used to select the fifty consumers

are not privileged or work-product.  In support, defendants argue that Ad Astra waived any such

claim in two respects: (1) by not timely asserting a privilege or work-product objection to the

interrogatory, and (2) by placing the criteria it applied for selecting the fifty consumer files at issue.

As explained below, the court agrees.

### A.  Ad Astra Waived Any Such Objections By Failing to Timely Assert Them

FED. R. CIV. P. 33(b)(4) specifies that untimely objections are waived unless the court

excuses the failure to object for good cause.  *See also In re 650 Fifth Ave. & Related Properties*,

830 F.3d 66, 99 n.30 (2d Cir. 2016) (noting the rule).  The word "timely" is construed to mean the

30-day time period to respond to the interrogatory. *Richmark Corp. v. Timber Falling Consultants*,

959 F.2d 1468, 1473 (9th Cir. 1992) ("It is well established that a failure to object to discovery

requests within the time required constitutes a waiver of any objection."); *see also Swackhammer*

*v. Sprint Corp. PCS*, 225 F.R.D. 658, 665 (D. Kan. 2004) (failure to assert a relevance objection

an initial response to an interrogatory waived the objection because it was untimely).

Ad Astra waived any attorney-client privilege or work-product objection—or any other

objection, for that matter—it may have had to the interrogatory by not timely asserting those

objections, and good cause does not exist to excuse that failure.  Ad Astra did not assert a specific

attorney-client privilege or work-product objection in its initial response or in its two subsequent

supplemental responses.  Yet Ad Astra's most recent supplemental response differentiates between counsel's actions and its employees' actions in formulating the list of fifty consumers—and unnecessarily so.  The interrogatory does not require Ad Astra to distinguish between what its own personnel did and what its counsel did.  It simply requires Ad Astra to explain "the process used by Ad Astra to select the list of fifty consumers."  (ECF No. 192-3, at 7.)  Despite this, Ad Astra unilaterally chose to distinguish between its own personnel's role versus its counsel's role in the process.  And the way that Ad Astra framed its response reveals that Ad Astra contemplated a difference in what responsive information it was required to disclose depending on which individual exercised judgment because, not only did Ad Astra voluntarily choose to distinguish between its personnel versus its counsel (a distinction that the interrogatory does not require), but then Ad Astra conspicuously omitted responsive information that presumably would have come from counsel.  Meanwhile, Ad Astra never asserted any privilege and/or work-product objection.

Ad Astra tries to overcome its failure to timely assert any such objection by arguing that the interrogatory itself does not call for the disclosure of privileged information, and that it only asserted the objections in follow-up emails responding to defense counsel's questions about what guidance Ad Astra's counsel gave in implementing the selection process.  In other words, Ad Astra essentially argues that the objections are not before the court because it did not raise them in response to the interrogatory itself.

This rationale is without merit for two reasons.  First, Ad Astra's second amended response discloses that its counsel was involved in the selection process and Ad Astra now contends that "any guidance given by counsel to Plaintiff in implementing that process *is* privileged."  (ECF No. 196.)  In other words, Ad Astra now admits that a substantive response implicates privileged information.  Second, Ad Astra's argument improperly seeks to do an end run around the formal

discovery process.  When Ad Astra was served with this interrogatory, it was incumbent upon Ad Astra to determine whether a substantive response would implicate privileged and/or work-product information and, if so, to timely assert those objections in its response.  But instead of doing that, Ad Astra served multiple non-responsive, evasive, and argumentative responses.  It was only once Ad Astra finally provided some semblance of a substantive response that it belatedly asserted privilege in emails between counsel.  A party does not demonstrate good cause for asserting a belated privilege or work-product objection by serving an interrogatory response that does not implicate privilege or work-product information only because the response is wholly deficient when a proper substantive response would call for the disclosure of such information.  Ad Astra therefore waived any attorney-client privilege and work-product objections in responding to this interrogatory.

### B.  At-Issue Waiver

Defendants also argue that Ad Astra waived any attorney-client privilege objection by placing the advice of counsel at issue in this litigation.  Courts commonly employ one of three approaches to determining whether a party waived privilege by putting the fact of communication at issue.  The intermediate approach provides that a party waives privilege when: (1) asserting the privilege is a result of an affirmative act, such as filing suit, by the party asserting it; (2) through the affirmative act, the party put protected information at issue by making it relevant to the case; and (3) applying the privilege would deny the opposing party access to information that is vital to its own case.  *See Hearn v. Rhay,* 68 F.R.D. 574, 579–81 (E.D. Wash. 1975) (originating the intermediate test, often known as "the *Hearn* test").  The Tenth Circuit has not adopted an approach for assessing at-issue waiver, but it has applied the *Hearn* test in addressing state law privilege claims.  *See Seneca Ins. Co. v. W. Claims, Inc.*, 774 F.3d 1272, 1276 (10th Cir. 2014) (applying

*Hearn* because both parties agreed that Oklahoma courts would apply a version of the *Hearn* test); *see also Frontier Ref., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 701 (10th Cir. 1998) (applying Wyoming law).  And other judges in this district have predicted that the Tenth Circuit would adopt the *Hearn* test.  *See, e.g., New Jersey v. Sprint Corp.*, 258 F.R.D. 421, 430 (D. Kan. 2009); *Williams v. Sprint/United Mgmt. Co.*, 464 F. Supp. 2d 1100, 1104 (D. Kan. 2006).[2]

The at-issue waiver doctrine is grounded in principles of fairness.  A party cannot put advice of counsel at issue in a manner that "in fairness requires the examination of privileged material."  *UUSI, LLC v. United States*, 121 Fed. Cl. 218, 225 (2015).  Courts generally consider whether fairness requires disclosure on a case-by-case basis, considering the context in which a party asserts privilege.  *In re Grand Jury Proceedings*, 219 F.3d 175, 183 (2d Cir. 2000).  "In other words, when a party entitled to claim the attorney-client privilege uses confidential information against his adversary (the sword), he implicitly waives its use protectively (the shield) under that privilege."  *In re Itron, Inc.*, 883 F.3d 553, 558 (5th Cir. 2018); *see also* 8 Charles Alan Wright & Arthur R. Miller, *et al.*, Federal Practice and Procedure § 2016.6 (3d ed.) (characterizing the privilege as one to suppress the truth, "but that does not mean that it is a privilege to garble it" (quotation omitted)).

---

[2] Ad Astra asserts both federal and state-law claims.  In such a case, the court considers both bodies of law.  *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1369 (10th Cir. 1997).  But the Kansas attorney-client privilege statute is typical of federal common law and the laws of other states.  *See In re Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2017 WL 2555834, at *1 (D. Kan. June 13, 2017) (applying federal law in a MDL involving only remaining state-law claims because there was no notable difference); *see also Herrmann v. Rain Link, Inc*., No. 11-1123-RDR, 2012 WL 1207232, at *4 (D. Kan. Apr. 11, 2011) ("Kansas law and federal law generally do not conflict concerning the elements and interpretation of the attorney-client privilege.").  Like the Tenth Circuit, the Kansas Supreme Court has not adopted or declined to adopt a test for at-issue waiver, but other courts in this district have predicted that, like the Tenth Circuit, Kansas would not adopt the automatic-waiver rule.  *See DeWitt v. Sw. Bell Tel. Co.*, No. 12-2605-SAC, 2014 WL 695744, at *5 (D. Kan. Feb. 24, 2014) (collecting cases).

Ad Astra cannot rely on the fifty-client sample as being representative in any sense (and presumably put on evidence to support the assertion) but then deprive defendants of the ability to test the assertion by claiming that portions of the selection method may be privileged.  Ad Astra has already touted its selection method as a "sword" by asserting, in the interrogatory response itself, that the sample is representative.  The response argues that "Ad Astra is confident that the 50 consumers it selected are *representative* of Lexington Law's overall client base."  (ECF No. 192-8, at 5-6 (emphasis added).)  Ad Astra's opposition to Lexington Law's motion to compel reaffirms this position.  Ad Astra states that it does not contend that the sample is statistically valid, but rather that it is "'representative' in the colloquial sense."  (ECF No. 196, at 3.)

During a hearing on the motion to compel during the final pretrial conference, the court gave Ad Astra an opportunity to withdraw this position so as to avoid defendants' at-issue waiver argument.  The court asked counsel whether Ad Astra intended to preserve its rights to present evidence or argument (at trial or otherwise) characterizing the sample as being unbiased in the sense that it was "representative," "random," or the like.  In response, Ad Astra's counsel asked to email a response to the court the following business day, which the court allowed.  But the emailed response effectively doubled down on its rights to somehow tout the legitimacy of its selection process, essentially obfuscating Ad Astra's plans for the material.  Ad Astra states that it will not argue the files constitute "a random sampling or a statistically valid representative sample" but that Ad Astra still wants to reserve the right to argue that the material "demonstrates a pattern of misconduct."  This is no different than what Ad Astra had advocated previously and still leaves the door open for Ad Astra to argue that the sample is "'representative' in the colloquial sense." Defense counsel responded by reiterating this concern.  Ad Astra again repeated its same position (i.e., that it does not intend to argue that the material is a random sampling or a statistically valid

sampling), but added that it reserves the right to argue a "pattern of misconduct," which Ad Astra characterized as "merely a reservation to argue the facts elicited from the evidence, as the proponent of evidence is always free to do."  The email further states that Ad Astra does not intend to argue that the evidence is a representative sample of the files and recordings *not* produced by Lexington Law.  These follow-up emails are insufficient to retract Ad Astra's position.  Ad Astra apparently still plans to argue the consumer files are representative in some fashion, whether "representative in the colloquial sense," as part of a "pattern of misconduct," or some variation thereof.[3]

Thus, Ad Astra has taken the affirmative act of asserting representativeness—putting the matter at issue—and it has not unequivocally retracted that position to obviate any at-issue waiver. By taking this position, Ad Astra made its selection process relevant to the case and this includes whatever portions of that process involved counsel.  And because Ad Astra is the only source of how it made the selection, application of the privilege would deny defendants access to vital information to potentially rebut the assertion.  In short, although Ad Astra has been less than clear about its plans, to the extent it seeks to argue any variation of an argument that the sample is

---

[3] The cases Ad Astra relies on in support of its position are factually distinguishable.  In *Williams v. Sprint/United Management Co.*, the court considered a number of arguments that plaintiffs contended amounted to defendant putting the advice of counsel at issue, one of which was defendant's witnesses' deposition testimony.  464 F. Supp. 2d 1100 (considering objections to a magistrate judge's underlying discovery order).  The court found that a party does not voluntarily raise advice of counsel when its witnesses simply respond to direct questions from opposing counsel during depositions.  *Id.* at 1116.  This bears no resemblance to the facts here.  In this case, the court's at-issue waiver is based not on Ad Astra's response to follow-up questions posed by email (to which Ad Astra objected anyway), but instead on Ad Astra's continued pursuit of its position that the sample is representative in some sense of the word—a position that Ad Astra unilaterally and voluntarily chose to take in this litigation and failed to unequivocally retract when given the opportunity to do so.  Ad Astra also relies on *New Jersey v. Sprint Corp.*, but that case is largely distinguishable for the same reasons. 258 F.R.D. at 432 (relying on *Williams* to find that "defendants have not impliedly waived the attorney-client privilege by placing advice of counsel at issue through . . . deposition testimony").

somehow representative, regardless of semantics, it has put the matter at issue.  Fairness therefore dictates that defendants should be able to discover the basis for the selection.

## V.    REASONABLE FEES AND EXPENSES

Because the court grants defendants' motion in full, it must consider whether to award defendants their reasonable expenses, including attorneys' fees, incurred in filing this motion.  *See* Fed. R. Civ. P. 37(a)(5)(A) (stating that the court must impose fees unless the movant filed the motion before conferring in good faith; the opposing nondisclosure was substantially justified; or other circumstances make an award of expenses unjust).  Relatedly, it is worth noting that this is now essentially the fifth time the court has considered the issue of Lexington Law's client communications in some fashion.  The court first considered the discoverability of these client communications at an in-person hearing on Ad Astra's wide-ranging motion to compel.  (ECF Nos. 33 & 42.)  The court reserved ruling on two production requests targeted at client communications and later granted Ad Astra's motion to compel production because Lexington Law had not supported its objections.  *See Ad Astra*, 2019 WL 1753958, at *4.  Up to that point, the court was ruling on discovery requests and objections at a high level and without either side's full understanding of the magnitude of production involved.  About a month later, Lexington Law told the court and Ad Astra that production would involve communications with more than 14,000 clients, and both parties agreed that it would be inefficient to proceed this way.  To that end, they agreed that Ad Astra could select up to one hundred clients for whom Lexington Law would produce documents.  Since that time, the attorney who took the lead for Ad Astra at the discovery conference has left the firm, and new defense counsel have become involved the case.  The court has now held two discovery conferences taking up issues related to the interrogatory and is now issuing this formal order.  At some point, the efficiencies that the parties originally sought to gain

from their agreement to narrow the scope of the production requests to select consumer files will be overshadowed by their ongoing disputes over how Ad Astra compiled the list.

That said, Ad Astra's initially dismissive ("We are done responding to this fiction.") and hide-the-ball tactics; its intransigence in unnecessarily dragging out a substantive response for months in disregard of the court's repeated admonitions that it should simply answer the interrogatory; its largely non-responsive, evasive, and argumentative second amended interrogatory response; and its gamesmanship with privilege may warrant an award of fees. But litigating whether fees and expenses are warranted and, if so, the appropriate amount, often results in the parties spending as much time and resources as they did litigating the underlying discovery motion. For this reason, the court orders defendants to serve a notice by **June 22, 2020**, informing Ad Astra and the court whether it intends to seek fees. If defendants intend to seek fees, the notice shall provide the dollar amount requested, including whatever fees Lexington Law estimates it will incur in further briefing on this matter. Thereafter, the parties must confer to attempt to reach an agreement regarding the issue of fees on or before **June 29, 2020**. If the parties have not reached agreement by that date, defendants may file a motion seeking fees by **July 7, 2020,** with the memorandum in support limited to five pages**.** Ad Astra's response brief is due by **July 14, 2020,** and is limited to five pages. Defendants' reply brief is due by **July 17, 2020,** and is limited to three pages.

## VI.     CONCLUSION

Defendants' motion is granted, and the court orders Ad Astra to serve an amended response to Interrogatory No. 1 by **June 12, 2020,** that omits all argumentative and nonresponsive verbiage and provides additional substantive detail, as directed above. This response shall be accompanied by a signed verification as required by the Federal Rules of Civil Procedure. Simultaneously, Ad

Astra must provide a copy of that amended response and verification to the undersigned's chambers at ksd_mitchell_chambers@ksd.uscourts.gov.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Compel a Complete Response to Interrogatory No. 1 (ECF No. 191) is granted.

**IT IS SO ORDERED.**

Dated June 5, 2020, at Topeka, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge