## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

AD ASTRA RECOVERY          )
SERVICES, INC.,            )
                           )
           Plaintiff,    )
                           )
       v.            )          Case No. 18-1145-JWB-ADM
                           )
JOHN CLIFFORD HEATH, ESQ., *et al.*,    )
                           )
         Defendants.    )

## MEMORANDUM AND ORDER

This matter comes before the court on Plaintiff Ad Astra Recovery Services, Inc.'s ("Ad Astra") Motion for Leave to Amend the First Amended Complaint (ECF 214) and, separately, two discovery motions that involve the same set of documents: (1) Defendants' Motion for a Protective Order (ECF 227), and (2) Ad Astra's Motion to Compel Defendants' Removal of their Attorneys' Eyes Only Designation and Redactions of Certain Agreements (ECF 231). Ad Astra initiated all of the issues raised in these motions months after the March 13 discovery deadline, in the midst of multiple rounds of revisions to the pretrial order.

Ad Astra's motion for leave to amend seeks to add a civil conspiracy claim. This motion is denied because Ad Astra has not shown good cause for filing this motion well beyond the scheduling order deadline to amend the pleadings. Ad Astra could have pleaded this claim sooner. The motion is also denied based on undue delay, futility, and undue prejudice to defendants if Ad Astra were allowed to inject this new legal theory at this late stage of the litigation.

The parties' competing motions to compel and for a protective order dispute whether defendants may maintain their Attorneys' Eyes Only ("AEO") designation and redaction of pricing information in defendant Lexington Law's contracts with the three major credit bureaus. As

explained below, Ad Astra's motion to compel these contracts to be reproduced without the AEO designation and redactions is denied, and defendants' motion for a protective order allowing them to maintain the AEO designation and redactions is granted.  No basis exists to compel further production of these contracts because they were not subject to any pending discovery request during the discovery period, which closed on March 13 (with limited exceptions that are not present here).  Ad Astra had notice of these documents nine months ago, mentioned them in a court filing four months ago, and had ample opportunity to pursue them during the fourteen months the court was routinely engaged in resolving numerous discovery disputes between the parties. Instead, Ad Astra waited until June 18 to informally request them from defendants while the parties were preparing their *second* draft pretrial order.  When Ad Astra did so, defendants voluntarily produced them in a good faith effort to avoid discovery disputes—apparently to no avail.  Thus, defendants' production of these documents is informal discovery outside the discovery period. And defendants have shown good cause to support the AEO designation and redactions.

The purpose of preparing a pretrial order is to encourage self-editing and for the parties to provide "reasonably fair disclosure to the court and opposing parties alike of their real trial intentions."  *Monfore v. Phillips*, 778 F.3d 849, 851 (10th Cir. 2015) (Gorsuch, J.).  Granting Ad Astra's motions would not further these goals.  Rather than clarifying matters, it would only serve to complicate the contours of the claims and record after nearly two years of discovery when Ad Astra had ample time and opportunity to pursue these issues.

## I.     BACKGROUND

Ad Astra is a debt collector and credit agency that filed this case in May 2018.  It alleges that defendants "engaged in a fraudulent credit-repair scheme designed to bombard debt collectors with false credit dispute letters with the intention of deceiving debt collectors . . . and frustrating

their efforts to collect legitimate debts." (ECF 120 ¶ 3.) Ad Astra alleges that defendants used deceptive marketing techniques to solicit financially troubled consumers by offering services from a law firm in hopes that the consumers would sign up for their credit-repair services. (*Id.* ¶ 5.) Once consumers signed up, the law firm would transmit mass credit-dispute letters to creditors in the consumer-clients' names without disclosing that the firm prepared and transmitted them. Ad Astra alleges this practice was designed to circumvent the Fair Credit Reporting Act ("FCRA") and trigger Ad Astra to perform certain onerous statutory investigative requirements. (*Id.* ¶¶ 6-9.) Ad Astra asserts four claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1962(c) and (d) and a Kansas common law fraud claim.[1] Defendants include (1) the law firm John C. Heath, Attorney at Law, PLLC d/b/a Lexington Law ("Lexington Law"); (2) Lexington Law attorneys John Clifford Heath, Kevin Jones, and Adam C. Fullman; (3) other related corporate entities allegedly involved in the scheme, including Progrexion Holdings, Inc.; Progrexion Teleservices, Inc.; PGX Holdings, Inc.; Progrexion ASG, Inc.; Progrexion Marketing, Inc.; Progrexion IP, Inc.; and (4) Jeffrey R. Johnson, CEO of the Progrexion entities.

## A. Background of Discovery, Including Delays Prompted by Ad Astra's Prior Amendment to the Pleadings

This case has a long and tortured procedural history, which the court will summarize in abbreviated fashion to the extent that it bears on the present motions. Discovery opened in August 2018 and was originally set to close approximately one year later on August 20, 2019. (ECF 21.) The first discovery motion was not filed until some six months later, and it revealed that the parties were still only in the preliminary stages of discovery. (ECF 33.) On April 4, 2019, the court convened a discovery conference and ruled on a number of outstanding discovery issues. (ECF

---

[1] Ad Astra also pleaded a claim for tortious interference with contractual relationships, but Ad Astra informed the court during the pretrial conference that it intends to abandon that claim.

41, 42, 44.)  The court recognized the case schedule would likely need to be extended considering the near-impossibility of timely completing discovery in view of the then-nascent stage of discovery.  On April 26, the court convened another discovery conference to address follow-up discovery issues and, after consultation with the parties, modified the scheduling order to reset realistic case deadlines.  (ECF 45-47.)  The court gave the parties an approximately sixty-day extension, with expert disclosures due in August, September, and October; discovery completion by November 20; a pretrial conference on December 5; and a deadline for dispositive and expert motions on December 18.  (ECF 47 ¶¶ 1-5.)  The court repeatedly told the parties to contact the undersigned any time they had discovery disputes they could not resolve so that the court could facilitate the orderly and efficient resolution of those disputes and not let them bog down the case schedule.  (*See, e.g.*, *id.* ¶ 6.)  Throughout 2019, the court was routinely involved in resolving many such disputes.  (*See, e.g.*, ECF 54, 55, 59, 61-62, 70, 73, 84, 87, 108.)

Meanwhile, on September 4, the court granted the parties' joint request to extend expert disclosure deadlines to October and November, and the discovery completion deadline to November 27.  (ECF 67-68.)  But the court denied the parties' request to extend the pretrial conference setting or the dispositive motion deadline.  The court had repeatedly cautioned the parties that it would not be inclined to further extend those dates and, by November 27, they would have had ample time to conduct discovery—a total of fifteen months—and both sides had contributed to unnecessary discovery delays in various ways.

By October 31, the parties sought yet another extension of the schedule, which the court granted in part and denied in part.  (ECF 86.)  In view of ongoing discovery disputes, the court compressed the deadlines for expert disclosures to November 6 through December 4; granted a modest extension of the deadline to complete all discovery to December 11; continued the pretrial

conference to December 17; and granted a minor adjustment to the deadline for dispositive and expert motions. (*Id.*)

As the parties were wrapping up discovery in November and December 2019, the landscape of the case shifted significantly. Up until then, the named defendants had included Lexington Law, Heath, Jones, Fullman, Lexington Consumer Advocacy, LLC, Progrexion Teleservices, Inc., Progrexion Holdings, Inc., and "XYZ Corp" and "John Doe" defendants. As depositions progressed, Ad Astra learned more about the various corporate entities involved in the alleged scheme at issue in this litigation. By November of 2019, Ad Astra issued a subpoena to depose H.I.G. Capital, LLC—a private equity company with an interest in PGX Holdings, Inc., which is a parent of the other Progrexion entities. (ECF 88-89.) H.I.G. Capital did not appear for the deposition, and Ad Astra requested a discovery conference to discuss this. (ECF 92.) The day after the court noticed the matter for a discovery conference, a new team of defense lawyers moved for admission pro hac vice—approximately 18 months into the case. (ECF 93-94.) At that discovery conference, the court granted Ad Astra's motion to compel H.I.G. Capital's deposition and Ad Astra notified the court that it intended to seek leave to add certain Progrexion-related defendants in view of what it had recently learned during discovery. (ECF 100.) Around the same time, a dispute arose about the scope and timing of expert disclosures, so the court gave the parties an approximately one-month extension to try to resolve those issues while Ad Astra moved to amend to add the new Progrexion-related defendants. (ECF 100-102.)

On December 26, the court granted Ad Astra's motion for leave to amend to drop Lexington Consumer Advocacy, LLC as a defendant, to add certain Progrexion-related defendants, and to clarify each defendant's role in the alleged scheme. (ECF 119.) The court granted the motion in part because defendants represented to the court during a discovery conference on

December 13 that, if the court granted the motion to amend, the newly added defendants would need only two additional months of discovery.  (*Id.* at 108.)[2]  The court therefore granted an approximately two-month extension to allow the newly added defendants to conduct discovery. The court extended the deadline to complete discovery to March 13, 2020, followed by the pretrial conference, and set an April 17 deadline for dispositive and expert motions.  (ECF 140.)  By March 13, the parties had largely completed discovery except for two depositions the parties had agreed to take in late March.  (ECF 157.)  Then the COVID-19 pandemic hit.  In view of the timing, the court allowed the parties to postpone and reschedule those depositions, continued the pretrial conference to May 29, and extended the dispositive and expert motions deadline to June 12.  (ECF 157, 160.)  During this extended period of discovery to accommodate the late-added defendants and COVID-19 related delays, the court continued to resolve the parties' numerous discovery-related disputes.  (ECF 142, 144, 146, 155, 158-159, 182-183, 189, 199, 202, 204.)

## B.      The Pretrial Conference

Against this backdrop, this case entered the pretrial-conference stage in May.  On May 22, the parties submitted their jointly proposed pretrial order.  When the court convened the pretrial conference on May 29, the undersigned asked the parties to make certain revisions to the pretrial order.  Among other things, Ad Astra's factual and legal contentions repeatedly lumped defendants together by collectively referring to them as "Defendants" or the "Progrexion Entities" without sufficiently clarifying the alleged distinctions among them, such as their respective roles, their interplay, and the basis for asserting the various claims against each.  The court directed Ad Astra to revise its contentions, including identifying which defendant committed which acts; explaining

---

2 On January 3, 2020, Ad Astra's counsel Hillary Korman withdrew as counsel of record because she had left Ad Astra's litigation counsel's law firm, Blank Rome, LLP.  (ECF 133.)  Up to that point, Korman had borne the bulk of the laboring oar representing Ad Astra at court hearings and seemed to have the most integral knowledge of the case from Ad Astra's perspective.

each defendant's role in the alleged scheme; and specifying how each defendant allegedly committed fraud—particularly those defendants that had not been involved with transmitting the dispute letters to Ad Astra, which is the alleged act forming the basis of the fraud claim. The court directed the parties to submit a second draft of the pretrial order by June 22, which the court would take up when it reconvened the final pretrial conference on June 24. (ECF 203.)

The parties resubmitted their second draft pretrial order on June 22. In that second draft, Ad Astra sought to add a Kansas common law civil conspiracy claim against all defendants. Defendants objected to this new claim because Ad Astra had not previously pleaded it. The court withheld entry of the pretrial order to allow Ad Astra to file a formal motion to amend. Ad Astra's motion to amend now before the court seeks leave to assert this civil conspiracy claim.

At the reconvened pretrial conference on June 24, the undersigned continued to require Ad Astra to clarify its legal and factual contentions to distinguish amongst the various defendants. Although Ad Astra had added the required detail in some places, its factual and legal contentions continued to lack clarity in other places by repeatedly referring to "defendants" collectively. The court therefore recirculated another draft pretrial order in which it directed Ad Astra to, among other things, (1) revise its factual contentions to specify which of the defendant entity(ies) prepare and send the dispute letters, and (2) revise its legal contentions supporting its fraud claim as to each defendant. (ECF 224, at 28:5-13 (stating that each defendant had to make a false statement as to an existing and material fact and so "lumping them all together as 'defendants' doesn't work under Kansas law").) Specifically, the court directed Ad Astra to once again revise the pretrial order—this time, specifying the alleged misrepresentation each defendant made. (*Id.*) The court ordered the parties to submit a final third draft of the pretrial order by July 10. (ECF 209.)

When the parties submitted that third draft on July 10, they made many of the changes requested by the court.  In clarifying the contours of the fraud claim, Ad Astra dropped that claim as to all defendants except Progrexion Holdings, Progrexion IP, and Lexington Law.  But Ad Astra still effectively seeks to maintain its common law claims as to all of the defendants by belatedly asserting the civil conspiracy claim.

Ad Astra's revisions in the third draft pretrial order also included substantive revisions beyond the scope of the revisions the court had allowed.  For example, Ad Astra added sixteen new footnotes to its factual contentions.  It added lengthy and unnecessarily detailed factual contentions concerning Lexington Law's contractual agreements with TransUnion—640 words total, including seven footnotes.  In a separate footnote, Ad Astra stated that it anticipated filing a motion to compel concerning redactions to pricing information in the TransUnion agreements and Lexington Law's designation of the agreements as AEO under the protective order.  At a discovery conference on July 22, the court learned that Lexington Law had since produced its agreements with the other two major credit bureaus, also with the AEO designation and similar redactions of pricing information.  The court therefore set a briefing schedule for the parties to file competing motions so that the court could resolve their disputes over the AEO designations and redactions. (ECF 221.)  Those motions are now ripe.  Nonparties TransUnion, Experian Information Solutions, Inc., and Equifax Information Services, LLC also filed briefs and declarations to support defendants' request to maintain the AEO designation and redactions in the credit bureau contracts.

## II.    LEXINGTON LAW'S CONTRACTS WITH THE CREDIT BUREAUS

The court turns first to the parties' competing motions regarding Lexington Law's credit bureau contracts—specifically, defendants' AEO designation and redaction of pricing information in those contracts.  Ad Astra moves the court to compel defendants to downgrade the AEO

designation to "confidential" and to produce unredacted versions that reveal the pricing information.  Conversely, defendants seek a protective order allowing them to maintain the AEO designation and the redactions of pricing information, thus making clear that defendants need not take any further action with respect to these documents.  For the reasons stated below, Ad Astra's motion to compel is denied, and defendants' motion for a protective order is granted.

### A.     Late Production of the Credit Bureau Contracts

The parties' dispute over the credit bureau contracts did not first arise until months after discovery closed.  As explained above, discovery closed on March 13, except for two depositions that were delayed until May because of the COVID-19 pandemic.  Ad Astra claims this issue was prompted by defendants' factual contentions in the draft pretrial order.  Defendants' factual contentions in the draft pretrial order submitted on May 22 stated in relevant part that "communications to the credit bureaus . . . are submitted electronically to the credit bureaus on platforms created pursuant to partnerships Lexington Law has with the credit bureaus," and that Lexington Law "communicated with the bureaus on its clients' behalf pursuant to contracts it has with the credit bureaus."  (May 22 draft pretrial order, at 11-12.)  Yet Ad Astra did not request production of these documents at the May 29 pretrial conference, and the court did not identify this aspect of the draft pretrial order as needing any further revisions.

Ad Astra first emailed defendants about the contracts on June 18.  (ECF 228-4, at 1.)  Ad Astra identified the above language in defendants' factual contentions and asked defendants to produce copies of the contracts if they had not already done so.  (*Id.*)  Defendants responded, explaining that Ad Astra had been aware of Lexington Law's contracts with the credit bureaus since at least November 5, 2019, when Ad Astra's counsel asked about those agreements at the deposition of Lexington Law's corporate representative, Cody Johnson.  (ECF 228-5, at 3.)  But Ad Astra contended that the documents should be produced immediately because they were

responsive to its Request for Production ("RFP") No. 67, and Ad Astra threatened to seek to exclude these contracts pursuant to Rule 37(c)(1).  (*Id.* at 1.)  Defendants disagreed that they should have produced the credit bureau contracts because Ad Astra expressly narrowed this RFP to exclude these contracts at the court hearing on April 4, 2019.  Furthermore, Ad Astra had never followed up to request that Lexington Law produce them after Johnson's deposition in November 2019.  Nevertheless, defendants voluntarily produced the contracts "in a good-faith effort to avoid unnecessary discovery briefing at this stage of the case."  (ECF 228, at 1.)  When defendants produced the contracts, they designated them as AEO and redacted certain pricing information.

**B.    The Contracts Were Not Responsive to Any Pending Request for Production During the Discovery Period**

The scheduling order required all discovery to be "commenced or served in time to be completed by March 13, 2020."  (ECF 140.)  Therefore, the court must first address whether the credit bureau contracts were responsive to any request for production that was pending during the discovery period upon which the court can compel production.  Ad Astra identifies RFP No. 67, which seeks Lexington Law's contracts with "outside vendors  . . . including, but not limited to, the United States Postal Service and/or other delivery service providers, such as Federal Express and UPS, and the credit bureaus."  (ECF 234-10, at 15.)  Defendants point out that this RFP was the subject of Ad Astra's initial motion to compel filed on February 28, 2019, and that Ad Astra narrowed this RFP to exclude the credit bureau contracts via its arguments at the April 4 hearing on that motion.  Ad Astra disputes that it narrowed the scope of this RFP at the hearing.

The court has reviewed the relevant portion of the hearing transcript.[3]  Lexington Law told the court that it had already produced documents responsive to RFP No. 67 such as contracts

---

[3] The attorney appearing on for Ad Astra at the April 4 hearing has now left the firm and no longer represents Ad Astra in this case. The only other attorney present for Ad Astra was local counsel.  In other words, the attorneys drafting this brief and attempting to explain to the court

among the co-defendants and with other Progrexion entities.  Defense counsel stated that he did

not know what other information Ad Astra wanted.  He stated, "[D]oes she want the vendor we

have with the coffee service?  Does she want the contract we have [with] the lawn maintenance?"

(ECF 240-2, at 91:7-9.)  When the court asked Ad Astra what additional vendor agreements it

sought, Ad Astra's counsel explained as follows:

> It's more how the primary vendors that they're using to conduct their
> business. He is agreeing to produce the USPS agreement. We would
> just want that to include **any sort of mailing vendors that they're**
> **using to assist them in mailing out these letters**. Our
> understanding is that Lexington Law prints them using Progrexion's
> equipment on site in Utah. And then there's some sort of
> intermediate vendor that forwards them to other states so that they're
> being mailed from the state where the consumer resides, and we're
> looking for any sort of contractual agreements between the vendors
> that aid them in sending out these letters, and unfortunately, we
> don't know who they are to be more specific, but that's what we're
> looking for.

(*Id.* at 92:8-19 (emphasis added).)  The court clarified, "Okay.  So we're just talking about, just to

narrow this, the vendors who aid them in sending out these letters," and counsel responded "yes."

Based on this representation, the court granted the motion in part and denied in part.  (ECF 41.)

This transcript establishes that Ad Astra expressly narrowed the scope of this RFP at the

April 4 hearing to include only documents with mailing vendors who helped Lexington Law mail

the dispute letters.  Vendors who aid in sending "letters" transmitted by physical "mail" do not

encompass the credit bureaus.  The credit bureaus facilitated electronic transmission of disputes

rather than physical transmission of dispute letters through the U.S. mail.  Consequently, the

narrowed scope of this RFP does not encompass the credit bureau contracts.

---

what happened at the court's own hearing were not themselves at the hearing.  Furthermore, they
ordered a copy of the hearing transcript but did not submit it as an exhibit.  Instead, defendants
submitted that hearing transcript as an exhibit.  (*See* Pl.'s Ex. Index, No. 234-1.)

Ad Astra also argues that it was unaware that the credit bureau agreements existed at the time of the April 4 hearing. In substance, the court understands Ad Astra's argument to be that it should not be held to the narrowed scope of RFP No. 67 because Ad Astra did not know about those agreements at that time. But Ad Astra had ample time and opportunity to revisit this issue during the discovery period.

To understand the rulings made at the April 4 hearing, it is helpful to recap why the court held an afternoon-long, in-person hearing and what followed. Ad Astra had served numerous sweeping (and sometimes imprecise) discovery requests, and defendants had stonewalled Ad Astra by asserting boilerplate objections. In other words, the parties had made very little meaningful progress on document production six months into discovery. The court therefore required the parties to appear in person to break the logjam, sort through their various positions, understand what documents and information Ad Astra really needed, and find out what defendants could and should reasonably produce and when. The court ruled on these issues at a high level and noted "that as the parties worked together to fulfill their discovery obligations, they may encounter unforeseen issues necessitating additional rulings." *Ad Astra Recovery Servs., Inc. v. Heath*, No. 18-1145-JWB-ADM, 2019 WL 4466903, at *3 (D. Kan. Sept. 18, 2019) (ruling on a subsequent discovery dispute stemming from discovery requests at issue at the April 4 hearing). Essentially, the court invited the parties to revisit issues raised at the hearing if the rulings proved unworkable. Ad Astra requested multiple discovery conferences with the court following the April 4 hearing, during which the court resolved many of these issues and invited briefing on the more complex ones. *See, e.g., Ad Astra Recovery Servs., Inc. v. Heath*, No. 18-1145-JWB, 2019 WL 2448569, at *2 (D. Kan. June 12, 2019) (furthering addressing RFPs seeking income and compensation

documents, which was also at issue during the April 4 hearing).  But Ad Astra never raised any further issue about the credit bureau agreements.

In sum, Ad Astra expressly narrowed the scope of the RFP so that it no longer encompassed the credit bureau contracts, the court adopted the narrowed scope when it granted in part and denied in part Ad Astra's motion to compel, and Ad Astra never asked the court to revisit this ruling before discovery closed on March 13, 2020.  Therefore, Lexington Law's belated production of the contracts constitutes informal discovery by agreement of the parties beyond the discovery period.  Because they are not responsive to any discovery request that was pending before discovery closed, Ad Astra's motion to compel is not properly before the court.  *See Cont'l Cas. Co. v. Multiservice Corp.*, No. 06-2256-CM, 2008 WL 73345, at *8 (D. Kan. Jan. 7, 2008) (denying motion to compel without a formal discovery request because the court does not compel responses to informal discovery requests); *see also* FED. R. CIV. P. 37(a)(3)(B)(iv) (authorizing motion to compel production "as requested under Rule 34," which governs formal RFPs).

### C.   Ad Astra's Motion to Compel is Denied as Untimely

The court also denies Ad Astra's motion to compel and grants defendants' motion for a protective order because Ad Astra's motion is untimely under this court's local rules.  A motion to compel must be "filed and served within 30 days of the default or service of the response, answer, or objection that is the subject of the motion, unless the court extends the time for filing such motion for good cause."  D. KAN. RULE 37.1(b).  Thus, a party may file a motion to compel within thirty days or longer time period for good cause shown.  Good cause exists if the moving party shows it acted diligently in attempting to resolve the discovery dispute at issue.

Ad Astra has not demonstrated that its motion was filed within thirty days or within another period for good cause shown.  Ad Astra filed its motion to compel concerning RFP No. 67 on February 28, 2019, which was more than thirty days after Lexington Law served its responses and

objections on November 14, 2018.  (ECF 33; ECF 234-12, at 33.)  At that time, the court found

good cause for the motion filed on February 28 and ruled on the merits.  As explained above, as to

RFP No. 67, the court granted the motion as to Lexington Law's contracts with mailing vendors

involved in sending the dispute letters but otherwise denied the motion.  To the extent Ad Astra

now seeks to compel Lexington Law to produce documents responsive to another aspect of RFP

No. 67—namely, Lexington Law's contracts with the credit bureaus—Ad Astra must demonstrate

good cause for its delay in filing that motion from December 14, 2018, to July 31, 2020.

Ad Astra has not shown that it acted diligently during that time period in attempting to

resolve any discovery dispute concerning Lexington Law's production of the credit bureau

contracts.  Ad Astra was put on notice that the credit bureau agreements existed when Johnson

testified about them at his deposition on November 5, 2019.  He testified that Lexington Law had

agreements with the credit bureaus regarding exchanging information.  (ECF 228-2, at 104:19-21.)

Counsel further inquired about the agreements:

> Q:  Do you have contracts with the credit bureaus? . .
> A:  I'm not sure what the agreements are with the credit
> bureaus.  I've never seen them.
> Q:  Do you have agreements with the credit bureaus?
> A:  I'm not sure what they are.  I'm not sure what I would even
> call them.  So much I've never seen them.  I don't know if they
> would be agreements or contracts or what.
> Q:  Do you have something between yourself and the credit
> bureaus that allows you to communicate electronically with them?
> A:  Yes.
> Q:  Okay.  Thank you.

(ECF 219-4, at 250:4-18.)  Johnson then went on to describe how disputes were electronically

submitted pursuant to these agreements.

Ad Astra argues Johnson's testimony was vague because he had never seen the agreements

and did not have personal knowledge of them.  But the fact that he lacked personal knowledge

about the exact form of the contracts is immaterial.  His testimony sufficiently put Ad Astra on

notice that they existed and were the mechanism that allowed Lexington Law to communicate electronically with the credit bureaus.  Ad Astra could have and should have followed up on this issue with defense counsel.  Instead, Ad Astra served a fourth set of RFPs three days after the deposition that followed up on various documents Johnson mentioned during his deposition, but not the credit bureau contracts.  (ECF 228, at 3.)

Ad Astra did not first contact defendants to ask them to produce the contracts until seven months later on June 18, 2020.  (ECF 219-3, at 2.)  During that lag, the parties' spent months completing discovery, including an extended period to accommodate Ad Astra's amendment to add additional defendants.  During all this time, the court continued to be integrally involved in resolving numerous discovery disputes.  It was not until the parties were finalizing their *second* draft of the pretrial order that Ad Astra requested Lexington Law's contracts with the credit bureaus.  But defendants' factual contentions in the pretrial order were not new.  Defendants included them in the first draft pretrial order on May 22.  ("With respect to electronic communications to the credit bureaus, Lexington Law made no representations . . . to Ad Astra; rather, it communicated with the credit bureaus on its clients' behalf *pursuant to contracts it has with the credit bureaus*." (emphasis added).)   And this contention mimics Johnson's salient deposition testimony from eight months earlier.  Indeed, in a court filing on April 15, Ad Astra pointed out his testimony "that Lexington Law corresponds with credit bureaus electronically, via computer code, **pursuant to agreements it has with credit bureaus**," and Ad Astra attached the deposition excerpt.  (ECF 173, at 2 (emphasis added); ECF 173-1, at 4-5.)

Ad Astra's inquiry about these contracts on June 18 does not demonstrate diligence in attempting to obtain these documents.  Because of this, the court cannot find good cause for its motion.  The motion is therefore denied as untimely under D. KAN. RULE 37.1(b).  For the same

reason, defendants' motion for a protective order against Ad Astra seeking to compel further production of these documents is granted.

### C.    Lexington Law Has Shown Good Cause to Maintain the Confidentiality Designation and Redactions of Pricing Information

Defendants separately move for a protective order authorizing the AEO designation and redactions of pricing information, thus requiring them to take no further action as to these documents.  If a motion to compel is denied, the court may issue any protective order authorized by Rule 26(c).  FED. R. CIV. P. 37(a)(5)(C).  Under that rule, the court may, for good cause, "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." FED. R. CIV. P. 26(c)(1).  "The 'good cause' standard of Rule 26(c) is highly flexible, having been designed to accommodate all relevant interests as they arise." *Rohrbough v. Harris*, 549 F.3d 1313, 1321 (10th Cir. 2008) (internal quotation marks omitted).  "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984).

### 1.    Untimely & Informal Discovery as a Basis for Good Cause

Defendants argue good cause exists because Ad Astra is seeking discovery outside of the March 13 discovery deadline and not in response to a formal RFP.  Defendants therefore contend that a protective order is warranted to protect them from the undue annoyance of responding to untimely and informal discovery.  In response, Ad Astra argues it acted diligently in seeking production of the agreements and reiterates its position that the agreements are responsive to RFP No. 67.  The court rejects these arguments for the same reasons described above.

Ad Astra also contends defendants were required to produce the documents under Rule 26(a)(1)(A)(ii) because they placed the agreements at issue by referencing them in the proposed pretrial order.  But Rule 26(a)(1)(A)(ii)'s mandatory disclosure obligations do not apply here.  That

16

rule requires a party to provide a copy or a description of all documents that the disclosing party has in its custody, possession, or control "that it may use to support its claims or defenses."  FED. R. CIV. P. 26(a)(1)(A)(ii).  Defendants state that they intended to rely on witness testimony that Lexington Law issued electronic disputes pursuant to the contracts, but they did not intend to introduce the contracts into evidence.  Therefore, they were not required to produce them.  *See* RICHARD L. MARCUS, 8A FED. PRAC. & PROC. CIV. § 2053 (3d ed.) ("[T]here is no requirement to disclose anything that the disclosing party will not use.").  Once Ad Astra requested these documents on June 18, it revised its contentions in the pretrial order regarding Lexington Law's agreements with the credit bureaus.  But this shows only that Ad Astra belatedly injected these contracts into the case by informally requesting that defendants produce them after the close of discovery and revising its portion of the pretrial order to rely on them.  The fact that the agreements may ultimately be introduced into evidence does not mean that Lexington Law was required to produce or disclose the contracts when it did not previously intend to rely on them.  And it does not show that Ad Astra acted timely or diligently in attempting to obtain these documents.  It shows the opposite.  Ad Astra's attempts at untimely and informal discovery are prejudicial and constitute good cause for a protective order establishing that defendants need not take any further action with respect to these agreements.  *See Escalante v. LifePoint Hosp.*, No. 17-2035-JWL-KGG, 2019 WL 1753959, at *2 (D. Kan. Apr. 19, 2019) (granting a protective order to preclude the opposing party from seeking untimely discovery).

## 2.    Defendants Have Shown Good Cause to Support Designating the Contracts as AEO

Protective orders with AEO provisions are a practical and cost-effective way for parties to comply with their discovery obligations, while protecting highly sensitive information.  *See Layne Christensen Co. v. Purolite Co.*, 271 F.R.D. 240, 247 (D. Kan. 2010).  The protective order in this

case allows for two different levels of protection: (1) "Confidential" information, and (2) heightened "Attorneys' Eyes Only" ("AEO") protection by stipulation of the parties.  The parties relied on this provision to stipulate to AEO designations in the past, and Ad Astra does not challenge Lexington Law's ability to utilize the AEO designation generally.   This AEO designation applies to documents containing "highly sensitive trade secrets or other highly sensitive competitive or confidential information and disclosure to another party would result in demonstrable harm to the disclosing party."  (ECF 22, at 5 n.1.)  When a party files a motion challenging a confidentiality designation, the designating party still has the burden to prove the necessity of the designation.  (*Id.* at 7.)  This is in line with the moving party's burden to show good cause on a motion for a protective order.

In this case, the agreements contain highly sensitive competitive information.  John C. Heath, Directing Attorney of Lexington Law, submitted a declaration in which he explains that it took years and significant resources for Lexington Law to develop the business relationships with the credit bureaus that resulted in the agreements.  (ECF 228-9 ¶¶ 4-6.)  These agreements provide Lexington Law with a competitive advantage in the field by enabling it to offer clients a unique credit-bureau-challenge process.  (*Id.* ¶¶ 3, 7.)  The contracts are also highly confidential.  The contracts themselves contain confidentiality provisions, and access is highly restricted even within Lexington Law; indeed, to Heath's knowledge, only he and one other Lexington Law employee have access to the contracts.  (*Id.* ¶¶ 8-11.)  If the contracts were disclosed, other firms offering credit-repair services could use the contracts to try to negotiate similar partnerships with the credit bureaus, thus causing significant competitive harm to Lexington Law.  (*Id.* ¶ 12.)  This explanation demonstrates good cause for the AEO designation.

In response, Ad Astra argues the protective order's lower-level "Confidential" designation sufficiently protects Lexington Law's interests because Ad Astra is not a direct competitor, and therefore there is less potential of harm from disclosure.  Nothing in the protective order itself or the Federal Rules impose such a requirement when the moving party otherwise demonstrates a specific harm from disclosure.  *See* Fed. R. Civ. P. 26(c)(1)(G) (contemplating the court's authority to enter a protective order requiring that "a trade secret or other confidential research, development, or commercial information not be revealed or be revealed in a specified way").  Furthermore, this argument contravenes Ad Astra's own frequent use of the AEO designation in this litigation even though the parties are not direct competitors, such as Ad Astra's designation of its software and valuation as AEO.  (ECF 228, at 4 n.1, 6.)

Ad Astra asks the court to downgrade the AEO designation to Confidential.  As a practical matter, this would eviscerate the protections that Lexington Law has in place to maintain the confidentiality of these documents.  At Lexington Law, only two attorneys have access to the contracts and the only way another employee could gain access is with sufficient justification and approval from Heath.  (ECF 228-9 ¶ 11.)  In contrast, the Confidential designation would allow Ad Astra to disseminate the documents throughout its business much more broadly.  The Confidential designation would allow Ad Astra to disclose these contracts to an unlimited number of employees, agents, representatives, expert witnesses, outside consultants, investigators, potential or anticipated fact witnesses and their counsel, and other limited contractors employed in connection with this litigation, among other categories of individuals.  (ECF 22, at 6-7.)  Ad Astra has not suggested a narrower category of individuals to whom it needs to disclose this information, and Ad Astra has not explained why it needs the AEO designation downgraded to Confidential in order to effectively litigate its claims.  *See, e.g., Glob. Material Techs., Inc. v.*

*Dazheng Metal Fibre Co.*, 133 F. Supp. 3d 1079, 1088 (N.D. Ill. 2015) ("It is important to note that an additional consideration in determining whether the continued AEO designation is appropriate is to weigh the risks to the [designating party] from disclosure against [the opposing party's] need to view the information in order to litigate its claims.").[4]  Ad Astra now has the contracts to use to litigate its claims, with the exception of narrowly tailored redactions to highly sensitive pricing information (discussed below) that is simply not relevant.

Ad Astra also argues the AEO designation is inappropriate because similar agreements between the credit bureaus and other entities are publicly available online.  But the fact that *some* of this information may be publicly available does not support removing the AEO designation as to the entirety of the agreements.  Lexington Law seeks to protect its contracts, in particular, because they are uniquely structured to provide Lexington Law with a competitive advantage in the credit-repair marketplace because of the way in which credit bureaus have agreed to accept challenges that Lexington Law submits on behalf of its consumer clients.  Thus, the court finds that defendants have established good cause for a protective order authorizing the AEO designation based on the potential competitive harm to Lexington Law.

### 3.   Ad Astra Has Demonstrated Good Cause to Warrant Redacting Highly Proprietary Pricing Information That is Not Relevant

The court applies the same good-cause standard in the context of a motion for a protective order authorizing redactions.  *See* FED. R. CIV. P. 26(c)(1)(D) (authorizing a protective order limiting the scope of disclosure or discovery to certain matters); FED. R. CIV. P. 26(c)(1)(G)

---

[4] Defendants point out that the protective order allows the parties to stipulate to limit disclosure of AEO material to "in-house counsel or party representative(s) whose assistance is reasonably necessary to the conduct of the litigation and who agree to be bound by the terms of the order." (ECF 22, 5 n.1.)  Apparently, the parties reached this type of agreement when Ad Astra produced its own AEO-designated documents.  (ECF 240, at 6.)  But Ad Astra does not seek such relief on this motion, and instead seeks a wholesale downgrade to Confidential.

(authorizing a protective order requiring that confidential commercial information "not be revealed or be revealed in a specified way"); *see also Am. Manufacturers Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, No. CV 05-5155 (AKT), 2009 WL 10701187, at *4 (E.D.N.Y. Nov. 18, 2009) (applying the good-cause standard to a motion for a protective order authorizing redactions).   In evaluating whether a protective order is warranted, the court often balances the need for the discovery against the reasons the responding party is seeking a protective order. *See e.g., Cazorla v. Koch Foods of Mississippi, L.L.C.*, 838 F.3d 540, 555 (5th Cir. 2016) ("Under the balancing standard, the district judge must compare the hardship to the party against whom discovery is sought against the probative value of the information to the other party.").

As a general rule, a party may not indiscriminately scrub documents it produces in litigation to redact information that is not relevant. *See Fish v. Kobach*, No. 16-2105-JAR, 2017 WL 1373882, at *7 (D. Kan. Apr. 17, 2017) (noting the general rule that "a party responding to a Fed. R. Civ. P. 34 document request because this process "invites additional discovery disputes" but finding redactions were appropriate because the court had conducted an in camera review and was addressing limited redactions of "completely irrelevant" information).   But this is not such a case. Here, defendants made narrowly tailored redactions to limited pricing information for which Heath and the credit bureaus articulated specific harm that would result from disclosure this information. According to Heath, disclosure of the pricing information would cause significant competitive harm to Lexington Law because various business entities involved with credit reporting could use that information to compete with Lexington Law in purchasing products from the credit bureaus, such as credit reports.   (ECF 228-9 ¶ 13.)   The credit bureaus echo these concerns of competitive harm.   They explain that the credit-reporting marketplace is highly competitive, and they have used their experience and knowledge to tailor their pricing terms to particular customers.   (ECF

226-1 ¶ 9; 228-1 ¶ 6; ECF 223 at 2.)  In other words, pricing is proprietary, and the credit bureaus derive value from it.  If pricing terms were to fall into the hands of a current or potential competitor, it could aid the competitor in modifying its own terms to the detriment of the respective credit bureau.  (ECF 226-1 ¶¶ 8, 11; 228-1 ¶¶ 3,6; ECF 223 at 5.)  The credit bureaus also state that they would suffer harm if this information were disclosed to other customers, who could then use it to negotiate different or more favorable terms to the detriment of the credit bureaus.  (ECF No. 226-1 ¶ 9; ECF. 228-11 ¶ 3.)  And all three credit bureaus take steps to ensure pricing information is kept confidential as to particular customers and not disseminated beyond the credit bureau.  (ECF No. 226-1 ¶ 10; ECF. 228-11 ¶5; ECF 223 at 2.)

In contrast to these specific articulations of harm, Ad Astra has not demonstrated that the redacted material is relevant to the claims or defenses in this case.  Ad Astra's arguments concerning relevance largely conflate the relevance of the agreements themselves with the relevance of the redacted material.  Ad Astra says the documents are relevant because they purportedly show that:

> (i) Lexington and Progrexion Marketing pose as a "Reseller" in order to circumvent crucial provisions of the FCRA, resulting in hundreds-of-thousands of additional electronic disputes making their way to Plaintiff via the Bureaus that Plaintiff would otherwise not be obligated to investigate; (ii) both Lexington and the Bureaus consider the correspondence submitted by Lexington to be "disputes" under the FCRA, which Lexington has steadfastly denied throughout this litigation; (iii) Lexington appears to charge consumers a markup for credit reports for the benefit of Progrexion Marketing, which is directly relevant to Plaintiff's claim that "[a]ny profits [Lexington] could have made were funneled through the Progrexion Entities to PGX"; and (iv) CreditRepair.com is as an "affiliate" of Lexington, refuting Defendants assertion that that there is "no formal or informal relationship or affiliation."

(ECF 238-1, at 6.)  These categorical arguments do not differentiate between the relevance of the contracts themselves versus the relevance of the redacted pricing information.  The contracts bear

on categories (i), (ii), and (iv) above; they appear relevant for the purposes Ad Astra states; and defendants have already produced the portions of the contracts that bear on those issues. Therefore, Ad Astra's articulation of relevance as to categories (i), (ii), and (iv) does not bear on the propriety of the redactions of pricing information.

Only category (iii) above—concerning inflated prices to consumers—implicates the redacted pricing information. But, Ad Astra's markup on what it charges consumers for their credit reports over and above what it pays the credit bureau to obtain those reports is not relevant to any claim or defense in this case. Nor is it relevant to damages because any potential damage to nonparties (for example, the consumers Lexington Law is allegedly overcharging for those credit reports) is not a part of this case. Ad Astra's only articulation of relevance is that Lexington Law serves as a front for "defendants' operation" and that any profits Lexington could have made were "funneled through the Progrexion Entities to PGX." (ECF 236, at 10; ECF 236-6, at 15; ECF 238-1, 6.) Certainly, the interconnectedness of defendants' operations is an issue in this case. But the redacted pricing information does not bear on the relationships amongst the various defendant entities. The contracts are with a nonparty. The court agrees with defendants inasmuch as it appears that Ad Astra seeks this pricing information for the impermissible purpose of disparaging Lexington Law for marking up credit reports that it sells to consumers. This is insufficient to override defendants' and the credit bureaus' legitimate proprietary interests in maintaining the confidentiality of these documents.

For these reasons, the court grants Lexington Law's motion for a protective order allowing it to maintain the AEO confidentiality designation and the redactions of the pricing information. In so holding, the court cautions the parties that the AEO designation only applies to discovery and pretrial proceedings, not to the use of evidence at trial. As specified in the protective order,

23

any "party that intends to present or that anticipates that another party may present Confidential Information at a hearing or trial must bring that issue to the attention of the court and the other parties" so that the court may make whatever further orders are necessary to govern the use of those documents or information.  (ECF 22, at 8.)

## III.  AD ASTRA'S MOTION TO AMEND

The court turns next to Ad Astra's motion to amend to assert a Kansas common law civil conspiracy claim.  The scheduling order established a deadline of November 20, 2018, for motions to amend the pleadings.  (ECF 21, at 9.)  When a party moves to amend after the scheduling order deadline, the moving party must (1) demonstrate good cause under Federal Rule of Civil Procedure 16(b)(4), and (2) satisfy the standards for amendment under Rule 15(a).  *Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014).

### A.  Good Cause Pursuant Rule 16(b)(4)

A scheduling order "may be modified only for good cause and with the judge's consent." FED. R. CIV. P. 16(b)(4).  To establish good cause, the moving party must show that it could not have met the deadline despite "diligent efforts."  *Husky Ventures, Inc. v. B55 Invs., Ltd.*, 911 F.3d 1000, 1020 (10th Cir. 2018).  Because Rule 16 requires diligence, if a party knows of "the underlying conduct but simply failed to raise [its] claims, . . . the claims are barred."  *Gorsuch*, 771 F.3d at 1240.  On the other hand, "Rule 16's good cause requirement may be satisfied . . . if a [party] learns new information through discovery or if the underlying law has changed."  *Id.*

In this case, Ad Astra was not diligent in seeking to amend to assert the civil conspiracy claim.  The court already granted Ad Astra leave to amend in December 2019, which was more than a year after the scheduling order deadline.  *See Ad Astra Recovery Servs., Inc. v. Heath*, No. 18-1145-JWB-ADM, 2019 WL 7187329 (D. Kan. Dec. 26, 2019).  The court allowed Ad Astra to

add defendants related to the already-named Progrexion entities and to elaborate on its factual allegations in view of all that Ad Astra had recently learned in depositions.  By that time, the parties were on the verge of the close of discovery, which would have closed in January 2020 if the court had not granted Ad Astra leave to amend, which necessitated a two-month extension for discovery to accommodate the newly added defendants.  And Ad Astra now argues the civil conspiracy claim "is based on the same underlying facts as Plaintiff's RICO and common law fraud claims." (*Id.* at 8.)  In fact, the proposed language for the pretrial order describes the overt acts in furtherance of the conspiracy as those "more fully set forth above in Counts 1-4 [the RICO claims] regarding Defendants' acts of racketeering." (ECF 215, at 4.)  Indeed, Ad Astra seeks to plead this claim to "conform to the evidence"[5] obtained in discovery.

But if the civil conspiracy claim is based on the same set of facts as the RICO claims, Ad Astra could have asserted the civil conspiracy claim from the outset or against all defendants via Ad Astra's substantial amendment in December 2019.  Ad Astra admits that it was not until it was preparing the pretrial order that it "evaluated all of the evidence identified during the discovery period" and simply sought to include another liability theory. (ECF 215, at 9.)  But, even then, Ad Astra did not seek to assert the civil conspiracy claim in the first draft pretrial order on May 22.  Instead, it sought to assert this claim only after the court required Ad Astra to revise its factual allegations and fraud claim to clarify the grounds that support the claim as to each defendant.  By the time the parties submitted the third draft of the pretrial order on July 10, Ad Astra abandoned

---

[5] Rule 15(b)(2) applies to amendments to conform to the evidence, but Ad Astra moves for leave to amend under Rule 15(a)(2), which applies to amendments made before trial with the opposing party's consent or by leave of the court. (ECF 215, at 5.)  The court has considered the argument insofar as it potentially bears on the level of undue prejudice to Lexington Law, but the court will not consider the argument in the context of a Rule 15(b)(2) analysis where Ad Astra has not moved for leave to amend under that provision.

its fraud claim against defendants other than Progrexion Holdings, Progrexion IP, and Lexington Law.  Thus, it appears Ad Astra seeks to assert the civil conspiracy claim (and hence maintain some state tort claim against all defendants) in order to circumvent its lack of a viable fraud claim against most of them.  The failure to clarify legal theories or to plead a claim that should have been readily ascertainable from the outset—because it is largely based on the same facts asserted from the outset—does not show that a party could not have met the scheduling-order deadline despite diligent efforts.  *See Gorsuch*, 771 F.3d at 1240 ("If the plaintiff knew of the underlying conduct but simply failed to raise [the] claims, [those] claims are barred."); *Smith v. Kansas Pub. Employees Ret. Sys.*, No. 18-2340-CM, 2019 WL 5102180, at *2 (D. Kan. Oct. 9, 2019) (finding a lack of good cause for an untimely motion to assert an immunity defense the party did not research earlier).

Ad Astra contends that allowing the late amendment is warranted because of all that it learned during discovery generally.  But Ad Astra does not identify anything in particular that it learned in discovery that triggered the civil conspiracy claim, as distinct from the other claims already asserted.  The only specific discovery Ad Astra identifies to try to demonstrate good cause for the belated amendment is (1) the deposition of Randy Padawer, and (2) production of the TransUnion agreements.  But the timeline of events contradicts that either of these events prompted the amendment.  Ad Astra's opening brief focused on defendants' late production of the TransUnion agreements to try to demonstrate good cause for the belated motion to amend.  (ECF 215, at 5.)  But Ad Astra sought to plead the civil conspiracy claim in the second draft pretrial order submitted on June 22.  At that time, defendants had not yet produced the credit bureau

26

contracts.  (ECF 224, at 18:4-11.)  They did not begin producing those until July 2.  (ECF 215, at 5.)  So those contracts did not prompt the amendment.

Perhaps recognizing this faux pas, Ad Astra changed course in its reply brief and did not even mention the TransUnion agreements, instead focusing on the Padawer deposition as justification for the late amendment.  (ECF 222, at 2.)  But Padawer was deposed on May 13, before the parties submitted their first draft pretrial order on May 22, and Ad Astra did not try to add the civil conspiracy claim at that time.  Again, it was only after the court expressed concerns at the May 29 pretrial conference about the fraud claim's lack of specificity against "all defendants" that Ad Astra shifted course and sought to plead the civil conspiracy claim in the second draft pretrial order on June 22.

Even looking beyond these incongruities in timing, Ad Astra does not identify any testimony from Padawer that would uniquely support a civil conspiracy claim that differs in substance from Ad Astra's long-pursued theory of the case about sending dispute letters *en masse*.  Ad Astra contends that Padawer's deposition testimony connects Progrexion to the fraudulent misrepresentations (*e.g.*, the dispute letters sent to Ad Astra).  But Ad Astra only generally explains that Padawer's testimony revealed the Progrexion entities' involvement in creating the auto-generated creditor library template, that he was involved in creating the language used, and that the Progrexion entities also create cease-and-desist letters for Lexington Law.  (ECF 222, at 2.)  This testimony shows the Progrexion entities' involvement with the law firm, but Ad Astra has alleged from the beginning that the Progrexion entities played a role in sending the letters.  (*See* Compl. ¶ 61 ("The Lexington Law Association and individual defendants acted in concert with the Progrexion Entities, their admitted affiliates, to print and mail (or submit) the dispute correspondence.").)  Indeed, Ad Astra represented on its motion to amend in December of 2019

that it had "ample evidence" to join the Progrexion entities because they all jointly participated in the scheme.  (ECF 105, at 3, 7.)

The TransUnion agreements also do not constitute new evidence supporting the proposed civil conspiracy claim.  Ad Astra argues those agreements demonstrate materially false statements. But Ad Astra's contentions in the pretrial order identify the allegedly "false statement" to be that Lexington Law erroneously purported to be a "reseller" of TransUnion credit reports.  Again, Ad Astra does not identify any way in which this allegation uniquely supports a civil conspiracy claim in ways that are not already at issue with respect to the other claims in the case, or any way in which contracts with a non-party credit bureau support a civil conspiracy claim amongst the numerous defendants.  And, as previously explained, Ad Astra also has not shown that it was diligent in obtaining the TransUnion or other credit bureau contracts, and its lack of diligence in obtaining the discovery that it now contends forms the basis for the amendment does not demonstrate its diligence in moving to amend.

The court therefore denies Ad Astra's motion to amend because it has not shown good cause to modify the scheduling order deadline for such a motion.  *See Husky Ventures*, 911 F.3d at 1019 (the court can deny a motion to amend for failure to show good cause under Rule 16(b)(4)).

### B.     Amendment Under Rule 15

The court also denies the motion to amend under Rule 15.  Once a party has filed a responsive pleading, the opposing party "may amend its pleading only with the opposing party's written consent or the court's leave," which should be freely given when justice requires.  FED. R. CIV. P. 15(a)(2).  The rule's purpose "is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties."  *SCO Grp., Inc. v. Int'l Bus. Machines Corp.*, 879 F.3d 1062, 1085 (10th Cir. 2018) (internal quotations omitted).  The court

may refuse leave to amend "only [upon] a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Wilkerson v. Shinseki*, 606 F.3d 1256, 1267 (10th Cir. 2010); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) (same).

Practically speaking, the party opposing a motion to amend generally bears the burden to demonstrate why the amendment should not be permitted. *See Wilkerson*, 606 F.3d at 1267 (in the absence of such a showing, amendment should be allowed); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (stating the party opposing amendment bears the burden to show undue prejudice and that there is a presumption in favor of amendment absent such a showing "or a strong showing of the remaining *Forman* factors"). Whether to grant a motion to amend is within the court's sound discretion. *Gorsuch,* 771 F.3d at 1240.

### 1. Undue delay

Delay alone is not enough to deny a motion to amend. *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205 (10th Cir. 2006). At some point, however, delay becomes undue when it places an unwarranted burden on the court or when it becomes prejudicial by placing an unfair burden on the opposing party. *Id.* The district court must focus primarily on the reasons for the delay. *Id.* Denial of leave to amend is appropriate when the movant lacks an adequate explanation for the delay. *Cohen v. Longshore*, 621 F.3d 1311, 1313 (10th Cir. 2010).

The court finds that Ad Astra unduly delayed for the same reasons that the court cannot find good cause to extend the scheduling order deadline to accommodate its untimely motion to amend. *See Hans v. Bd. of Cty. Commissioners of Shawnee Cty., Kansas*, No. 16-4117-DDC, 2017 WL 3781837, at *3 (D. Kan. Aug. 31, 2017) ("Rule 15(a)'s undue-delay analysis is similar to the good-cause analysis[.]"). Additionally, this delay is now a pattern that has held up entry of the

pretrial order for months while Ad Astra belatedly requested the credit bureau contracts, tried to add a claim, made unwarranted substantive revisions to multiple drafts of the pretrial order that were never asked about or contemplated during the conference calls with the court, and forced motion practice on a discovery dispute that separately delayed entry of the pretrial order and resulted in sanctions assessed against Ad Astra.  *See Ad Astra Recovery Services, Inc. v. Heath*, No. 18-1145-JWB-ADM, 2020 WL 4346965 (D. Kan. July 29, 2020).

The court must construe the Federal Rules to facilitate the just, speedy, and inexpensive determination of every action.  *See* FED. R. CIV. P. 1.  Ad Astra has had an atypically lengthy discovery period in which it had ample opportunity to conduct full and fair discovery and to fine tune its legal theories.  Instead, Ad Astra waited until the second draft of the pretrial order to attempt to plead a claim that should have been apparent much sooner—perhaps as early as the outset of the case but, at the latest, when Ad Astra sought leave to amend in December of 2019. This is now just one motion in a line of motions that unnecessarily delayed progress in this case.

## 2.  Futility

"A proposed amendment is futile if the [pleading], as amended, would be subject to dismissal."  *Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Inv'r's Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999).  The court considers whether the amended complaint could withstand a motion to dismiss pursuant to Rule 12(b)(6).  *See* 6 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1487 (3d ed.) (collecting cases).  To withstand dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In analyzing whether dismissal is

appropriate, the court must "accept the facts alleged in the complaint as true and view them in the light most favorable to the plaintiff." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016).

Ad Astra's proposed amendment states as follows:

**Count Seven**
**Civil Conspiracy Under Kansas Law**

> The Progrexion Entities, along with Lexington Law and the Individual Defendants, conspired to commit common law fraud as set forth in Count Six. There was a meeting of the minds between Defendants regarding the object and course of action of the conspiracy. Defendants took overt acts in furtherance of the conspiracy and to conceal the existence of the conspiracy from Ad Astra and others, including its own clients, as more fully set forth above in Counts 1-4 regarding Defendants' acts of racketeering. As a direct and proximate result of the conspiracy and defendants' unlawful overt acts, Ad Astra sustained damages as set forth herein.

(ECF 215, at 4.)[6]

This proposed claim is futile. To begin, a plaintiff asserting a civil conspiracy claim under Kansas law must allege that each defendant against whom it asserts the claim personally committed an unlawful act. *See Meyer v. Christie*, 634 F.3d 1152, 1157 (10th Cir. 2011) ("[A] defendant cannot be liable for civil conspiracy under Kansas law where that defendant did not commit an independent actionable tort, regardless of whether tort claims have been alleged against other defendants."); *see also Rezac Livestock Comm'n Co. v. Pinnacle Bank*, No. 15-4958-DDC, 2019 WL 7116086, at *6 (D. Kan. Dec. 23, 2019) ("[T]he defendant against whom a civil conspiracy is alleged must personally have committed an unlawful act. If the defendant himself has committed an unlawful act, then he also could be held liable for an act done by another member

---

[6] Rather than Ad Astra submitting a proposed amended pleading, as would ordinarily be required under this court's local rules, the court directed Ad Astra to submit its proposed amendment to the pretrial order because Ad Astra is moving to amend at the pretrial stage.

of the conspiracy.").  Ad Astra's proposed claim asserts that defendants conspired to "commit common law fraud as set forth in Count Six."  (ECF 215, at 4.)  But Ad Astra dropped its fraud claim as to all defendants except Progrexion Holdings, Progrexion IP, and Lexington Law in the third draft pretrial order.  Because the civil conspiracy claim is premised on the fraud claim, it would be futile as to the other defendants.

Further exacerbating these deficiencies, a party asserting a Kansas common law civil conspiracy claim must plead five essential elements:  "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof."  *Citizens State Bank, Moundridge v. Gilmore*, 603 P.2d 605, 613 (Kan. 1979).  Ad Astra's proposed civil conspiracy claim does not allege facts sufficient to show a meeting of the minds regarding the object or course of action.  It merely contains a conclusory recitation of the claim elements without explaining how its factual allegations support those elements.  Ad Astra argues that it has "alleged more than sufficient facts" and that it has alleged the entities "acted in concert to make material misrepresentations regarding the dispute letters with the goal of committing fraud against Plaintiff by deceiving Plaintiff into believing that the dispute correspondence was received directly from the consumer."  (ECF 222, at 2.)  But these factual allegations go to the interconnectedness of the parties' business operations and describe how the dispute letters were transmitted.  A "conspiracy is not proven by showing a mere relationship or association between the accused parties."  RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 27 (2020).

### 3.  Undue prejudice

Even if the claim is not futile, it is so deficiently pleaded (for the reasons explained above) that defendants would suffer undue prejudice if they were suddenly forced to defend against such

an undefined and unwieldy claim at this late procedural juncture.  Undue prejudice is the most important factor in determining whether to allow an amendment to the pleadings.  *See Minter*, 451 F.3d at 1207.  A party may be unduly prejudiced when an amendment unfairly affects a party preparing its defense—for example, when the amendments "arise out of a subject matter different from what was set forth in the complaint and raise significant new factual issues."  *Id.*; *see also Hirt v. Unified Sch. Dist. No. 287*, 308 F. Supp. 3d 1157, 1168 (D. Kan. 2018) ("While any amendment invariably causes some practical prejudice, undue prejudice means that the amendment would work an injustice to the defendants." (internal quotations omitted)).

Although Ad Astra's civil conspiracy claim is largely premised on the same set of facts as its other claims, defendants would be unduly prejudiced by the amendment because it is an eleventh-hour effort to switch legal theories at the summary-judgment stage.  In what appears to be an attempt to save an unclear and generally pleaded fraud claim, Ad Astra has proposed an unclear and generally pleaded civil conspiracy claim.  But allowing the present amendment at this stage is even more problematic because, as discussed above, it is deficiently pleaded.  At this late stage of the litigation, defendants will have no opportunity to flesh out the contours of this claim, such as via a motion to dismiss and/or subsequent clarifying amendments.  Rather, defendants would be forced to tackle an amorphous claim for the first time on summary judgment.  This is unfair to defendants when Ad Astra could have pleaded this claim long ago.

### C.  Denial of the Motion

In sum, the court denies Ad Astra's motion to amend because it has not shown good cause to extend the November 20, 2018, scheduling-order deadline to amend the pleadings.  The court also denies the motion under a Rule 15(a)(2) analysis because defendants have shown that Ad

Astra unduly delayed in seeking to amend and that the claim is futile or, at the very least, that the claim is so deficiently pleaded that defendants would be prejudiced by this late-stage amendment.

## V.        REASONABLE FEES AND EXPENSES FOR DISCOVERY MOTIONS

Because the court denies Ad Astra's motion to compel in full and grants Lexington Law's motion for a protective order in full, it must consider whether to award defendants their reasonable expenses, including attorneys' fees, incurred in filing this motion.  *See* FED. R. CIV. P. 26(g)(3) (stating that on a motion for a protective order, Rule 37(a)(5) applies to an award of expenses); FED. R. CIV. P. 37(a)(5)(B) (stating that if a motion to compel is denied the court must impose fees unless the motion was substantially justified or other circumstances make an award of expenses unjust).  However, litigating whether fees and expenses are warranted and, if so, the appropriate amount, often results in the parties spending as much time and resources as they did litigating the underlying discovery motion.  For this reason, the court orders defendants to serve a notice by **September 4, 2020**, informing Ad Astra and the court whether they intend to seek fees.  If defendants intend to seek fees, the notice must provide the dollar amount requested, including whatever fees defendants estimate they will incur in further briefing on this matter.  Thereafter, the parties must confer to attempt to reach an agreement regarding the issue of fees on or before **September 11, 2020**.  If the parties have not reached agreement by that date, defendants may file a motion seeking fees by **September 18, 2020,** with the memorandum in support limited to five pages.  Ad Astra's response brief is due by **September 25, 2020,** and is limited to five pages. Defendants' reply brief is due by **September 30, 2020,** and is limited to three pages.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Leave to Amend the First Amended Complaint (ECF 214) is denied.

**IT IS FURTHER ORDERED** that Defendants' Motion for a Protective Order (ECF 227) is granted.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Compel Defendants' Removal of their Attorneys' Eyes Only Designation and Redactions of Certain Agreements (ECF 231) is denied.

**IT IS SO ORDERED.**

Dated August 27, 2020, at Topeka, Kansas.

<u>s/ Angel D. Mitchell</u>
Angel D. Mitchell
U.S. Magistrate Judge