IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

AD ASTRA RECOVERY SERVICES, INC.,

        Plaintiff,

v.                                  Case No.  18-1145-JWB

JOHN CLIFFORD HEATH, ESQ., et al.,

        Defendants.

## MEMORANDUM AND ORDER

This matter comes before the court on the following motions for summary judgment and supporting memoranda: Defendants' joint motion for summary judgment (Docs. 268, 269, 285, 286, 287, 310, 318, 334, 340); Defendant Fullman's motion for summary judgment (Docs. 272, 273, 282, 306, 316, 338); and Defendant Jones' motion for summary judgment (Docs. 276, 277, 308, 317, 337).[1]  The motions have been fully briefed and the court is prepared to rule.  For the reasons stated herein, the joint motions for summary judgment are DENIED IN PART AND GRANTED IN PART.  Fullman's motion for summary judgment and Jones' motion for summary judgment are DENIED.

### I.     Uncontroverted Facts and Statutory Background

The following statement of facts are taken from the parties' submissions and the stipulations in the pretrial order.[2]  Factual disputes about immaterial matters are not relevant to the

---

[1] Plaintiff also moves for permission to file a surreply.  (Doc. 344.)  Plaintiff's surreply addresses both the pending summary judgment motions and Defendants' *Daubert* reply brief regarding Plaintiff's expert.  With respect to the current motions before the court, Plaintiff's argument in the surreply raises issues that were already in the briefing and do not need to be further expanded.  With respect to the *Daubert* motion, Plaintiff argues that Defendants raised a new argument and additional supporting documents in the reply brief.  This court does not consider new arguments in a reply brief.  Therefore, Plaintiff's motion is denied.

[2] Although Defendants included a section of background with citations to the record, these statements were not included in the factual statement and therefore are not included in this recitation.  *See* D. Kan. R. 56.1(a).

determination before the court.  Therefore, immaterial facts and factual averments that are not supported by the record citations are omitted.  Legal conclusions are also not proper facts. Defendants also object to Plaintiff's exhibits that are from other litigation, including deposition excerpts and the pretrial order from another action, *CBE Group v. Lexington Law Firm*, Case No. 3:17-cv-02594-L (N.D. Tex.).  With respect to the excerpts from Fed. R. Civ. P. 30(b)(6) depositions in the *CBE Group* action, the court finds that these exhibits are admissible as they are not hearsay.  They are statements of an opposing party under Rule 801(d)(2)(A) and (D).  Although Defendants generally object to the court's considerations of these deposition excerpts, they make no argument as to any specific testimony.  With respect to the stipulations in the pretrial order governing the *CBE Group* case, those stipulations were agreed to for that action and Plaintiff makes no showing that the stipulations are binding beyond that case.  The court declines to consider this exhibit on summary judgment.

Plaintiff Ad Astra is a debt collector and data furnisher.  Plaintiff brings claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1962(c) and (d), and a Kansas common law fraud claim.  (Doc. 257-1.)  As a debt collector, Plaintiff collects debts primarily on behalf of one client, CURO Group Holdings Corp. ("CURO").  (*Id.* at 3.)  Plaintiff is subject to the provisions in the Fair Credit Reporting Act ("FCRA"), Fair Debt Collection Practices Act ("FDCPA"), and state laws applicable to debt collection.  Defendant John C. Heath, Attorney at Law, PC d/b/a Lexington Law Firm ("Lexington Law") is a law firm that provides services to its clients, including credit repair services.  (*Id.*)  Lexington Law's principal place of business is in North Salt Lake City, Utah.  Lexington Law employs attorneys in house and it also engages law firms in certain states to serve as "of counsel."  (*Id.*)  John Heath is the Directing Attorney of Lexington Law.  Defendant Kevin Jones was previously employed by Lexington Law as the

Directing Attorney of Operations and Chief Compliance Officer ("CCO").  In the role of CCO, Jones was responsible for the day to day operation of Lexington Law's compliance program. (Docs. 277 at 2; 308 at 5.)  Jones implemented a compliance framework and investigated matters raised by consumers.  In the role as Directing Attorney of Operations, Jones hired in house attorneys to work for Lexington Law and directly managed the full-time Lexington Law attorneys. Defendant Adam Fullman is a principal at Fullman Law Firm and serves as of counsel to Lexington Law's clients in California.  (Docs. 273 at 2, 306 at 5.)  Defendant Jeffrey Johnson served as the Co-CEO of Defendants PGX Holdings, Inc. ("PGX"), Progrexion Holdings, Inc., Progrexion Teleservices, Inc. ("Teleservices"), Progrexion ASG, Inc., Progrexion Marketing, Inc., and Progrexion IP, Inc. (collectively referred to as "the Progrexion entities") prior to his retirement in April 2020.  (Doc. 257-1 at 3.)  PGX and Progrexion Holdings are both holding companies.  The remaining Progrexion entity Defendants are subsidiaries of Progrexion Holdings.  According to Defendants, some of these Progrexion entities essentially provide services to Lexington Law as vendors.  (Doc. 334-5 at 80:19-24.)  For example, ASG provides services to Lexington Law which include paying its bills and managing its bank accounts.  (Docs. 318 at 23; 334 at 5.)

Relevant to the issues in this case, the FCRA gives consumers the right to have negative information on their credit reports, which are generated by Equifax, Experian, and TransUnion (the "Bureaus"), referred to as "tradelines," investigated for accuracy.  A consumer may submit a dispute by: (1) submitting it directly to the Bureau that generated the report with the negative tradeline; (2) submit a dispute to the "reseller" of the negative tradeline; or (3) submit a direct dispute to the data furnisher that provided the negative information.  *See* 15 U.S.C. §§ 1681i(a)(1)(A), 1681s-2(a)(8).  Upon receiving notice of a dispute, the person who provided the negative information must conduct an investigation, review the information provided by the

consumer, and report the results of the investigation within 30 days.  *Id.* § 1681s-2(a)(8)(E).  The investigation requirement does not apply to a dispute submitted by a credit repair organization ("CRO").  *Id.* § 1681s-2(a)(8)(G).  A dispute submitted by a CRO is considered a frivolous dispute. *Id.* § 1681s-2(a)(8)(F); 12 C.F.R. § 1022.43(f).  An investigation is also not required when "the furnisher has a reasonable belief" that a CRO submitted or prepared the dispute for the consumer or the dispute is submitted on a form supplied to a consumer by a CRO.  12 C.F.R. § 1022.43(b)(2). The applicable statute defines a CRO as a

> person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of--
>
> (i) improving any consumer's credit record, credit history, or credit rating; or
> (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)…

15 U.S.C. § 1679a(3).  Lexington Law is registered as a credit services organization in both Utah and California under those states' statutes regarding credit repair agencies, which are similar in definition to the federal statute.[3]  (Doc. 318-13.)  A brief history of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679, *et seq*., explains why Congress exempted CRO disputes from the investigation requirement.

---

[3] *See* Cal. Civ. Code § 1789.12 ("Credit services organization" means a person who, with respect to the extension of credit by others, sells, provides, or performs, or represents that he or she can or will sell, provide or perform, any of the following services, in return for the payment of money or other valuable consideration: (1) Improving a buyer's credit record, history, or rating. (2) Obtaining a loan or other extension of credit for a buyer."  Utah Code Ann. § 13-21-2 (3)(a)("Credit services organization" means a person who represents that the person or an employee is a debt professional or credit counselor, or, with respect to the extension of credit by others, sells, provides, or performs, or represents that the person can or will sell, provide, or perform, in return for the payment of money or other valuable consideration any of the following services:(i) improving a buyer's credit record, history, or rating; (ii) providing advice, assistance, instruction, or instructional materials to a buyer with regard to Subsection (3)(a)(i); or (iii) debt reduction or debt management plans."  Notably, under the Utah statute, an attorney is exempted from status as a credit services organization if his or her services are incidental to his or her practice as an attorney.  *Id.* § 13-21-2(3)(b).

Congress enacted the CROA to ensure that buyers of CROs' services were provided with information necessary to make an informed decision and to protect the public from unfair or deceptive advertising.  15 U.S.C. § 1679(b).  Congress was concerned with entities that were leading consumers to believe that all adverse information in a consumer report could be deleted. The legislative history explains that

> [T]he "Credit Repair Organization Act," addresses credit repair fraud.  As consumers have experienced problems with the consumer reporting industry, credit repair organizations have emerged offering, for a fee, to help consumers eliminate adverse information from consumer reports. While some of these organizations may benefit consumers, the Committee is aware that a number of fraudulent credit repair organizations have inappropriately led consumers to believe that adverse information in consumer reports can be deleted or modified regardless of the accuracy of the information.

S. Rep. 103–209, *7 (1993), 1993 WL 516162.

The House Report also explains that some CROs had marketed services to consumers and led them to believe that adverse information can be deleted even if it is accurate and that their practice was to "inundate[e] consumer reporting agencies with so many challenges to consumer reports that the reinvestigation system breaks down, and the adverse, but accurate, information is deleted." H.R. Rep. No. 103–486, at 57 (1994), 1994 WL 164513.  Plaintiff essentially alleges that Lexington Law operates in this same manner.

Lexington Law, along with Progrexion Marketing, markets Lexington Law as a leading credit repair law firm.  (Doc. 310-47.)  Consumers are referred to Lexington Law from Teleservices by intake agents.  These consumers may have originally been transferred to an intake agent with Teleservices after calling one of the numerous "hot swap" partners that are affiliated with Teleservices.  (Doc. 310-5 at 121:7-25.)  For example, a consumer might have initially called a hot swap partner for a loan but was informed that he needed to repair his credit prior to receiving a loan.  (Doc. 318-16 at 3.)  These hot swap partners are paid for referring clients to Lexington

Law.  (Doc. 310-34 at 174-175.)  Teleservices employs approximately 1,100 intake agents.  (Docs. 318 at 21, 334 at 5.)  During an intake call, Teleservices' agents may offer consumers a free credit repair consultation based on their credit situation.  (Docs. 318 at 22, 334 at 5.)  Teleservices' agents then provide the consumers with an engagement agreement for Lexington Law.  Commissions are earned by the referring agent after a consumer signs the engagement agreement.  (Doc. 310-5 at 109:3-25.)  Lexington Law does not perform any services for a consumer client until the engagement agreement is executed.  According to Lexington Law, a consumer or a Lexington Law employee can talk to an attorney by calling a hotline that is answered by an attorney during business hours.  (Doc. 334-5 at 45:7-12, 147:10-19.)  If the consumer enrolls as a client, Teleservices will start the dispute process.  This process involves providing a consumer with the option of disputing all negative items on his or her credit report or going through the report item by item.  (Docs. 318 at 22, 334 at 5.)  The consumer can access his or her account on Case Valet, which is a program for Lexington Law's clients.  In the "case valet, the consumer client chooses how he or she wishes Lexington Law to challenge the negative items on his or her credit report." (Doc. 318-31 at 9.)

The engagement agreement, which is signed by Lexington Law's consumer clients, provides the following language that is applicable to this action:

> You understand Communications sent by Lexington to Furnishers and Bureaus on your behalf will be sent in your name, and will not be identified as being sent by Lexington. Copies of written Communications will be provided to you upon request.
>
> ***
>
> You agree that Lexington may act as your non-exclusive agent and attorney in fact, on your behalf, for the limited purposes of: . . .
> (b) disputing, challenging, or investigating with Bureaus as applicable, at your direction and within our professional judgment, inaccurate, unfairly reported, incomplete, or unsubstantiated information on such disclosures and reports; . . .

(d) investigating and/or verifying information provided by Furnishers to Bureaus; and
(e) signing letters on your behalf and in your name.

(Doc. 269-5 at 9, 11.)

The consumer client engages Lexington Law's services based on a tiered system. Basically, the consumer clients pay a monthly fee which is dependent on the number of communications - disputes - sent to the Bureaus and Furnishers, such as Plaintiff. (*Id.* at 3-6.) The greater number of disputes, the higher the fee.

Since 2014 through the filing of Plaintiff's Amended Complaint, Lexington Law sent Plaintiff at least 595,117 letters on behalf of consumers. The letters originate under a patented process, that patent for which is owned by Progrexion IP. This patent is licensed to Lexington Law and is used to generate dispute letters from a bank of form letters. (Doc. 334 at 5.) The form letters were previously drafted and approved by attorneys. (Doc. 334-5 at 182:12-16.) An automated process typically determines which letters from the bank of form letters should be sent out. (*Id.* at 182:21-23; Doc. 269-8 at 97:4-25.) In this automated process, the letters are selected using the information in the Case Valet system. (Doc. 269-8 at 97:4-25.) Under Lexington Law's "challenge logic," a paralegal is trained to challenge a different number of tradelines depending on what level of service a consumer signed up for. The challenge logic also instructs the paralegal to challenge only one-third of the negative items at a time in order to avoid "a frivolous response from the credit bureaus." (Doc. 318-29.) The dispute letters are not sent under Lexington Law's letterhead but sent with the return address reflecting the name of the consumer. The letters are also signed in the name of the consumer and written in first person. (*See id.* at 183:16-23, Doc. 310-8) ("Negative credit reporting should be removed from my credit report because my identity was stolen.") For example, one letter states the following: "You must provide validation for

account information sent to the three consumer reporting agencies for me, [F.K.] for suspect account." (Doc. 310-8 at 5.) Another example states: "With this letter, I request that Ad Astra Recovery Servic [sic] formally substantiate consumer information Ad Astra Recovery Servic [sic] reported to the major consumer reporting agencies for me, [T.B.], as regards the unvalidated account..." (*Id.* at 13). The letters include different font and spelling errors. When Defendant Jones complained to someone at Lexington back when he first was employed that the letters looked unprofessional and questioned why the letterhead was not used, he was told that letterhead was not used because the letters would be less likely to be reviewed by the creditors. (Doc. 308-2 at 43:12-14.)

Until a couple of years ago, the letters were overnighted from Lexington Law to the consumer's state of residence. (Doc. 310-43 at 90:3-18.) Then, they were placed in the regular mail in the consumer's state of residence. (Doc. 334-5 at 184:6-25.) The individual dispute letters are not reviewed by an attorney or a paralegal prior to being sent out. (Docs. 318 at 25; 334 at 5.) The consumer also does not review the letters prior to them being sent on his or her behalf. (Doc. 310-25 at 60:24-61:4.) The consumer can request to review the letters and will be provided with the template letter that was sent but not the letter with the electronic signature. (Doc. 334-5 at 133:10-24, 137:5-13.) Lexington Law also advises consumers that disputes cause creditors to go through a costly investigation process and they will remove negative but accurate items from a credit report when they get a dispute to avoid the cost. (Docs. 318 at 28;318-37 at 3.) Lexington Law will also continue to dispute negative tradelines even after the information has been verified. (Docs. 318 at 28; 310-43 at 111:6-13, 113:16-24.)

After receiving a letter like the ones at issue in this case, Plaintiff treats it as a "dispute" coming from an individual consumer. Plaintiff then conducts an investigation and responds to the

letter. This takes approximately five to ten minutes, on average. (Doc. 286 at 436:7-10.) Plaintiff also investigates disputes submitted by attorneys when the dispute reflects that it's from an attorney on behalf of a consumer. (*Id.* at 443:22-444:3.) In responding to these disputes, Plaintiff spends a similar amount of time that it spends in responding to individual consumer disputes. (*Id.* at 444:12-16.) Plaintiff's policy, however, is to not investigate dispute letters sent "by a credit repair organization (CRO) that identified themselves as a credit repair organization." (Doc. 310-11 at 440:15-24.) Plaintiff considers those disputes frivolous. *Id.* If a "letter is signed by an attorney that happens to be a credit repair organization, it's still considered an attorney dispute." (*Id.* at 446:7-10.) Also, if Plaintiff receives a letter on law firm letterhead, it treats those disputes as an attorney dispute. (Doc. 287 at 106:4-7.)

Lexington Law also submits disputes electronically ("e-disputes") through a web-based platform called e-OSCAR. The disputes are submitted in a format called an Automated Consumer Dispute Verification ("ACDV"). These e-disputes are sent directly to the credit bureaus. Although the ACDV contains a code that signifies the type of e-dispute at issue, e.g. identity fraud, there is no identifying information that informs Plaintiff if the e-dispute is from a consumer, CRO, or an attorney. (Doc. 286 at 432:21-433:5.) Also, Lexington Law has contracts with the Bureaus which contain provisions requiring the Bureaus to treat the electronic disputes as if they were submitted directly by the consumers. (Doc. 318 at 26 (citing to the agreements); 340 at 7.) The credit bureaus then send the ACDVs or e-disputes to the debt collector, such as Plaintiff, without identifying the source of the dispute. (Doc. 269-6 at 430:22-24, 432:7-9.) Between 2014 and mid-2019, Lexington Law sent at least 687,916 electronic disputes to the Bureaus concerning debts Plaintiff was trying to collect. (Docs. 318 at 26, 334 at 7.) Because Plaintiff is unaware of who has initiated the electronic dispute, Plaintiff investigates all disputes, including electronic disputes that may

9

have been initiated by a credit repair organization ("CRO").   (Doc. 269-6 at 429:22-432:13.) Plaintiff then investigates and responds to the dispute in the same manner.   (*Id.* at 433:3-5.) Plaintiff also suspends collection efforts on that debt.  (*Id.* at 427:18-24, 431:5-7.)

Plaintiff contends that Lexington Law discourages their consumer clients from going through each negative item on their credit reports line-by-line and instead encourages the consumer clients to dispute all negative items.   Defendants dispute this contention and assert that the consumer clients choose what items to dispute.  Plaintiff further contends that Lexington Law does not perform any investigation to determine the accuracy of a negative item on a consumer's report. (Doc. 310 at 20.)  A review of the deposition testimony by Cody Johnson in the *CBE* case states that Lexington Law communicates with the client to obtain information regarding the debts.  (Doc. 310-43 at 62:1-6.)  Lexington Law does not take any further action and relies on their clients' representations.

Plaintiff has introduced evidence that Lexington Law encourages and assists its consumer clients in disputing negative items even after the consumer has admitted that the negative items are accurate.  (Doc. 318 at 27; *see, e.g.*, Doc. 318-36 at 7:21-25) (informing a client that she is encouraged to pay her obligations that she actually owes but that the obligations would be challenged either way).  Lexington Law insists that it only attempts to validate negative tradelines with respect to the disputes at issue in this case.  (Doc. 334 at 7, 10.)  Plaintiff has attached letters as exhibits that seek more than validation, such as assertions that the account does not belong to the consumer client due to identity theft.  (*See* Doc. 310-8.)  Moreover, the engagement agreement and Lexington Law's challenge logic suggests that they do challenge the debt of their consumer clients.  (Docs. 269-5; 318-29.)

Plaintiff's previous President, David Newman, testified that Plaintiff began noticing an influx of dispute letters that increased gradually over time. (Doc. 269-9 at 34:7-18.) This resulted in Plaintiff gradually hiring more staff to deal with the consumer dispute letters. (*Id.*) Newman and others employed by Plaintiff tried to determine who was sending the dispute letters because there were similar letters with similar fonts and they would sometimes arrive in full boxes. (*Id.* at 22:9-25.) Newman testified that they had narrowed the identity of the sender down to Lexington Law about one year prior to filing this suit although the investigation had begun some time before that. (*Id.*) During the investigation, Newman called Plaintiff's attorney at that time to ask if Plaintiff had to respond to the dispute letters because they believed that the letters were being sent by a CRO. (Doc. 310-19 at 30:9-24.) Newman was advised that Plaintiff had to assume that it was from a consumer because they were not 100 percent sure that they didn't come from the consumer. (*Id.*) In September 2017, Newman spoke with Heath and the chief financial officer of Lexington Law. (*Id.* at 57:7-13, 236:14-16.) Newman was told that Lexington Law had a variety of letters that they used and admitted that the consumers didn't sign the letters. (*Id.* at 236:16-25; 237:2-6, 14-16.)

Plaintiff filed this suit against Defendants in May 2018. (Doc. 1.) The pretrial order in this case identifies five claims that remain. (Doc. 257-1.) The first four claims allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Specifically, counts one and three alternatively allege violations of § 1962(c) and assert that Defendants conducted and participated in the enterprise's affairs

through a pattern of racketeering activity, namely mail and wire fraud.  Counts one and three differ in that they allege that the enterprise is comprised of certain Defendants.  Counts two and four, also pled alternatively based on the compilation of the enterprise, allege a RICO conspiracy.  Plaintiff has also alleged a claim of fraud under Kansas state law.  The state law claim is only asserted against Lexington Law, Progrexion Holdings, and Progrexion IP.  Plaintiff asserts that it has suffered more than $3 million in compensatory damages due to the statutory investigations undertaken in responding to the dispute letters at issue and in pausing collections on the debt at issue.  (Doc. 257-1 at 37.)

Defendants now move for summary judgment on Plaintiff's claims.  With respect to counts one and three, Defendants argue that Plaintiff has failed to establish racketeering activity in that there is no evidence of fraud and that Defendants' conduct did not cause Plaintiff's loss.  Defendants Johnson and Fullman also move for summary judgment on the basis that there are insufficient facts to create a genuine dispute regarding their role in the operation or management of the RICO enterprise or alternate RICO enterprise.  With respect to counts two and four, Defendants argue that the conspiracy claims fail without an underlying RICO violation.  Defendants also move for summary judgment on the state law fraud claim on the basis that there is no evidence of fraud, Plaintiff did not reasonably rely on the misrepresentations, and Plaintiff's damages were not caused by Defendants' conduct.

## II.   Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's

favor. *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol—Myers Squibb Co*., 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Garrison v. Gambro, Inc*., 428 F.3d 933, 935 (10th Cir. 2005). Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III.    Analysis

### A.  RICO Claim under § 1962(c)

To prove Plaintiff's RICO claim, the following must be established: 1) Defendants violated § 1962; 2) Plaintiff suffered an injury; and 3) Defendants' violation is the cause of the injury. *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 881 (10th Cir. 2017). "Sufficiently establishing the element of causation—both actual and proximate—is crucial to proving any violation of RICO." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1088 (10th Cir. 2014) (citing *Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 656–60 (2008)).

With respect to the first requirement, a violation of § 1962, Plaintiff must prove that each Defendant "(1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Hickenlooper*, 859 F.3d at 882 (citation omitted). The pattern of racketeering activity includes the commission of certain predicate acts, which are specified state or federal offences. *Ogles v. Sec. Benefit Life Ins. Co*., 401 F. Supp.3d 1210, 1221 (D. Kan. 2019) (citing *In re: EpiPen*

*(Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 336 F. Supp.3d 1256, 1322

(D. Kan. 2018)); *see also* 18 U.S.C. § 1961(1).

> The word racketeering tends to evoke images of mobsters and organized criminals, and true enough, RICO—at least initially—"was an aggressive initiative to supplement old remedies and develop new methods for fighting crime." *Sedima, S.P.R.L.*, 473 U.S. [at] 498; *see also id.* at 526, (Powell, J., dissenting) (observing that "mobsters ... were the clearly intended target of" RICO).   But the plain language of RICO defines racketeering far more broadly in a way that allows the statute to "reach both legitimate and illegitimate" businesses. *Id.* at 499 [] (internal quotation marks omitted). Indeed, among many other qualifying acts, RICO defines a racketeering activity as "any act which is indictable under" the federal statute outlawing wire fraud—a crime that any modern business could commit. 18 U.S.C. § 1961(1)(B); *see also* 18 U.S.C. § 1343 (outlawing wire fraud).

*CGC Holding Co., LLC*, 974 F.3d at 1210–11.

Here, Plaintiff contends that Defendants predicate acts include mail and wire fraud, which are included under RICO.[4]  *Id.*  Defendants' joint motion for summary judgment argues that Plaintiff failed to establish a dispute of fact as to racketeering activity and that Plaintiff failed to show causation.  (Doc. 268.)  Defendants Jones and Fullman separately moved for summary judgment to argue that they did not direct the affairs of the enterprise.  (Docs. 272, 276.)  The other elements of the RICO claims are not at issue.  The court will first address the joint arguments regarding the alleged racketeering activity.

To assert mail fraud, Plaintiff must establish "(1) the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States mails for the purpose of executing the scheme." *Ogles*, 401 F. Supp.3d at 1221 (citation omitted).  Wire fraud consists of the same first element but requires the use of the wires for executing the scheme. *Id.*  A "scheme to defraud is conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension." *United States v. Welch*,

---

[4] In connection with counts 3 and 4, Plaintiff has also alleged that the Progrexion entities engaged in money laundering. (Doc. 257-1 at 33-34.)

327 F.3d 1081, 1106 (10th Cir. 2003).  The common thread among mail and wire fraud is the concept of fraud.  *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006) (citation omitted).  Fraud based on false representations must be established by proving a material false representation.  *Id.*  A scheme to defraud may also be proven by "deceitful concealment of material facts."  *United States v. Gallant*, 537 F.3d 1202, 1228 (10th Cir. 2008).  In the context of wire fraud, the Tenth Circuit has held that a misleading omission can be actionable as fraud absent a duty to speak if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled."  *Id.* (citing *United States v. Cochran*, 109 F.3d 660, 665 (10th Cir. 1997)).

Here, the pretrial order states that

> Defendants devised a scheme and artifice to defraud, and obtain money or property by means of false or fraudulent pretenses, representations and promises including (among other things) misrepresenting the disputed items, the source, author, and place of mailing of the dispute correspondence, concealing that such correspondence was drafted by and sent from Defendants, and causing the U.S. Postal Service mails and interstate wires to be used to transmit forged, disguised communications in interstate commerce.

(Doc. 257-1 at 31.)

Based on the framing of Plaintiff's claims in the pretrial order, the fraud includes two main categories of fraud: 1) fraudulent misrepresentations regarding the negative tradelines at issue; and 2) fraudulent misrepresentations and concealment regarding the identity of the sender of the dispute letters and the electronic disputes.[5]  Plaintiff asserts in its opposition memoranda that it has put forth a dispute of fact as to both.  Defendants argue that there is no evidence of fraudulent misrepresentation regarding the tradelines and, with respect to the identity of the sender, that these

---

[5] Plaintiff has also included several categories of fraud in the contentions' section of the pretrial order.  Although Plaintiff's response to the joint motion for summary judgment also relies on this conduct, Defendants did not move for summary judgment on these contentions.

statements were not false - because they had the authority to send correspondence - and that they were not fraudulently concealed - because they had no duty to disclose that they sent the dispute letters.  Defendants further argue that Plaintiff cannot show that the violation was the cause of Plaintiff's injury because Plaintiff would have taken the same actions even if it had known the identity of the sender.  Notably, although Defendants do not admit that Lexington Law is a CRO under the federal statute, Defendants do not argue that Plaintiff was required to respond because Lexington Law is not a CRO.

### False Statements Regarding the Negative Tradelines

Plaintiff contends that Defendants encourage consumers to challenge all negative tradelines even if those tradelines are accurate.  In support of this contention, Plaintiff has cited to call transcripts that several consumers had with various employees of Defendants.  (Doc. 318 at 27.)  For example, one consumer, T.B.[6], chatted online with a paralegal for assistance on either July 8 or August 7, 2018.[7]  (Doc. 318-33.)  T.B. informed the paralegal that he did not know what challenge action to select for his negative tradelines on case valet because "nothing applies."  (*Id.* at 2.)  T.B. stated that he didn't know how this was all going to help him because everything is "accurate," which is what he "told them in the beginning," and he was at least hoping to get the items that he "settled with them" off of his report.  (*Id.* at 3.)  The paralegal begins reciting the different selections from case valet, such as "not mine" or "never late."  (*Id.*)  Although the paralegal does not expressly tell T.B. to select a specific challenge for a negative tradeline, she also does not address his statement that the debts are accurate but continues to inform him of the different challenges that he can make.  The exhibit then reflects that an item was challenged on

---

[6] The court has used the consumer's initials for privacy concerns.
[7] The exhibit reflects the date as 2018-08-07 but there is no indication if the "08" indicates the month or the day. (Doc. 318-33.)

July 16 and 17, 2018 to TransUnion and Equifax.  (*Id.* at 4-5.)  The exhibit indicates that a challenge was sent to Plaintiff on T.B's debt.  There are also two undated letters to T.B. indicating that a "formal debt validation request" was sent to Plaintiff.  (*Id.* at 6.)

Plaintiff has attached other exhibits referencing calls with Defendants' employees.  (*See* Doc. 318 at 27-28.)  These exhibits show that consumers have indicated that their debts are accurate but Defendants' employees encourage continuing to challenge these debts.  Defendants have attempted to dispute these factual contentions by stating that its clients have a right to a fair and accurate report.  Defendants also cite to five lines of deposition testimony stating that Lexington Law only verifies tradelines.  (Doc. 334 at 7.)  Plaintiff, however, has attached an exhibit that indicates that Lexington Law submitted a legal challenge to a debt in addition to seeking a verification.  (Doc. 318-33.)  Moreover, Plaintiff has submitted dispute letters which show that Lexington Law has sent disputes that challenge the debt instead of merely asking for verification. (*See* Doc. 310-8) ("Negative credit reporting should be removed from my credit report because my identity was stolen.")  Lexington Law's engagement agreement also suggests that it will challenge the accuracy of debt on behalf of the client.

At this stage, the court finds that there is a genuine dispute of material fact as to whether Lexington Law made false statements regarding the accuracy of negative tradelines in the dispute letters that were mass mailed to Plaintiff.

**Misrepresentations and Concealment Regarding the Identity of the Sender in the Mailed Dispute Letters**

The bulk of Plaintiff's claim involves the alleged misrepresentations and omissions surrounding the dispute letters.  It is undisputed that the letters, each of which appears to be signed by a consumer and contains a return address of the consumer, were not written by those consumers,

were not signed by the consumers, and were not placed in the mails by the consumers.  Rather, the letters were generated by Lexington Law from a bank of forms.  The letters were written in the first person and appear as if they were coming directly from a consumer.  The postmark also reflects a mailing from the state identified on the return address although all of the letters originated in Utah.  None of the consumers verified the information in the letters and no one from Lexington Law reviewed the letters prior to their being sent out.

Plaintiff argues that the letters, as a whole, contain affirmative false representations in that the return address is false and Defendants concealed the fact that Lexington Law drafted the letters. Plaintiff argues that this intentional concealment was done so that Plaintiff would have to respond to the dispute under the applicable statute.  This scheme to defraud was perpetrated using the mails as Defendants sent out the letters - with these fraudulent misrepresentations and omissions - en masse using the postal service.  Plaintiff contends that this scheme resulted in a loss of millions of dollars because Plaintiff was forced to investigate all of these disputes that it would not have investigated had it known that these letters originated from Lexington Law.  Defendants counter that the statements are not false because Lexington Law's relationship with its consumer clients authorized Lexington Law to send letters on each consumer client's behalf.  Defendants further assert that Lexington Law had no duty to disclose the fact that it was the entity drafting and mailing out the dispute letters.

The parties spend a significant amount of time arguing the significance of Lexington Law's engagement agreement and other laws relating to whether Lexington Law had a duty to disclose to Plaintiff that Lexington Law drafted and sent the dispute letters.  In light of the Tenth Circuit's authority, however, a duty to disclose is not required in order to establish actionable fraud under the mail and wire fraud statutes.  Rather, nondisclosure, such as a misleading omission, can support

a claim of fraud if "it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled." *Gallant*, 537 F.3d at 1228. Notably, Defendants cite to *United States v. Cochran*, 109 F.3d 660, 665 (10th Cir. 1997), for the proposition that "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." (Doc. 269 at 19.) The full sentence, however, states that "Mr. Cochran bases his argument on the Supreme Court's holding in *Chiarella v. United States*, 445 U.S. 222, 235 ... (1980), that '[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.'" *Id.* The Tenth Circuit went on in *Cochran* to hold that, in the context of certain transactions in a wire fraud prosecution, "a misleading omission[ ] is actionable as fraud ... if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled." *Id.* (citing *Emery v. American General Finance, Inc.*, 71 F.3d 1343, 1348 (7th Cir. 1995)).

In their reply brief, recognizing the Tenth Circuit's holding in *Gallant*, Defendants argue that Lexington Law's actions in concealing the identity of the sender is not misleading, arguing that there "is nothing misleading about sending letters in the client's name where the client is the source of the letter and the subject of the tradeline." (Doc. 334 at 13.) Defendants then go on to say that such an omission cannot constitute a federal crime. The issue is not whether the omission itself is a federal crime but whether the omission was intended to induce a false belief, which resulted in an advantage to the misleader and a disadvantage to the misled. Viewing the facts in a light most favorable to Plaintiff, this omission was clearly intended to result in Plaintiff's belief that the letters were sent from consumers. Based on the facts, Defendants went to great lengths to ensure that the identity of the sender would be difficult, if not impossible, to determine. This was done by utilizing a bank of letters with thousands of different templates, different spellings, and

phrases, and by purposefully mailing these letters from the State that was identified in each letter's return address.  The significance of the sender, as Defendants well know, is that Plaintiff must investigate a dispute that is initiated by a consumer.  *See* 15 U.S.C. § 1681s-2(a)(8).  Failure to do so can result in significant fines by the government.  As Plaintiff pointed out, had it ignored this duty, it could have resulted in fines of millions of dollars based on the 595,117 dispute letters it received from Lexington Law.  Under the FCRA, willful non-compliance fines range from $100-$1,000 per violation.  15 U.S.C. § 1681n(a)(1)(A).  A reasonable jury could conclude that Lexington Law was counting on Plaintiff to treat these letters as those from a consumer and not from a CRO as Plaintiff can ignore a letter from a CRO as frivolous.

Moreover, Defendants argument that the dispute letters do not contain false statements because they had authority to send letters in the consumers' names is not persuasive.  Defendants are relying on the engagement letters which did give authority to send correspondence in the consumer's name.  In support of their argument, Defendants cite to several cases which stand for the proposition that an agent may sign the principal's name without indicating that this act was done by an agent.  (*See* Doc. 269 at 17-18.)  None of those cases, however, state that such an act is authorized when the document is never reviewed by the principal nor reviewed by the agent who used a computer to generate the letter and signature.[8]  In *CBE Group, Inc. v. Heath*, No. 17-2594, 2020 WL 584620 (N.D. Texas Feb. 6, 2020)[9], a case heavily cited by Defendants, the district court

---

[8] *See, e.g., Estate of Stephens*, 28 Cal. 4th 665, 670, 49 P.3d 1093, 1095 (2002) ("Shirley immediately told Austin of each step of the execution, notarization, forwarding of the deed to the County Recorder's office for recording, and return of the deed to him after recording. At each of these steps Austin verbally acknowledged to Shirley that that was what he wanted to happen and instructed her to proceed with the next step.") *In re Barber*, 982 S.W.2d 364, 367 (Tex. 1998) (finding that a judge's rubber-stamped signature affixed by his clerk was acceptable because it was undisputed that the judge directed her to place his stamp on the order). *Elliott v. Mut. Life Ins. Co. of New York*, 91 P.2d 746, 747 (Okla. 1939) (finding that letter was enforceable when agent wrote letter on behalf of principal and signed the principal's name after being directed to do the same).

[9] An appeal in this matter is currently pending before the Fifth Circuit.  Case No. 20-10166.

set aside the jury's verdict finding that Lexington Law committed fraud by sending dispute letters that purported to be from the consumer.  In doing so, the district court cited to *Attorney Grievance Commission of Maryland v. Paul*, 187 A.3d 625, 459 Md. 526 (2018).  In *Paul*, the court concluded that an attorney did not make any false statement or omission by signing a nondisclosure agreement in the client's name.  *Id.* at 635-36.  Significantly, prior to signing the document, the "[attorney] and [client] discussed the relevant agreement, and [client] gave [attorney] his permission to sign his name on the agreement because Burke was away on vacation."  *CBE Grp., Inc.*, 2020 WL 584620, at *8 (quoting *Paul*, 187 A.3d at 636).  Although there was no dispute that no one reviewed the dispute letters at issue, the district court in *CBE Group* determined that Lexington Law's conduct did not amount to misrepresentation.  *Id.*  By contrast, in this case the court finds that the lack of review of the dispute letters by the consumer or an attorney at Lexington Law with access to the consumer's file is significant.  Although Lexington Law had authority to send a letter in the consumer's name, it is undisputed that these letters were not reviewed prior to being sent out.  Indeed, at some level the letters appear to be fabrications in the sense that they are form letters selected by a computer algorithm, complete with spelling errors built in to add the appearance of legitimacy, but otherwise rendered without review by any human to confirm that they are truthful and accurate with respect to the consumer from whom they purport to originate.  Lexington Law has not established that its authority extended to sending form letters that were never reviewed for accuracy.  Moreover, given that they were form letters, it would be highly unlikely that all of the statements in the letters were true for all 595,117 letters.  *See In re Disciplinary Action Against McCray*, 2008 ND 162, ¶ 21, 755 N.W.2d 835, 843 (N.D. Sept. 3, 2008) ("He was obviously aware the form letters were not written or sent by [the client] and the information contained in them could

not possibly be true for 9,450 clients.")  The court finds that there is a fact issue as to whether Lexington Law made false affirmative statements in the dispute letters.

Finally, with respect to this scheme to defraud, Defendants argue that it did not proximately cause Plaintiff's injuries because Plaintiff would have taken the same actions even if it had known that Lexington Law was the sender of the 595,117 dispute letters.  The court, however, declines to view the evidence in the way that Defendants argue it should be viewed.

In opposition, Plaintiff asserts that the statements and omissions were material and that it would not have responded to the 595,117 dispute letters had it known that Lexington Law sent those letters.  (Doc. 311 at 33-34.)  This is because Lexington Law is a CRO and Plaintiff's policy is to not investigate disputes initiated by CROs.  (*Id.* at 10-11.)  In support of this, Plaintiff cites to the testimony of its corporate representative Tracy Bengtson.  Bengtson testified that "dispute letters sent by a credit repair organization that identified themselves as a credit repair organization are considered frivolous and do not merit a response, and that is Ad Astra's policy."  (Doc. 318-5 at 440:20-25.)  Bengtson then testified that Plaintiff responds to disputes from attorneys and those disputes are treated as an attorney dispute and is routed to a different compliance officer.  (*Id.* at 443:22-444:3.)  Bengtson was then asked "if the letter is signed [by] an attorney that is a credit repair organization, what does Ad Astra do in that circumstance?"  (*Id.* at 446:3-5.)  Bengtson replied that Plaintiff would still consider that letter to be an attorney dispute.  (*Id.* at 446:7-11.)

Defendants argue that this testimony is the death knell to Plaintiff's claim because Plaintiff cannot show that their actions, in concealing the identity and source of the letters, were the proximate cause of Plaintiff's injury because Plaintiff would have responded to **all** 595,117 dispute letters had Lexington Law included its letterhead on the dispute letters.  Defendants can present this argument to the jury.  The court cannot conclude on summary judgment that a response by a

corporate representative regarding what Plaintiff would do when faced with **a single letter** is the same action Plaintiff would have taken with 595,117 letters given the substantial amount of time and effort that Plaintiff had to expend in responding to all of these letters and the evidence that Plaintiff expended time and energy trying to prove that these letters were coming from a CRO.

Given the evidence and the fact that Plaintiff does not have to respond or suspend debt collection on disputes initiated by a CRO under the FCRA, the court finds that Plaintiff has shown that there is a dispute of material fact as to whether Plaintiff's damages, which include lost profits from collections and other damages from the time spent responding to the dispute letters, were caused by the alleged RICO violation.  Therefore, Defendants' motion for summary judgment based on a failure to establish a genuine dispute of material fact as to whether Defendants engaged in mail fraud is denied.

### Misrepresentations in Electronic Disputes

Plaintiff has also asserted that Defendants engaged in a scheme to defraud in which they made false representations in connection with the 687,916 electronic disputes sent to the Bureaus by Lexington Law concerning debts Plaintiff was trying to collect from 2014 through mid-2019. Defendants move for summary judgment on the basis that Plaintiff cannot establish that false representations were made.  The undisputed facts show that the Bureaus were aware that Lexington Law submitted the disputes.  In sending the electronic disputes to Plaintiff, the Bureaus do not identify who submitted the electronic dispute.   Therefore, Defendants argue that they have made no affirmative misrepresentations in submitting the electronic disputes.

In response, Plaintiff argues that the evidence shows that Lexington Law deceived Plaintiff by using the Bureaus as a conduit for their scheme.  Plaintiff further argues that at least one Bureau, TransUnion, contractually agreed not to disclose the source of the electronic dispute and that

Lexington Law misrepresented to the Bureaus that it was a reseller under the FCRA.  Plaintiff also asserts that Lexington Law disputed accurate information.  First, with respect to the contractual agreement not to disclose, this fact has no bearing on the allegations of fraud because the evidence is that the Bureaus do not identify the identity of the person making the dispute in any event.  Second, with respect to a misrepresentation in the Bureau contracts regarding Lexington Law's status as a reseller, a reseller is a legal term under the FCRA.  15 U.S.C. § 1681a(u).  To establish a violation of wire fraud, the scheme must be based on a false statement of material fact.  *Tronsgard v. FBL Fin. Grp., Inc.*, 312 F. Supp.3d 982, 993 (D. Kan. 2018).  The representation that Lexington Law is a reseller is a representation of law, not one of fact, and therefore it is not actionable in fraud.  *Id.*  (holding that a misrepresentation that an employee is an independent contractor is not actionable as it is not a statement of fact).

Plaintiff offers no facts regarding statements made by Lexington Law, or any other Defendant, to the Bureaus that led to their designation of Lexington Law as a reseller in the contractual agreements.  Defendants argue that they are a reseller when they resell credit reports to their consumer clients.  As Plaintiff has made no effort to establish what false statements of fact were made to the Bureaus regarding Lexington Law's status as a reseller, Plaintiff has not established fraud regarding Lexington Law's reseller status.   Therefore, to the extent Plaintiff's wire fraud claim is based on misrepresentations regarding Lexington Law's status as a reseller and its contracts with the Bureaus regarding the transmissions of e-disputes, Plaintiff has not established a dispute of fact regarding a scheme to defraud.

However, as discussed earlier, Plaintiff has introduced evidence that Lexington Law disputes negative tradelines even when the affected consumers admit that the tradelines are accurate.  Therefore, the court finds that there is a material dispute of fact as to whether Lexington

24

Law submitted e-disputes which were inaccurate.  It will be Plaintiff's burden to establish this evidence at trial with respect to the e-disputes.

### B.  Individual Defendants

Defendants Adam Fullman and Kevin Jones move for summary judgment on the basis that Plaintiff has not established that they operate and manage the Lexington Law enterprise.  Plaintiffs have asserted alternative allegations of the enterprise at issue.  Count 1 alleges that the enterprise is an association-in-fact enterprise consisting of Defendants Heath, Fullman, Jones, Johnson, the Progrexion Entities, Lexington law, and certain non-defendants.  (Doc. 257-1 at 31.)  Count 2 alleges an alternative RICO enterprise which consists of only Lexington Law and alleges that the remaining Defendants operated and managed the alternate enterprise's affairs.  (*Id.* at 32.)  Plaintiff further alleges that each Defendant is employed by or associated with the Enterprise and operates and manages its affairs.  (*Id.* at 31-32.)

As discussed, to establish a violation of § 1962(c), Plaintiff must show that each Defendant conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs.  A RICO enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  Plaintiff's RICO claim in count 1 is based on an allegation of an "association-in-fact" enterprise.  An association-in-fact enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).  Fullman and Jones argue that they did not conduct or participate in the conduct of the enterprise or alternate enterprise.[10]

---

[10] The difference in the alternative allegations concerns the members of the enterprise.  Otherwise, the allegations regarding the conduct is identical.  Therefore, the court will proceed to refer to the enterprise throughout this order.

To prove its claim against Fullman and Jones, Plaintiff must show that each Defendant "participated in the operation or management of the enterprise itself." *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1251 (10th Cir. 2016). Liability depends on these Defendants participating in the conduct of the enterprise and not just their own affairs. *In re: EpiPen*, 336 F. Supp.3d at 1318 (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001)). To meet the operation and management test,

> the defendant need not have primary responsibility for the enterprise's affairs, a formal position in the enterprise, or significant control over or within an enterprise. This test requires less. Instead, even lower rung participants in the enterprise who are under the direction of upper management may be liable under RICO if they have 'some part' in operating or managing the enterprise's affairs. Yet, allegations that simply describe a defendant's conduct through its regular course of business, goods and services that ultimately benefit the enterprise do not suffice to state a RICO claim.

*Id.* (internal citations and quotations omitted).

### Adam Fullman

The facts, both undisputed and those viewed in a light most favorable to Plaintiff, regarding Fullman's involvement with Lexington Law and the scheme to defraud create a dispute of material fact as to whether he participated in the operation or management of the enterprise. Fullman is a licensed California attorney who is of counsel to Lexington Law. In that role, he speaks to Lexington Law clients who are located in California when those clients ask to speak with an attorney. (Doc. 316-1 at 64:2-7.) Fullman is paid a monthly flat rate fee under the of counsel agreement. Fullman is a principal of the Fullman Law Firm. He is not a partner, member, owner, or employee of Lexington Law. (Doc. 282.) Fullman knows that Lexington Law gets its clients from advertising but he is not involved in and does not participate in the marketing. (Doc. 316-1 at 52:10-19.) Fullman also knows that Progrexion helps with marketing and sales. (*Id.* at 78:13-15.) Fullman believes that he met Jeffrey Johnson, Progrexion's President, back in 2005. At that

26

time, he believed that Progrexion and Lexington Law officed next door because Johnson had walked over to Lexington Law from his office.  (Id. at 125:1-9.)  Fullman has no knowledge regarding the financial relationship between the Progrexion entities and Lexington Law.  (Id. at 125:10-12.)  Fullman considers both Heath and Kevin Jones friends and will have lunch with them when he is in Utah.

Lexington Law's profile lists Fullman as a directing attorney at Lexington Law - California.  (Docs. 306-10 at 11.)  Fullman estimates that he and his firm receive more than 1,000 new clients a month under the of counsel agreement.  Fullman is not involved with drafting or sending the dispute letters at issue in this case.  (Doc. 306 at 2, 10; 316-1 at 66:15-24.)  Fullman understands that the dispute letters are generated by Lexington Law based on forms and are electronically signed on behalf of the clients.  Fullman knows that this procedure has been used since he began working with Lexington Law in 2005.

Under the of counsel agreement, Fullman is responsible for the majority of his overhead, such as his office, staff, and equipment, although Lexington Law reimburses Fullman for operating expenses related to his representation of Lexington Law clients, such as supplies and postage.  (Doc. 282 at 21.)  Fullman's duties include analyzing credit reports and information provided by clients.  Fullman will also draft letters on behalf of consumers.  Fullman testified that he has drafted letters under the Lexington Law name for landlords to show that the client has taken steps to dispute an item on his or her credit report.  (Doc. 316-1 at 96:2-24.)  Fullman can review the client's file in Lexington Law's computer system and make changes if necessary.

Fullman argues that Plaintiff has failed to introduce any evidence to support that he conducted or participated in the affairs of the enterprise.  According to the pretrial order, the purpose of the enterprise is to "defraud debt collection agencies like Ad Astra by profiting from

27

'credit repair' services in a manner that is illegal and fraudulent." (Doc. 257-1 at 32.) The question is - did Fullman participate in or conduct those affairs or was he just engaging in his regular business by providing of counsel services to Lexington Law? Fullman argues it's the latter while Plaintiff argues that his entire representation of Lexington Law's clients was related to the scheme to defraud. In support of his position, Fullman cites to *Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993). In that case, the outside attorney had sporadic involvement with the enterprise which included the preparation of two letters in 1982, a partnership agreement, and assistance in the bankruptcy proceeding, which involved another two letters. The court held that this was not sufficient to find that he conducted or participated in the enterprise. Significantly, the enterprise began several years before his involvement, his role was limited, and he never held a formal position in the partnership. *Id.* at 1344-45. Although Fullman does not personally send out the letters or review the same, neither does any other attorney at Lexington Law. Moreover, Fullman has been of counsel for Lexington Law since 2005. In that role, he knows that the firm's primary role is credit repair services. He assists in that role by talking to hundreds of clients to advise them. He also makes changes to their files, which is significant in that the electronic files are what trigger the dispute letters.

Fullman also cites to *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1102 (10th Cir. 1999), in support of his position. In that case, the court stated that a review of the record, almost 50 volumes, did not show any support for a finding that outside title companies managed a RICO enterprise. Although the plaintiff had claimed that the title companies failed to correct misrepresentations, made misrepresentations to the homeowners, failed to make certain disclosures, and other allegations, the record simply did not support these claims. *Id.* The title companies simply provided their regular title services to the entities that comprised the enterprise.

*Id.* Again, although Fullman does not draft the dispute letters at issue, he represents the Lexington Law California clients. He is paid by Lexington Law to do so and he is actively involved in the clients' representation, which includes making changes to their files. Fullman has represented thousands of clients on behalf of Lexington Law over the years.

The court finds that Plaintiff has shown a dispute of material fact as to whether Fullman had some part in directing or participating in the operation of the enterprise. *See CGC Holding Co., LLC*, 974 F.3d at 1211 (finding sufficient evidence that a defendant was liable when she received money generated by the activities' of the co-conspirators and she drafted letters in the early days of the scheme); *VNA Plus, Inc. v. Apria Healthcare Grp., Inc*., 29 F. Supp. 2d 1253, 1259 (D. Kan. 1998) (finding that a defendant involved in the day to day operations by controlling the billing services and practices of the enterprise was at the center of the enterprise).

Fullman's motion for summary judgment is therefore denied.

### Kevin Jones

The facts, both undisputed and those viewed in a light most favorable to Plaintiff, regarding Jones' employment by Lexington Law and the scheme to defraud create a dispute of material fact as to whether he participated in the operation or management of the enterprise. Jones began employment with Lexington Law as an associate attorney. Prior to the allegations in this case, Jones had a small ownership interest in Lexington Law but he never received a percentage of revenue. (Doc. 317 at 2.) He was also involved in the training of paralegals when he was an associate attorney. At that time, prior to 2012, Jones would have trained Progrexion's marketing staff. (Doc. 277-2 at 37:2-16.) In 2012, he was named the Director of Attorney Operations and, in 2015, he also took on the role of COO. His primary job was the day to day operation of Lexington Law's Compliance Program. He created the compliance management system to handle

29

complaints and he also created a process called CARE, which is the Client Attorney Rapid Escalation.  (Doc. 277-2 at 51:18-52:19.)  As part of his duties, he supervised the in house attorneys and participated in the hiring of attorneys.  Jones does not have access to information regarding Lexington Law's revenue.  (Doc. 317 at 2.)  Jones' employment agreement required him to oversee the day-to-day operation of the firm when Heath was absent.

Jones testified that he was not involved in drafting or revising the dispute letters.  (Doc. 277-2 at 160:8-14.)  Jones did know that the letters are drafted with a computer program.  Jones previously expressed criticism over the letters because he would receive complaints from the clients regarding the letters.  Jones thought the letters seemed unprofessional because the dispute letters were not on firm letterhead.  (Doc. 308-2 at 100:13-18.)  Jones was told that letterhead was not used because the letters would be less likely to be reviewed by the creditors.  (*Id.* at 43:12-14.)  During his time at Lexington Law, Jones was not involved with the writing of any policies with respect to the communication with creditors or the Bureaus.  (Doc. 277-2 at 238:4-9.)  Jones also testified that Lexington Law relied on the client's representations regarding their debt.  Jones was aware of Progrexion's business relationship with Lexington Law but he had never seen the servicing agreements between Lexington Law and the Progrexion entities.  (*Id.* at 207:4-7.)  Jones testified that in his experience at Lexington Law, Heath did what Progrexion asked him to do, and everything regarding marketing decisions was run through Progrexion.  (Doc. 308 at 47:23-25, 139:24-25.)  Jones separated from Lexington Law in 2019.  He received a severance package when he separated.

Jones argues that Plaintiff has failed to identify any specific facts that he directed the affairs of the enterprise.  The only authority in support of his motion is *BancOklahoma*.  (Doc. 277 at 6.)[11]

---

[11] Jones cited additional authority in his reply brief.  (Doc. 337.)  The authority cited therein is not persuasive to the court as it concerned outside parties and not those employed at the center of the enterprise.  (*Id.* at 6-7.)

This authority is not persuasive for the reasons discussed herein.  Jones is not an outside party as in *BancOklahoma*.  Jones was an integral part of Lexington Law for a significant number of years.  He was involved in training paralegals, hiring attorneys, supervising those attorneys, and handled the firm's compliance issues.  Moreover, Jones was the second person in authority at Lexington Law and was to oversee it in Heath's absence.  The court finds that Plaintiff has established a dispute as to whether Jones had "some part in directing" the affairs of the enterprise.  *Reves*, 507 U.S. at 179; *VNA Plus, Inc*., 29 F. Supp. 2d at 1259.

Jones' motion for summary judgment is denied.

### C.  RICO Conspiracy

Defendants also moved for summary judgment on Plaintiff's claims of RICO conspiracy.  Defendants argued that a conspiracy claim cannot survive absent an underlying RICO violation.  Defendants' argument is accurate; however, the court has determined that the RICO substantive claims must proceed to trial.  Therefore, Defendants' motion for summary judgment on the RICO conspiracy claims is denied.

### D.  State Law Fraud Claim

Defendants move for summary judgment on Plaintiff's state law fraud claim.  This claim is based on the same facts as the RICO claims.  Therefore, for the reasons stated in this order, the court finds that there is a material dispute of fact as to whether Defendants made fraudulent representations.  Defendants further argue that Plaintiff did not reasonably rely on the false representations and omissions because Plaintiff delayed its investigation into trying to determine where the letters were coming from.  (Doc. 269 at 25-27.)  Plaintiff, however, argues that the evidence supports that the dispute letters gradually increased and that it only learned the extent of the scheme prior to the initiation of the suit.  (Doc. 310 at 14.)  The court finds that the question

of whether Plaintiff reasonably relied on the representations in the dispute letters is in dispute and this question must be resolved by a jury.

Defendants also assert that Plaintiff has not shown that its damages were caused by Defendants because Plaintiff would have taken the same actions had it known that the letters were from Lexington law.   The court determined that this issue is also for the jury for the reasons discussed herein.

### E.  Collection Damages

Defendants argue that Plaintiff's collection damages were caused by its own business decisions and not by Defendants' conduct.   Under the FDCPA, a debt collector must cease collection activity if a consumer disputes the validity of the debt within 30 days of the consumer's receipt of an initial communication from that debt collector.  15 U.S.C. § 1692g(a)-(b).  Defendants argue that Plaintiff has not established that the dispute letters were sent within that 30-day window and, therefore, Plaintiff was not required to halt collection.  Plaintiff's business practice is to halt collections on debts anytime a consumer challenges a debt.  Plaintiff asserts that this is done in good faith and so that Plaintiff is not subjected to liability for collecting an inaccurate amount. (Doc. 318 at 40.)

The court finds that this issue is also one for the jury.  Defendants are free to argue that they did not cause these damages if the jury determines that Plaintiff has otherwise proven its case.[12]

### IV.   Conclusion

---

[12] The court notes that Defendants have filed an objection to Plaintiff's expert regarding these damages.  (Doc. 264). The court need not resolve this issue in order to rule on the present summary judgment motions.  However, the court has not yet determined whether the evidence regarding these damages is admissible based on the arguments raised by Defendants.

Defendants' joint motion for summary judgment (Doc. 268) is GRANTED IN PART and DENIED IN PART. Fullman's motion for summary judgment (Doc. 272) and Jones' motion for summary judgment (Doc. 276) are DENIED.  Plaintiff's motion to file a surreply (Doc. 344) is DENIED.

IT IS SO ORDERED.  Dated this 26th day of February 2021.

                       __ s/ John W. Broomes_____
                       JOHN W. BROOMES
                       UNITED STATES DISTRICT JUDGE