IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

AD ASTRA RECOVERY SERVICES, INC.,

    Plaintiff,

v.   Case No. 18-1145-JWB

JOHN CLIFFORD HEATH, ESQ., et al.,

    Defendants.

**MEMORANDUM AND ORDER**

This matter comes before the court on Plaintiff's motion in limine to exclude the opinions of Bruce Green (Doc. 260). The motion has been fully briefed and the court is prepared to rule. (Docs. 261, 262, 263, 303, 326.) For the reasons stated herein, Plaintiff's motion is GRANTED.

**I.  Facts**

The facts of this case have been set forth in this court's memorandum and order on the motions for summary judgment. (Doc. 363.) The facts that are relevant to the pending issues are restated below.

Plaintiff Ad Astra is a debt collector and data furnisher. Plaintiff brings claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1962(c) and (d), and a Kansas common law fraud claim. (Doc. 257-1.) As a debt collector, Plaintiff collects debts primarily on behalf of one client, CURO Group Holdings Corp. ("CURO"). (*Id.* at 3.) Plaintiff is subject to the provisions in the Fair Credit Reporting Act ("FCRA"), Fair Debt Collection Practices Act ("FDCPA"), and state laws applicable to debt collection. Defendant John C. Heath, Attorney at Law, PC d/b/a Lexington Law Firm ("Lexington Law") is a law firm that provides services to its clients, including credit repair services. (*Id.*) Lexington Law's principal place of business is in

1

North Salt Lake City, Utah.  Lexington Law employs attorneys in house and it also engages law firms in certain states to serve as "of counsel."  (*Id.*)

Relevant to the issues in this case, the FCRA gives consumers the right to have negative information on their credit reports, which are generated by Equifax, Experian, and TransUnion (the "Bureaus"), referred to as "tradelines," investigated for accuracy.  A consumer may submit a dispute regarding these tradelines.  *See* 15 U.S.C. §§ 1681i(a)(1)(A), 1681s-2(8).  Upon receipt of a dispute by a consumer, an investigation must be conducted by Plaintiff in accordance with the statute.  The investigation requirement does not apply to a dispute submitted by a credit repair organization ("CRO").  *Id.* § 1681s-2(a)(8)(G).  An investigation is also not required when "the furnisher has a reasonable belief" that a CRO submitted or prepared the dispute for the consumer or the dispute is submitted on a form supplied to a consumer by a CRO.  12 C.F.R. § 1022.43(b)(2).  Lexington Law is registered as a credit services organization in both Utah and California under those states' statutes regarding credit repair agencies, which are similar in definition to CRO under the federal statute.  (Doc. 318-13.)

Lexington Law, along with Defendant Progrexion Marketing, markets Lexington Law as a leading credit repair law firm.  (Doc. 310-47.)  Consumers are referred to Lexington Law from Defendant Teleservices by intake agents.  Teleservices' agents then provide the consumers with an engagement agreement for Lexington Law.  The engagement agreement, which is signed by Lexington Law's consumer clients, states that Lexington Law will send written communications to debt collectors such as Plaintiff and sign those letters in the consumer client's name.

Since 2014 through the filing of Plaintiff's Amended Complaint, Lexington Law sent Plaintiff at least 595,117 letters on behalf of consumers.  The letters are generated by an automated process that is based on a patent owned by Defendant Progrexion IP.  This patent is licensed to

2

Lexington Law and is used to generate dispute letters from a bank of form letters.  (Doc. 334 at 5.) The form letters were previously drafted and approved by attorneys although the computer program will make some changes to those letters.  (Doc. 334-5 at 182:12-16.)  An automated process typically determines which letters from the bank of form letters should be sent out.  (*Id.* at 182:21-23; Doc. 269-8 at 97:4-25.)  In this automated process, the letters are selected using the information in the Case Valet system, which is a system that the consumer clients can access to provide information regarding their debts.  (Doc. 269-8 at 97:4-25.)  The dispute letters are not sent under Lexington Law's letterhead but sent with the return address reflecting the name of the consumer.  The letters are also signed in the name of the consumer and written in first person.  (*See id.* at 183:16-23, Doc. 310-8.)  The individual dispute letters are not reviewed by an attorney or a paralegal prior to being sent out.  (Docs. 318 at 25; 334 at 5.)  The consumer also does not review the letters prior to them being sent on his or her behalf.  (Doc. 310-25 at 60:24-61:4.)  The consumer can request to review the letters and will be provided with the template letter that was sent but not the letter with the electronic signature.  (Doc. 334-5 at 133:10-24, 137:5-13.)

After receiving a letter like the ones at issue in this case, Plaintiff treats it as a "dispute" coming from an individual consumer.  Plaintiff then conducts an investigation and responds to the letter.  This takes approximately five to ten minutes, on average.  (Doc. 286 at 436:7-10.) Plaintiff's policy, however, is to not investigate dispute letters sent by a CRO because it considers those disputes frivolous.

Plaintiff filed this suit against Defendants in May 2018.  (Doc. 1.)  Plaintiff asserts that it has suffered more than $3 million in compensatory damages due to the statutory investigations undertaken in responding to the dispute letters at issue and in pausing collections on the debt at issue. (Doc. 257-1 at 37.)  The court denied Defendants' motions for summary judgment and this

matter is set for trial in May 2021. Defendants seek to call Bruce Green to opine regarding the propriety of Lexington Law sending the dispute letters at issue in the consumer's name. Plaintiff moves to exclude his opinions on the basis that they are unreliable.

## II. Standard

Federal Rule of Evidence 702, which controls the admission of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under this rule, the district court must satisfy itself that the testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony. *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018) (citing *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)). The district court must first determine whether the witness is qualified by knowledge, skill, training, experience, or education to render an opinion. *Id.* If so, the district court must determine whether the witness's opinion is reliable by assessing the underlying reasoning and methodology. *Id.* at 1283. The court is not required to admit opinion evidence that is "connected to existing data only by the *ipse dixit* of the expert," and may exclude the opinion if "there is simply too great an analytical gap between the data and the opinion offered." *Id.* (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)). But the rejection of expert testimony is the exception rather than the rule, and "[v]igorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579, 596 (1993).

"The court has discretion to determine how to perform its gatekeeping function under *Daubert*." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2020 WL 1164869, at *3 (D. Kan. Mar. 10, 2020) (citing *Bill Barrett Corp. v. YMC Royalty Co.*, LP, 918 F.3d 760, 770 (10th Cir. 2019)). The most common method of fulfilling that role is by conducting a *Daubert* hearing, "although such a process is not specifically mandated." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). In this instance, neither party has requested a *Daubert* hearing. Moreover, the nature of the opinions expressed, the relative completeness of the expert report, and the materials cited in support of and against the challenged opinions lead the court to conclude that the motions can be decided without a *Daubert* hearing. *Ho v. Michelin N. Am., Inc.*, 520 F. App'x 658, 664 (10th Cir. 2013) (district court permissibly exercised its discretion in ruling without a formal *Daubert* hearing).

### III. Analysis

Defendants have offered the expert testimony of Bruce Green, an attorney who is a full-time Professor at Fordham Law School. Green is admitted to practice in New York and has been a member of the faculty at Fordham since 1987. He regularly teaches courses on professional conduct and has co-authored a casebook on this subject. Green has served on many committees related to professional responsibility over several years and has been previously retained as an expert on lawyers' professional conduct. Defendants retained Green to address the application of professional standards to "Lexington's preparation and sending of letters on behalf of its clients to

debt collection agencies such as plaintiff...." (Doc. 263-1.) Green's three main opinions in this case include the following: 1) Lawyers can perform limited services, such as drafting correspondence for their clients; 2) Lawyers need not disclose their role in drafting or sending clients' correspondence to third parties; and 3) Lexington acted consistent with professional standards in preparing and sending the consumer letters at issue. Green has also opined that 4) Lexington's preparation of the letters did not constitute fraud under the rules of professional conduct in that the letters contained no false representations regarding who prepared the letters or how they were prepared; and 5) Lexington's conduct in signing and mailing the letters was not deceptive. (*Id*. at 5-11.)

Plaintiff moves to exclude these opinions on the basis that Green's opinions are not relevant because Lexington Law does not perform legal services, the opinions are not reliable, and the opinions constitute impermissible legal conclusions as to the ultimate issues. Plaintiff does not offer any strong argument regarding Green's qualifications. Rather, Plaintiff focuses on Green's "flawed assumptions." (Doc. 261 at 6.) Plaintiff argues that the opinions are premised on the assumption that Lexington law is providing legal services and "that its attorneys participate in the information-gathering, drafting, and review of the dispute letters transmitted on behalf of its credit repair clients." (*Id.*) Plaintiff argues that the opinions are not reliable because they are premised on an erroneous understanding of the facts and a selective review of the law. Plaintiff further argues that the final opinions regarding fraud and deceptive conduct are inadmissible as they are conclusions of law on ultimate issues of fact. In response, Defendants argue that Green is qualified to opine on these issues and that his opinions are relevant and would be helpful to the jury. Notably, Defendants argue that Plaintiff may simply cross-examine Green regarding the facts concerning how the letters are prepared and mailed. (Doc. 303 at 11.)

An expert's opinion must be based upon sufficient facts, it must be the product of reliable principles and methods, and the expert must reliably apply the principles and methods to the facts of the case. Reviewing Green's opinion, he states that all of the facts or data that he was provided was cited in the report. (Doc. 263-1 at 4.) Based on that report, it appears that Green reviewed Lexington Law's engagement agreement in forming his opinions. Green opined that the engagement agreement allowed Lexington to perform certain tasks. He also considered Plaintiff's amended complaint in determining that Lexington signed the dispute letters in the consumer's name and mailed those letters to Plaintiff without indicating that they were prepared by Lexington. (*Id.* at 5.) Green's opinion states that he does not have independent knowledge of the facts and discovery in the case. (*Id.* at 4.) Notably, Green bases his opinions on the Utah Rules of Professional Conduct and also cites to rules of several other states. He also states that his conclusion and analysis would be the same "under any state's professional conduct rules, because the rules of every state permit lawyers to draft clients' correspondence to third parties without disclosing to the recipients the lawyers' representation or their role as the drafters." (*Id.* at 6-7.)

The undisputed facts in this case are that the dispute letters are drafted and signed by an automated process. At no point in the process does a Lexington Law attorney or paralegal review a dispute letter prior to being sent out. Moreover, there is no evidence that a Lexington Law attorney or paralegal reviews a consumer client file and selects a form letter to be sent out. Also, it is undisputed that the consumer client does not review or approve a dispute letter before it is sent out. Rather, a computer program determines which form letter to send from a bank of forms, which, according to Defendants, were previously drafted by attorneys.

Green's opinions presume that an attorney has drafted the correspondence on behalf of his or her consumer client and formed his opinions based upon this presumption. Defendants argue

7

that there are facts in the record that support a finding that Lexington Law provided legal services because it sends other correspondence (not dispute letters), the attorneys update the letters, and they ensure that the letters fit each individual client's situation. (Doc. 303 at 10.) There is testimony that the attorneys update the form bank of letters from time to time but the record clearly shows that the automated process is how the dispute letters are drafted and sent out. Although Defendants argue that there is testimony that the attorneys ensure that the letters fit each individual client's situation, the testimony does not support such a generalization. (Doc. 303 at 10.) Rather, Defendant Heath testified that the letter could be edited based on client feedback and it does happen but he could not explain how a letter is edited based on client feedback. (Doc. 303-3 at 61:14-25.) Notably, Jones, who was employed by Lexington Law for several years as an associate attorney and then as Directing Attorney of Operations and Chief Compliance Officer, testified that he never drafted a dispute letter and that the letters are generated through a computer program. (Doc. 310-23 at 160:8-14.) Defendant Fullman, who is California of counsel, is also not involved with drafting or sending dispute letters. (Doc. 306 at 2, 10; 316-1 at 66:15-24.) Fullman also understands that the dispute letters are generated by Lexington Law based on forms and are electronically signed on behalf of the clients. Fullman knows that this procedure has been used since he began working with Lexington Law in 2005.

      Rule 702 permits expert testimony by a "witness who is qualified" if the expert's testimony is helpful to the jury and is reliable in that it is "based on sufficient facts or data; ... is the product of reliable principles and methods; and ... the expert has reliably applied the principles and methods to the facts of the case." Based on Green's qualifications as a legal expert, which are not seriously disputed, the court finds that he is qualified to opine on the professional standards of attorneys in

providing legal services. However, his opinions are not reliable because they are not based on sufficient facts. To determine whether an opinion is based on sufficient facts, the court employs a quantitative rather than a qualitative standard, i.e., the question is whether the expert considered enough information to make the proffered opinion reliable. Fed. R. Evid. 702 advisory committee's notes to 2000 amendment. That the expert relied on disputed facts in reaching his opinion does not render the expert's opinion unreliable under this test. *Id.* An expert's opinion, however, should be excluded as unreliable if the expert is "oblivious" to "key facts." *Conroy v. Vilsack*, 707 F.3d 1163, 1170 (10th Cir. 2013).

Here, it is undisputed that attorneys did not draft the dispute letters. Rather, the dispute letters were generated by a computer using a form bank. While an attorney may have drafted the form templates at some point, Lexington Law attorneys took no part in deciding what dispute letter to send or in reviewing a client file prior to sending the correspondence. This was all done by an automated process. Moreover, the undisputed evidence shows that the dispute letters were never reviewed by an attorney or paralegal prior to the letters being sent out. Green's opinions are based on a premise that a Lexington Law attorney drafted the correspondence at issue. Green makes no reference to the automated process that actually generates the letters, nor does he discuss the lack of any attorney involvement in the dispute letter process. *See In re Disciplinary Action Against McCray*, 2008 ND 162, ¶ 21, 755 N.W.2d 835, 843 (N.D. Sept. 3, 2008) ("He was obviously aware the form letters were not written or sent by [the client] and the information contained in them could not possibly be true for 9,450 clients.") Based on the limited facts in his report, it is clear that Green is also unaware that the envelopes bear the consumer client's return address and are overnighted to the consumer's State of residence so that the postal stamp can bear a mark from that State.

Because Green's report fails to consider these undisputed facts, his opinions on the propriety of Lexington Law's conduct in sending the dispute letters cannot have "rested on a reliable foundation." *Conroy*, 707 F.3d at 1170 (citation omitted).

## IV.     Conclusion

Plaintiff's motion in limine to exclude the opinions of Bruce Green (Doc. 260) is GRANTED.

IT IS SO ORDERED.  Dated this 3rd day of March 2021.

s/ John W. Broomes<br>
JOHN W. BROOMES<br>
UNITED STATES DISTRICT JUDGE