IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

AD ASTRA RECOVERY SERVICES, INC.,

        Plaintiff,

v.                                Case No.  18-1145-JWB

JOHN CLIFFORD HEATH, ESQ., et al.,

        Defendants.

## MEMORANDUM AND ORDER

This matter comes before the court on Defendants' motion in limine to exclude the opinions of Ricardo Zayas (Doc. 264).  The motion has been fully briefed and the court is prepared to rule. (Docs. 265, 283, 284, 304, 327, 331, 342, 343.)  For the reasons stated herein, Defendants' motion is GRANTED IN PART AND DENIED IN PART.

### I.  Facts

The facts of this case have been set forth in this court's memorandum and order on the motions for summary judgment.  (Doc. 363.)  The facts that are relevant to the pending issues are restated below.

Plaintiff Ad Astra is a debt collector and data furnisher.  Plaintiff brings claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), and a Kansas common law fraud claim.  (Doc. 257-1.)  As a debt collector, Plaintiff collects debts primarily on behalf of one client, CURO Group Holdings Corp. ("CURO").  (*Id.* at 3.)  Plaintiff is subject to the provisions in the Fair Credit Reporting Act ("FCRA"), Fair Debt Collection Practices Act ("FDCPA"), and state laws applicable to debt collection.  Defendant John C. Heath, Attorney at Law, PC d/b/a Lexington Law Firm ("Lexington Law") is a law firm that provides services to

1

its clients, including credit repair services.  (*Id.*)  Lexington Law's principal place of business is in North Salt Lake City, Utah.  Lexington Law employs attorneys in house and it also engages law firms in certain states to serve as "of counsel."  (*Id.*)  Defendant Jeffrey Johnson served as the Co-CEO of Defendants PGX Holdings, Inc. ("PGX"), Progrexion Holdings, Inc., Progrexion Teleservices, Inc. ("Teleservices"), Progrexion ASG, Inc., Progrexion Marketing, Inc., and Progrexion IP, Inc. (collectively referred to as "the Progrexion entities") prior to his retirement in April 2020.  (Doc. 257-1 at 3.)  PGX and Progrexion Holdings are both holding companies.  The remaining Progrexion entity Defendants are subsidiaries of Progrexion Holdings.  According to Defendants, some of these Progrexion entities essentially provide services to Lexington Law as vendors.  (Doc. 334-5 at 80:19-24.)  They provide these services pursuant to agreements entered into between those Defendants and Lexington Law.

Relevant to the issues in this case, the FCRA gives consumers the right to have negative information on their credit reports, which are generated by Equifax, Experian, and TransUnion (the "Bureaus"), referred to as "tradelines," investigated for accuracy.  A consumer may submit a dispute regarding these tradelines.  Upon receipt of a dispute by a consumer, an investigation must be conducted by Plaintiff in accordance with the statute.  The investigation requirement does not apply to a dispute submitted by a credit repair organization ("CRO").  An investigation is also not required when "the furnisher has a reasonable belief" that a CRO submitted or prepared the dispute for the consumer or the dispute is submitted on a form supplied to a consumer by a CRO.  12 C.F.R. § 1022.43(b)(2).  Lexington Law is registered as a credit services organization in both Utah and California under those states' statutes regarding credit repair agencies, which are similar in definition to CRO under the federal statute.  (Doc. 318-13.)

Lexington Law, along with Progrexion Marketing, markets Lexington Law as a leading credit repair law firm.  (Doc. 310-47.)  Consumers are referred to Lexington Law from Teleservices by intake agents.  Teleservices' agents then provide the consumers with an engagement agreement for Lexington Law.  The engagement agreement, which is signed by Lexington Law's consumer clients, states that Lexington Law will send written communications to debt collectors such as Plaintiff and sign those letters in the consumer client's name.

Since 2014 through the filing of Plaintiff's Amended Complaint, Lexington Law sent Plaintiff at least 595,117 letters on behalf of consumers.  The letters originally come from a patent that is owned by Progrexion IP.  This patent is licensed to Lexington Law and is used to generate dispute letters from a bank of form letters.  (Doc. 334 at 5.)  An automated process typically determines which letters from the bank of form letters should be sent out.  (*Id.* at 182:21-23; Doc. 269-8 at 97:4-25.)  The dispute letters are not sent under Lexington Law's letterhead but are sent with the return address reflecting the name of the consumer.  The letters are also signed in the name of the consumer and written in first person.  (*See id.* at 183:16-23, Doc. 310-8.)

After receiving a letter like the ones at issue in this case, Plaintiff treats it as a "dispute" coming from an individual consumer.  Plaintiff then conducts an investigation and responds to the letter.  This takes approximately five to ten minutes, on average.  (Doc. 286 at 436:7-10.) Plaintiff's policy, however, is to not investigate dispute letters sent by a CRO because it considers those disputes frivolous.

Lexington Law also submits disputes electronically ("e-disputes") through a web-based platform called e-OSCAR.  Between 2014 and mid-2019, Lexington Law sent at least 687,916 electronic disputes to the Bureaus concerning debts Plaintiff was trying to collect.  (Docs. 318 at 26, 334 at 7.)  Because Plaintiff is unaware of who has initiated the e-dispute, Plaintiff investigates

all disputes, including e-disputes that may have been initiated by a CRO.  (Doc. 269-6 at 429:22-432:13.)  Plaintiff then investigates and responds to the e-dispute in the same manner.  (*Id.* at 433:3-5.)  Plaintiff also suspends collection efforts on that debt.  (*Id.* at 427:18-24, 431:5-7.)

Plaintiff filed this suit against Defendants in May 2018.  (Doc. 1.)  Plaintiff asserts that it has suffered more than $3 million in compensatory damages due to the statutory investigations undertaken in responding to the dispute letters at issue and in pausing collections on the debt at issue.  (Doc. 257-1 at 37.)  The court largely denied Defendants' motions for summary judgment and this matter is set for trial in May 2021.  The court did grant summary judgment on Plaintiff's allegations that Defendants engaged in fraud when Lexington Law misrepresented its status as a reseller and contracted with the Bureaus to hide its identity in initiating e-disputes.  (Doc. 363 at 23-25.)  Therefore, as discussed herein, opinions related to damages on this issue are not relevant to the issues remaining in the case.

Plaintiff has obtained a damages' expert who will opine regarding Plaintiff's damages and also opine on the business relationship between Defendants.  Defendants seek to exclude these opinions for the reasons discussed herein.

## II.    Standard

Federal Rule of Evidence 702, which controls the admission of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under this rule, the district court must satisfy itself that the testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony. *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018) (citing *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)). The district court must first determine whether the witness is qualified by knowledge, skill, training, experience, or education to render an opinion. *Id.* If so, the district court must determine whether the witness's opinion is reliable by assessing the underlying reasoning and methodology. *Id.* at 1283. The court is not required to admit opinion evidence that is "connected to existing data only by the *ipse dixit* of the expert," and may exclude the opinion if "there is simply too great an analytical gap between the data and the opinion offered." *Id.* (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)). But the rejection of expert testimony is the exception rather than the rule, and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579, 596 (1993).

"The court has discretion to determine how to perform its gatekeeping function under *Daubert*." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2020 WL 1164869, at *3 (D. Kan. Mar. 10, 2020) (citing *Bill Barrett Corp. v. YMC Royalty Co*., LP, 918 F.3d 760, 770 (10th Cir. 2019)). The most common method of fulfilling that role is by conducting a *Daubert* hearing, "although such a process is not specifically mandated." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). In this instance, neither party has requested a *Daubert* hearing. Moreover, the nature of the opinions expressed, the relative completeness of the expert's reports, and the materials cited

in support of and against the challenged opinions lead the court to conclude that the motion can be decided without a *Daubert* hearing.  *Ho v. Michelin N. Am., Inc.*, 520 F. App'x 658, 664 (10th Cir. 2013) (district court permissibly exercised its discretion in ruling without a formal *Daubert* hearing). Should additional *Daubert* issues arise at trial that require further inquiry, the court will determine at that time how to handle them.  *Cf. Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 772 (10th Cir. 2019) ("a judge does not abuse his discretion by conducting a *Daubert* hearing in the presence of the jury through direct examination and voir dire.") (citing *Goebel*, 215 F.3d at 1087).

### III.    Analysis

Plaintiff's expert Ricardo Zayas is a certified public accountant ("CPA") with over 40 years of experience in forensic accounting.  He is a partner at the accounting firm Marcum LLP.  Zayas has several certifications including a CPA, Certified Fraud Examiner ("CFE"), Certified Valuation Analyst ("CVA"), and a certification in financial forensics ("CFF").  (Doc. 265-4.)  He has prior experience as a special agent for the United States Department of Labor, in the Office of Labor Racketeering; as a special agent for the Internal Revenue Service in the criminal investigation division; and, as an accountant/auditor for the United States Department of Defense.  According to his resume, he has extensive litigation experience and has been appointed by federal and state courts to serve in roles such as a receiver, examiner, forensic accountant, and monitor.  (*See id*.)

Plaintiff retained Zayas to opine regarding the operational and fiscal control of Defendant PGX over its subsidiaries, the remaining Progrexion Defendants, and Lexington Law, and to offer opinions regarding Plaintiff's damages.  Zayas submitted a report regarding the business structure, business interactions, and financial transactions between all Defendants.  (Doc. 265-2.)  With respect to this report, Zayas opined that PGX and the Progrexion entities exercised operational and

6

fiscal control over Lexington Law. (*Id.* at 11.) Zayas also submitted two reports regarding Plaintiff's damages. (Doc. 265 at 3.) The second report was an updated calculation and replaced the first damages report. (*Id.*; Docs. 265-3; 343 at 3.)

Defendants now move to exclude Zayas' opinion on the control issue on the basis that it is not reliable because it is not based on a "discernable methodology nor a guiding principle." (Doc. 265 at 3.) Defendants also seek to exclude Zayas' damages opinions on the basis that they are unreliable for various reasons.

In their briefing, Defendants do not take issue with Zayas' qualifications to render his damages opinions. Based on his education and experience, the court finds that Zayas is qualified to testify as to Plaintiff's damages in this case. With respect to his opinion regarding the Progrexion entities' control over Lexington Law, Defendants make minimal argument regarding Zayas' qualifications which is addressed herein. Nevertheless, the court finds that Zayas is also qualified to review Defendants' financial records and to perform cash flow analyses in order to render his control opinion which is based on those records.

### 1. Control Opinion

Defendants argue that Zayas' opinion that the Progrexion Defendants exercised operational and fiscal control over Lexington Law is not reliable because he does not utilize a discernable methodology. Defendants further argue that it is not relevant to the issue before the jury because Zayas does not define control. In response, Plaintiff argues that Zayas' report shows that he "exhaustively reviewed and analyzed numerous relevant and reliable documents" to form his opinion. (Doc. 343 at 4.)

In determining whether an expert's opinion is admissible, the court must satisfy itself that the testimony is both reliable and relevant, in that it will assist the trier of fact. *Schulenberg*, 911

F.3d at 1282.   In order to prove its RICO claim, Plaintiff will be required to show that each Defendant "participated in the operation or management of the enterprise itself."  *George v. Urban Settlement Servs*., 833 F.3d 1242, 1251 (10th Cir. 2016).   The operation and management test requires a defendant to have some part in operating or managing the enterprises' affairs.  *Id.* Although a defendant need not have significant control over the enterprise, evidence of control of an enterprise's operation is relevant to Plaintiff's RICO claims.  *Id.*

Therefore, the question is whether Zayas' opinion is reliable.  Defendants suggest that it is not because Zayas has not employed a methodology in forming his opinion and because he cannot explain the extent of the "operational control" opinion.  (Doc. 265 at 6-8.)

Turning to the report, Zayas states that he inspected and analyzed financial records and other information regarding: 1) the business structure of Lexington Law and the other named Defendants; 2) the business interactions between Lexington Law and the other named Defendants; and 3) the financial transactions (i.e. the flow of funds) between all Defendants.  (Doc. 265-2 at 2.)  The list of documents reviewed by Zayas spans five single-spaced pages.  (Doc. 342-4 at 26-30.)  Zayas reviewed all of the servicing agreements entered into between Defendants regarding the credit repair services provided by Lexington Law.  (*Id.* at 27-28.)  Zayas also reviewed the parties' financial records and thousands of pages of Lexington Law documents that were produced in discovery.   Zayas also reviewed depositions, responses to requests for admissions, and interrogatories.  (*Id.* at 30.)  Zayas stated that his opinions were based on the evaluations of those documents.

After undertaking his review of those documents, Zayas made several findings.  He determined that Lexington Law routinely reports operating losses and that any profits are distributed through the Progrexion entities pursuant to the service agreements.  He further

determined that PGX was highly leveraged and undercapitalized in that its debt far exceeded its equity.  Based on the inspection and analysis of the financial statements, tax returns and other information, Zayas concluded that PGX and the Progrexion entities exercised operational and fiscal control over Lexington Law.  Although John Heath and Eric Kamerath are the holders of the equity interests in Lexington Law, Zayas opined that the evidence does not support a finding that they can exercise independent authority to direct activities of the firm or withdraw profits.  This conclusion is based on the following: 1) PGX made a determination in 2016 that Lexington law was a variable interest entity ("VIE") as defined by applicable accounting guidance, which is an acknowledgement that PGX exercised certain levels of control over Lexington Law; 2) the VIE conclusion was based on the interactions in the service agreements which enable the Progrexion entities to exercise operational and fiscal control over the operations; 3) despite generating more than 75 percent of $900,000,000 of PGX's reported revenue, Heath receives less in compensation than officers in the Progrexion entities; and 4) Lexington law routinely reports operating losses and the profits are distributed to Progrexion pursuant to the service agreements.  (Doc. 265-2 at 11-12.)

Although the report lays out the documents reviewed and states that a financial analysis was performed on Defendants' financial records, Defendants argue that Zayas has not identified his method.  The court disagrees.  Zayas is an expert in accounting.  Zayas has reviewed the financial records and servicing agreements to make an opinion regarding the flow of funds.  Based on that flow of funds, the related servicing agreements, and other evidence in this case, Zayas has determined that the PGX entities exercise operational and fiscal control over Lexington Law. Accountants review financial information in making opinions regarding a company's finances and then explain the impact of that financial information.  *See In re Com. Fin. Servs., Inc*., 350 B.R.

520, 528 (Bankr. N.D. Okla. 2005); *Int'l Adhesive Coating Co. v. Bolton Emerson Int'l Inc.*, 851 F.2d 540, 544-45 (1st Cir. 1988) (finding that business and financial records are typically relied on as a basis for an accountant's expert opinion). In this case, Zayas has opined that a review of all the records shows that the Progrexion entities have operational and fiscal control over Lexington Law. Although Defendants have cited to several cases in an attempt to argue that Zayas has no methodology to arrive at his opinion, Defendants have not cited to any authority that would suggest accountants employ some other methodology other than reviewing financial and business records. Zayas then analyzes those records and determines, based on his experience, which includes being an accountant and fraud examiner, among other roles, that the Progrexion entities exercise operational and fiscal control over Lexington Law. Based on the information before the court, Zayas has employed a methodology that is recognized in the accounting profession. *See id.*; *see also Util. Trailer Sales of Kansas City, Inc. v. MAC Trailer Mfg., Inc.*, 267 F.R.D. 368, 370–71 (D. Kan. 2010) (discussing the admissibility of an accountant's opinion on lost profits). Moreover, Zayas has connected the facts and assumptions he used to the underlying opinion based on the explanation set forth above. Defendants may explore this issue with Zayas on cross-examination.

Defendants further argue that Zayas cannot even define his own opinion regarding control and that the opinion is vague and unsupported by objective guidance. Zayas defines control as who directed where the money could go and states that this standard is used in related party and VIE considerations under accounting principles. (Doc. 265-5 at 154:7-22.) Zayas further explained that in these types of cases, the entity that controls the funds generally will most often control the entity. *Id.* Zayas explained that, under accounting principles,

> the criteria alone for being considered a variable interest entity includes control criteria. So if you're acknowledging that an entity is a variable interest entity, you

are also correspondingly acknowledging that there is a level of control that is exercised over the -- over the entity, and what that control may be could vary from circumstance to circumstance. But it carries -- the acknowledgment carries with it -- or, excuse me, the determination that it's a VIE carries with it that acknowledgment.

(Doc. 342-2 at 148:11-21.)

The court finds that Zayas has sufficiently explained his opinion and the basis for the same. In addition to PGX's acknowledgement that Lexington Law is a VIE, which includes exercising control over the entity, Zayas has also explained how the financial analysis of these Defendants shows that the Progrexion entities exercise control over Lexington law.  In Zayas' opinion, the operational and fiscal control are tied largely based on the service agreements which dictate the operations between the Defendants.  (*Id.* at 167:17-168:9.)  Notably, these services agreements obligate Lexington Law to pay more than $44,000,000 annually to the Progrexion entities and three of those agreements provide that Progrexion can increase the amounts due up to 7 percent at Progrexion's discretion.  (Doc. 342-3 at 7.)

In their reply brief, Defendants argue that Zayas cannot base his control opinion on the VIE determination that he did not personally analyze.  (Doc. 331 at 2.)   In support, Defendants cite to *Beck's Office Furniture and Supplies, Inc. v. Haworth, Inc*., 94 F.3d 655 (Table), 1996 WL 466673, *7 (10th Cir. Aug. 16, 1996).   In that case, the witness testified on the value of the company based on a report valuing the business but the witness did not do an independent evaluation.  The witness, however, admitted that the report was unreliable and without the report he could not have provided any figure for the value.  The court found it was an abuse of discretion to admit the testimony.  In doing so, the Tenth Circuit noted that an expert is allowed to rely on hearsay and even on the opinions of others when the conclusions are in the record. *Id.*  Here, Zayas

has relied on an audit performed by KPMG.  Defendants do not argue that the audit was unreliable and inadmissible.  Defendants' arguments are not persuasive.

Moreover, Zayas has not simply parroted the opinion that Lexington Law is a VIE because of the audit.  Rather, Zayas' opinion is that the Progrexion entities exercised control over Lexington Law.  That opinion is based, in part, on the evidence that PGX has acknowledged that Lexington Law is a VIE, which, under accounting principles, is a recognition that PGX exercises a controlling interest over the fiscal operations of Lexington Law through the service agreements. Zayas does not have to independently make the determination of whether Lexington Law is a VIE because he is not parroting that opinion.  Rather, he is using PGX's corporate records to support his determination that the Progrexion entities exercise control over Lexington Law.  Again, Defendants make no argument regarding the reliability of the audit performed by KPMG.

Defendants further argue that Zayas ignored evidence of Lexington Law's control over its own operations.  (Doc. 265 at 8-9.)  This argument goes to the weight of the evidence and not its admissibility.  There are facts in the record that support Zayas' opinion as identified in his report. Moreover, Zayas has not opined that the Progrexion entities exercised complete control over Lexington Law.

Although Defendants do not directly attack Zayas' qualifications, two stray sentences in their brief state he is not an expert on corporate governance and has no experience in the credit repair industry.  (Doc. 265 at 8.)  Zayas' opinions are based on accounting and economic principles and his experience as a forensic accountant.  Defendants have not explained why Zayas must have expertise in corporate governance to testify as to his opinions which are based on a review of the financial documents and depositions in this case.  Moreover, Defendants make no persuasive argument that he must have experience in the credit repair industry to offer his opinions in this

case.  *See Util. Trailer Sales of Kansas City, Inc*., 267 F.R.D. at 370–71.  The court has already determined that Zayas is qualified to give these opinions and these arguments do not persuade the court otherwise.

Defendants' motion to exclude Zayas' control opinion is denied.

### 2.  Cost Damages

Next, Defendants move to exclude Zayas' opinions on Plaintiff's costs in responding to the correspondence at issue.  According to Zayas's report, Plaintiff sustained damages by responding to thousands of dispute letters "which purported to have been prepared and submitted by individual 'consumers.'"  (Doc. 265-3 at 10.)   When preparing his report, Zayas assumed that Lexington Law functioned as a CRO and, as such, Plaintiff would not have had an obligation to respond to the dispute letters.  (Doc. 342-2 at 188:17-189:13.)   Zayas opined that Plaintiff incurred the following costs in responding to the thousands of dispute letters: payment of additional employee salaries; lost collection revenue for debts that are disputed; lost collection revenue for files that are recalled by clients after being disputed; postage paid to mail responses; costs incurred with Plaintiff's letter vendor; personnel and transaction costs of responding to electronic disputes; and counsel fees.  (Doc. 265-3 at 11.)  The damages are broken down in the following categories: 1) Ad Astra Personnel Time; 2) Ad Astra Processing Costs; 3) eOscar Personnel Time; 4) eOscar Disputes; 5) Post May 2018 Estimated Loss; and 6) Lost Commissions.  (*Id.* at 19.)   The first two categories include responding to the 594,117 letters between 2014 and May 2018.  The next two categories include costs in responding to the electronic disputes.  The fifth category includes costs in responding to dispute letters received after May 2018.  The last category includes loss of collections and commissions due to Plaintiff's inability to collect on those debts after they were

disputed by Lexington Law.  The first five categories are referred to in the briefing as the cost damages and the last category is the commission damages.

In calculating the amount of personnel time for processing the dispute letters, Zayas reviewed a written narrative of the process that Plaintiff's personnel conducted to process the letters and also observed that process.  (Docs. 265-3 at 13; 342-2 at 54-56.)  The process is outlined in Zayas' report.  Based on the narrative and the observation, Zayas determined that the processing of each dispute results in six minutes of personnel time.  Zayas then calculated the personnel cost based on the average wage rate of $11.80 per hour.  (Doc. 342-4 at 80.)  In calculating Plaintiff's damages for personnel costs to process the 594,117 dispute letters through May 2018, Zayas multiplied the total letters times six to calculate the total minutes as 3,564,702.  Zayas then determined that there was a total of 59,412 hours utilized in responding to the letters for a total wage cost of $700,797.00.  (*Id.*)

Zayas' report also states that some disputes require the involvement of compliance personnel to address some issues.  Zayas states that 10-20% of consumer dispute letters required involvement of compliance personnel and that the time expended by compliance personnel was in addition to the six minutes that would be expended in processing the dispute letter.  Zayas then calculated that compliance personnel would be involved in 15% of the dispute letters, for a total of 89,118 letters.[1]   (Doc. 342-4 at 80.)  Zayas' table also shows that the time spent by the compliance personnel on each dispute was an additional 2 minutes.  (Doc. 265-3 at 15.)  Based on

---

[1] There is an error in the body of the report regarding the number of dispute letters involving compliance personnel. The body of Zayas' report states that the number was 118,823, which is equal to 20 percent of the total dispute letters (594,117).  (Doc. 342-4 at 15.)  Attachment 5, that is referenced in the report as a basis for his opinion, however, states that the number of letters is 89,118, which is 15 percent of 594,117.  (Doc. 342-4 at 80.)  This does not affect the damages calculation, however, because the damages calculation in the body of the report corresponds with the calculation in the attachment.

the same wage calculation, Zayas determined that the damages for the compliance personnel time was $35,053 for the dispute letters that were sent prior to May 2018.

Zayas has also calculated Plaintiff's costs in processing dispute letters that were sent after May 2018.  (Doc. 265-3 at 16.)  Zayas determined that the damages for processing 190,863 dispute letters resulted in damages of $225,135 of wages for personnel and $11,261 of wages for compliance personnel.  (*Id.*)  For both groups of dispute letters, Zayas also included damages for the direct mail cost calculated at $.53 per dispute letter.  In addition, Zayas calculated an overhead rate to the total excess personnel costs.  This burden was determined to be 31 percent of the overall personnel cost and comprised of "the average cost of medical insurance for an entry level employee and the employer contribution for FICA [and] Medicare taxes."  (*Id.* at 15.)

With respect to the e-disputes, Zayas applied a five minute processing time and an estimated cost of $.30 per e-dispute to arrive at a total cost of $882,574.[2]  In calculating the amount of time to process an e-dispute, Zayas testified that his estimation was based on discussions with Plaintiff's personnel who indicated that it took less time to process these disputes.  (Doc. 265-5 at 93:15-94:3.)  Zayas did not observe Plaintiff's personnel processing an e-dispute.  Zayas testified that the same process is involved in processing an e-dispute but that they do not have to process the disputes on paper.  (*Id.* at 94:15-95:10.)  As a result, Zayas discounted the response time on the e-disputes by one minute.  (*Id.* at 93:19-94:3.)

First, Defendants seek to exclude Zayas' entire damages opinion on the basis that it is based on facts or assumptions that are refuted by the evidence.  (Doc. 265 at 3.)  Defendants argue that "the evidence clearly establishes that if Lexington Law had identified itself as the source of the

---

[2] On page 19 of Zayas' report, the total damages for e-disputes amount to $882,574.  (Doc. 265-3 at 19.)  This number is also reflected in attachment 5 to his report.  (Doc. 342-4 at 80.)  However, on page 12 of his report, he states that the damages relating to electronic disputes is $893,795.  (Doc. 265-3 at 15.)  This number is not repeated in the report. It appears it is an error as the final graph in the report shows these damages to be $882,574.  (*Id.* at 19.)

letters, Plaintiff would have treated them as an 'attorney dispute.'" (*Id.* at 11.)  Relying on deposition testimony by Plaintiff's corporate representative, Defendants argue that Plaintiff responds to all attorney disputes so therefore Plaintiff would have responded to the disputes if they had arrived with the Lexington Law letterhead.

Defendants made this same argument regarding Plaintiff's damages on summary judgment. The court determined that it was a question for the jury.  (Doc. 363 at 22-23.)  In that same regard, if the jury believes that Plaintiff would have responded to the several hundred thousand dispute letters if it had known that they came from Lexington Law, then the jury can find that Plaintiff incurred no damages as there is evidence that Plaintiff takes the same amount of time, if not longer, in responding to attorney disputes.  Zayas' opinion is not unreliable as there are sufficient facts that lend support to Zayas' assumption - that Plaintiff would not have responded to letters from Lexington Law because it is a CRO as discussed in this court's previous order.  (*Id.*)

Next, Defendants argue that his analysis regarding Plaintiff's costs is premised on unsupported conjecture.  Defendants first point to Zayas' estimation regarding the amount of time it takes Plaintiff's personnel to respond to e-disputes.  Defendants assert that Zayas' estimate of five minutes is based on pure conjecture because he did not observe Plaintiff's personnel or conduct a time study.  Based on his deposition testimony, Zayas gave a sufficient explanation for coming to the five minute estimate.  However, Zayas' opinion as to the total amount of damages is not relevant after this court's decision on summary judgment.  With respect to e-disputes, the only remaining issue with respect to the alleged scheme to defraud is whether Lexington Law submitted e-disputes that included misrepresentations regarding the accuracy of the debt.  (*Id.* at 24-25.)  This court ruled that Plaintiff did not establish a dispute of fact regarding a scheme to defraud involving "Lexington Law's status as a reseller and its contracts with the Bureaus." (*Id.* at

24.)  Zayas' opinion regarding damages pertaining to e-disputes are premised on Lexington Law's conduct in concealing its identity in transmitting the electronic disputes.  (*See* Doc. 265-3.)  As such, Zayas has calculated damages based on every e-dispute submitted by Lexington Law.  Zayas has not opined on the damages in responding to e-disputes that include misrepresentations regarding the validity of the debt.  The *Daubert* inquiry asks in part whether an expert's opinion will help the jury understand the evidence or determine a fact in issue -- a condition that "goes primarily to relevance." *Daubert,* 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Id.* (citation omitted).  Zayas' total damages opinion regarding Plaintiff's damages in responding to all of the e-disputes it received from Lexington Law is not relevant to the remaining issues in the case.   Therefore, it is not helpful to the jury and will not be admitted.[3]

Defendants also argue that Zayas' estimate regarding the extra cost for compliance personnel in handling the mailed disputes is not supported by the evidence.  (Doc. 265 at 14.)  In support, Defendants cite to the testimony of Plaintiff's corporate representative who testified that compliance personnel assist when there is a high volume of disputes, testifying that "compliance will essentially act as an overflow to make sure that we're getting them handled."  (Doc. 265-7 at 523:14-23.)   Therefore, Defendants argue, Zayas' report that compliance personnel time is in addition to regular personnel time is not supported by the evidence. In response, Plaintiff merely states that "there is no reason why compliance personnel cannot be involved in responding to 10 to 20 percent of consumer dispute letters."  (Doc. 342 at 15.)  But that is not Defendants' position. Rather, Defendants argue that there is no evidence to support Zayas' opinion that the compliance

---

[3] As discussed, Zayas has not offered an opinion regarding damages due to misrepresentations in the e-disputes regarding the validity of the debt.  Should Plaintiff present evidence at trial regarding such e-disputes, the court will consider at that time whether Zayas may opine as to Plaintiff's damages as a result of those e-disputes.

personnel spend an extra 2 minutes in addition to the time spent by other personnel in processing the dispute letters. Plaintiff offers no argument as to why this additional damage calculation is supported by evidence in the record.

Based on a review of the evidence, there is no support for Zayas' determination that compliance personnel are engaged in a review of dispute letters that results in additional time beyond that of the typical processing time. The evidence is that compliance personnel will assist with processing the dispute letters when there is an influx of letters. Therefore, the calculation of damages for compliance personnel which is in addition to the damages already calculated for the processing of the dispute letters is not based on facts that are present in the case and, as a result, that opinion is not reliable. *Conroy v. Vilsack*, 707 F.3d 1163, 1170 (10th Cir. 2013).

Finally, Defendants seek to exclude all of Zayas' remaining personnel and processing cost damages calculations on the basis that the opinions are "riddled with unsupported figures and contradicted by the evidence." (Doc. 265 at 14.) The court has not made such a finding. Rather, the court has determined that the calculation as to the costs for compliance personnel is not reliable. This calculation can be extracted from Zayas' opinion as Zayas has clearly identified the different categories of damages in his report. As to the opinion regarding e-disputes, the court has determined that it is not relevant due to the summary judgment determination. Except for their arguments disposed of herein, Defendants do not seriously challenge Zayas' cost opinions as to the personnel time to respond to the mailed dispute letters, the cost to mail responses, and the overhead burden. Based on Zayas' qualifications as an accountant and his detailed explanation as to how he arrived at those calculations, the court finds that Zayas may offer these opinions during trial.[4] These opinions are based on assumptions that have sufficient evidentiary support to pass

---

[4] With respect to the opinions regarding the cost of overhead in processing the dispute letters, Zayas must provide updated calculations and can only offer an opinion regarding overhead costs with respect to support personnel costs.

the admissibility threshold.  *See BC Tech., Inc. v. Ensil Int'l Corp.*, 464 F. App'x 689, 704 (10th Cir. 2012) (damages calculations satisfy Rule 702 even if based on disputed facts); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### 3.  Commission Damages

Zayas has offered an opinion regarding the collections that Plaintiff allegedly lost due to the disputes sent by Lexington Law.  As discussed, Plaintiff collects debts for its clients.  In collecting those debts, Plaintiff receives commissions which equal approximately 30 percent of the collections.  Zayas has opined that Plaintiff has been damaged by Defendants' conduct in that Plaintiff did not collect payments on debts owed its clients due to Defendants' actions in sending dispute letters.  Zayas' report details how he came to his opinion regarding the commission damages.  Zayas explains that debts are more difficult to collect with the passage of time and that Lexington Law "routinely submitted second and third disputes to" Plaintiff on behalf of its customers.  (Doc. 265-3 at 16.)  Each initial dispute delays collection activity for up to thirty days and subsequent disputes further delay collection efforts.  As discussed in the summary judgment decision, Plaintiff stops collection efforts on debt that is the subject of a consumer dispute.

In order to calculate these damages, Zayas collected data from Plaintiff's operations to determine the actual collections obtained by Plaintiff.  At the time the data was collected, Plaintiff had data dating back to September 2016.  Reports were generated to determine the average outstanding balance of debt owed and the actual collections during the time period of September

---

His opinion regarding overhead burden damages is based on a calculation of overhead cost at 31 percent of the cost of wages for both support personnel and compliance personnel.  (Doc. 265-3.)  The court has determined that his opinion regarding compliance personnel costs is unreliable and cannot be a basis for calculating overhead.

2016 through September 2019.  (*Id.* at 17.)  The data was compiled for two groups: consumer

clients of Lexington Law and all other accounts, which was referred to as "Ad Astra" in the report.

After compiling the data, it was determined that the liquidation rate - the percent collected on the

average outstanding balance - for Lexington Law consumer clients (2.717%) was 34 percent less

than for all other accounts serviced by Plaintiff in which disputes were submitted (4.120%).  Zayas

then determined that Plaintiff's lost collections during that time period amounted to $1,268,406.

Had Plaintiff recovered those collections, Plaintiff would have been paid commissions of $380,480

from those accounts.  (*Id.* at 18.)  Zayas then took the difference in the rates (4.120 - 2.717) to find

the historic difference of 1.403 percent and applied that amount to the average outstanding balance

for Lexington Law consumer accounts during 2014, 2015, and 2016 to determine the total loss of

commissions for the entire time period to be $535,860.  (*Id.*)

Defendants argue that Zayas' methodology for estimating the lost commissions is

unreliable.  Defendants first argument is easily disposed of.  Defendants again argue that Plaintiff

did not suffer any damages on lost commissions because Plaintiff would have suspended collection

on these accounts even if it knew that Lexington Law sent the dispute letters instead of the actual

consumer.  Again, Defendants can make this argument to the jury.

Defendants also argue that Zayas' opinion is not relevant to the issue before the court

because Zayas' pool of all other disputed accounts include disputes from consumers, attorneys,

and CROs.  Zayas explained that he compared both groups of accounts because it was a more

appropriate comparison in that they all had submitted disputes regarding their debt.  (Doc. 342-2

at 31:16-32:10.)  Defendants essentially argue that Zayas should have instead compared the

collection rates of Lexington Law clients to those of consumers who were represented by an

attorney.  (Doc. 265 at 16.)  While Defendants continue to maintain that Plaintiff would have

treated its letters as attorney letters, Plaintiff maintains that it would have treated the dispute letters as coming from a CRO and not conducted an investigation and, presumably, continued collecting on the debt.

Defendants' argument is insufficient to warrant excluding Zayas' opinion regarding lost commissions. Zayas has provided a basis for comparing the two groups and he has relied on Plaintiff's records regarding collections on all accounts that had disputes. The court finds that Zayas' method is sufficiently sound. *See BC Tech., Inc.*, 464 F. App'x at 704 ("If the calculations upon which the loss of profits are based are estimated in any reasonable way and the underlying assumptions on which the [expert] relied are not without support in the record, the calculations may be upheld as a valid means of measuring loss of profits.") (quotation omitted). Defendants can cross examine Zayas on this issue.

**IV.     Conclusion**

Defendants' motion to exclude the opinions of Plaintiff's expert is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.  Dated this 25th day of March  2021.

__ s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE
